**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JAN 1 3 2005

**FILED**

JAN 1 0 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| ALPHONSE L. PEREZ and DOUGLAS G. PHILLIPS individually and on behalf of all others similarly situated | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO.: 02C7884 |
| | ) | Honorable: Rebecca R. Pallmeyer |
| RADIOSHACK CORPORATION | ) ) | |
| Defendant. | ) ) | |
| | ) ) ) | <u>**COLLECTIVE CLASS ACTION**</u> <u>**[29 U.S.C. §216(b)]**</u> |

<u>**NOTICE OF FILING**</u>

TO:     SEE ATTACHED SERVICE LIST

**PLEASE TAKE NOTICE** that on January 10, 2005, the attached PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT was filed with the U.S. District Court for the Northern District of Illinois at the Dirksen Federal Court Building, 219 South Dearborn Street, Chicago, Illinois.

One of the Attorneys for Plaintiff

<u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned, certify that a copy of the foregoing notice and attached were served upon the above-named attorneys of record on this 10th day of January, 2005, by: [ ] hand-delivery; [ ] facsimile; [X] and/or by placing a copy in pre-paid envelope and depositing the same in the U.S. Mail.

*Aurora Sanchez*

SUBSCRIBED AND SWORN TO
BEFORE ME THIS 10th DAY OF
JANUARY, 2005.

*Pamela Kilby*
NOTARY PUBLIC

**TOUHY & TOUHY, LTD.**
ATTORNEYS AT LAW
161 NORTH CLARK STREET
SUITE 2210
CHICAGO, ILLINOIS 60601
(312) 372-2209
(312) 456-3838 Fax
TOUHYLAW.COM
ATTORNEY CODE
No. 38699

**"OFFICIAL SEAL"**
Pamela Kilby
Notary Public, State of Illinois
My Commission Exp. 05/21/2005

268

## SERVICE LIST
*Perez. et. al. v. RadioShack Corporation*
*CASE NO.: 02 C 7884*

Robert S. Brewer, Jr., Esq.
James S. McNeill, Esq.
MCKENNA LONG & ALDRIDGE LLP
750 B Street-Symphony Towers
Suite 3300
San Diego, California 92101
Tel:    (619) 595- 5400
Fax:    (619) 595-5450

James S. Whitehead, Esq.
Michael B. Segall, Esq.
SIDLEY, AUSTIN, BROWN & WOOD LLP
Bank One Plaza
10 South Dearborn Street
Suite 2591
Chicago, Illinois 60603
Tel:    (312) 853 - 7000
Fax:    (312) 853 - 7036

Robert W. Thompson, Esq.
CALLAHAN, MCCUNE & WILLIS LLP
111 Fashion Lane
Tustin, California 92780
Tel:    (714) 730 - 5700
Fax:    (714) 730 - 1642

1  ROBERT W. THOMPSON, ESQ. (SBN 106411)
   **CALLAHAN, McCUNE & WILLIS, APLC**
2  111 Fashion Lane
   Tustin, California 92780-3397
3  Tel:   (714) 730-5700
   Fax:   (714) 730-1642
4
   Attorneys for Plaintiffs,
5      **ALPHONSE L. PEREZ and DOUGLAS G. PHILLIPS individually, and on behalf**
   **of all other similarly situated**
6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE NORTHERN DISTRICT OF ILLINOIS

10                             EASTERN DIVISION

11

12  ALPHONSE L. PEREZ and DOUGLAS G.          )  Case No.:  02-C7-884
    PHILLIPS individually, and on behalf of all  )
13  other similarly situated,                  )  JUDGE: Honorable Rebecca R. Pallmeyer
                                               )  Room 2119
14                                             )
                 Plaintiffs,                   )
15                                             )  **PLAINTIFFS' MEMORANDUM OF LAW**
           vs.                                 )  **IN SUPPORT OF MOTION FOR**
16                                             )  **PARTIAL SUMMARY JUDGMENT**
    RADIOSHACK CORPORATION,                    )
17                                             )  **[Filed concurrently with: MOTION;**
                 Defendants.                   )  **STATEMENT OF UNDISPUTED**
18                                             )  **MATERIAL FACTS]**
                                               )
19                                             )  **COLLECTIVE CLASS ACTION**
                                               )  **[29 U.S.C. §216(b)]**
20  _____ )

21
         COMES NOW Plaintiffs and file the following Memorandum of Law in Support of their
22
    Motion for Partial Summary Judgment.
23

24

25

26

27

28

                                    - i -

# TABLE OF CONTENTS

I. Introduction.................................................................................................................iii

II. Standard for Granting Partial Summary Judgment..................................................1

III. The Fair Labor Standards Act....................................................................................1

IV. Class Members Are Entitled to Judgment Because They Do Not Regularly and
Customarily Supervise at Least Two Full-time Employees .......................................3

    A.    Supervision Must be of "Two or More Employees" ...........................................3

    B.    Supervision Must be "Customarily and Regularly." ..........................................5

    C.    RadioShack's Arguments for Interpretations More Favorable to its Position Are
Contrary to Accepted Legal Standards...............................................................7

    D.    At Least 1521 Class Members Do Not Customarily and Regularly Supervise Two or
More Full-time Employees, or their Equivalent.................................................9

V. The Applicable Statutory Period Is Three Years .....................................................10

    A.    RadioShack Knew it Was Violating the FLSA When it Failed to Pay Overtime Wages
to Managers Who Supervised Fewer than Two Full-time Employees....................11

    B.    RadioShack Acted with Reckless Disregard When it Failed to Pay Overtime Wages to
Managers Who Supervised Fewer than Two Full-time Employees. ......................12

VI. Plaintiffs Are Entitled to Liquidated Damages.......................................................13

VII. Plaintiffs Are Entitled to Attorneys' Fees and Costs...............................................15

VIII. Conclusion...............................................................................................................15

**TABLE OF AUTHORITIES**

1

2  **Cases**

3  *A. H. Phillips, Inc. v. Walling* (1945) 324 U.S. 490 ...........................................................9

4  *Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242.....................................................1,11

5  *Arnold v. Ben Kanowsky, Inc.* (1960) 361 U.S. 388 .......................................................2,8

6  *Auer v. Robbins* (1997) 519 U.S. 452...........................................................................2,6,8

7  *Bankston v. Illinois*, (7th Cir., 1995) 60 F.3d 1249 ....................................................10,14

8  *Castro v. Chi. Hous. Auth.* (7th Cir. 2004) 360 F.3d 721 ...............................................14

9  *Celotex Corp. v. Catrett* (1986) 477 U.S. 317 ..................................................................1

10  *Corning Glass Works v. Brennan* (1974) 417 U.S. 188 ....................................................2

11  *Herman v. Harmelech*, (D. Ill. 2000) 2000 U.S. Dist. LEXIS 5523 ...................................4

12  *Holly Farms Corp. v. Nat'l Labor Rels. Bd.* (1996) 517 U.S. 392 .....................................8

13  *Klein v. Rush-Presbyterian-Saint Luke's Medical Ctr.* (7th Cir., 1993) 990 F.2d 279......................2

14  *Mareau v. Klevenhagen* (1993) 508 U.S. 22 ....................................................................8

15  *McLaughlin v. Richland Shoe Co.* (1988) 486 U.S. 128 ................................................10

16  *Mitchell v. Kentucky Finance Co.* (1959) 359 U.S. 290....................................................9

17  *Murray v. Stuckey's* (8th Cir. 1995) 50 F.3d 564............................................................4,5

18  *Secretary of Labor v. Daylight Dairy Products, Inc.* (1st Cir. 1985) 779 F.2d 784...................3,5

19  *Walton v. United Consumers Club* (7th Cir., 1986) 786 F.2d 303 ...................................14

20

**Statutes**

21  29 U.S.C. § 216...............................................................................................................13

22  29 U.S.C. § 255...............................................................................................................10

23  29 U.S.C. § 260...............................................................................................................14

24  29 U.S.C. 207.....................................................................................................................1

25  29 U.S.C. 213..................................................................................................................1,3

26  29 U.S.C. 216(b)..............................................................................................................15

27

28

1

**Regulations**

2    29 C.F.R. § 541.1(f)........................................................................................2,3

3    29 C.F.R. § 541.105(a) ....................................................................................3

4    29 C.F.R. § 541.107(b) ....................................................................................5

5    5 C.F.R. § 104................................................................................................10

6    69 Fed. Reg. 22135 (April 23, 2004)..............................................................4

7    Fed. R. Civ. Proc. R. 56.................................................................................1

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF LAW

## I.    INTRODUCTION

Plaintiffs are moving for partial summary judgment on the issue of liability for class members who were misclassified as exempt and denied overtime wages because they did not customarily and regularly supervise two or more employees as required by the exemption. Because this is one of the two requirements of the exemption and the facts are not in dispute, this issue is appropriate for summary judgment. Further, as the Court commented, it would not be "fair to hold people who are clearly entitled to benefits under the Fair Labor Standards Act hostage to others who may or may not be and for whom will require a lengthy determination process." (Court Transcript, June 2, 2004, Page 10:14-17.) Thus, Plaintiffs now move for summary judgment for those 1521 class members who clearly do not meet the exemption.

## II.    STANDARD FOR GRANTING PARTIAL SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56, subdivisions (a) and (c), provide that a claimant is entitled to partial summary judgment on the issue of liability where there is "no genuine issue as to any material fact and [the claimant] is entitled to a judgment as a matter of law." To determine whether a genuine issue of material fact exists, the court does not weigh the evidence or determine the truth of the matters asserted. (*Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505.) The opposing party may not rest on the pleadings but must demonstrate through specific factual evidence that there is a genuine issue of material fact in order to defeat summary judgment. (*Celotex Corp. v. Catrett* (1986) 477 U.S. 317, 324, 91 L. Ed. 2d 265, 106 S. Ct. 2548.) Unless a reasonable jury could find for the nonmoving party, summary judgment must be granted. (*Anderson*, 477 U.S. at 249.)

## III.    THE FAIR LABOR STANDARDS ACT

The Fair Labor Standards Act ("FLSA") provides that all employees must be compensated for any hours worked in excess of 40 per week at a rate of no less than one and one-half times their regular rate of pay. (29 U.S.C. 207.) The FLSA also creates limited exemptions to this general rule. (29 U.S.C. 213.) In this lawsuit, Plaintiffs bear the burden of

1   proving only that the FLSA applies, that they worked for RadioShack more than 40 hours in a

2   week, and that they were not paid overtime compensation.

3         RadioShack does not dispute that the FLSA applies or that the class worked overtime and

4   were not paid overtime wages. Instead, RadioShack has asserted the "Executive" exemption as

5   an affirmative defense, for which it bears the burden of proof. "The employer bears the burden

6   of proving the application of an exemption." (*Klein v. Rush-Presbyterian-Saint Luke's Medical*

7   *Ctr.* (7th Cir., 1993) 990 F.2d 279, 283 (*citing Corning Glass Works v. Brennan* (1974) 417 U.S.

8   188, 196-97).) Moreover, "FLSA **exemptions are to be 'narrowly construed** against . . .

9   employers' and **are to be withheld except as to persons 'plainly and unmistakably within**

10   **their terms and spirit**.'" (*Auer v. Robbins* (1997) 519 U.S. 452, 462, 117 S. Ct. 905, 137 L. Ed.

11   2d 79 (citing *Arnold v. Ben Kanowsky* (1960) *Inc.*, 361 U.S. 388, 392, 4 L. Ed. 2d 393, 80 S. Ct.

12   453)(emphasis added).)

13         The Executive exemption asserted by RadioShack can be met either through a "long test"

14   where the employees earn less than $250 per week, or a "short test" where the employees earn

15   $250 or more per week. (29 C.F.R. § 541.1(f); [29 C.F.R. 541.104].) [1] The short test is

16   applicable here, as all class members earn at least $250 per week. In order to be considered

17   exempt from overtime as an executive under the short test: (1) the employee's primary duty

18   must consist of "the management of the enterprise in which the employee is employed or of a

19   customarily recognized department or subdivision thereof;" and (2) the employee's primary duty

20   must include "the customary and regular direction of the work of two or more other employees

21   therein." (29 C.F.R. § 541.1(f); [29 C.F.R. § 541.100].) This motion addresses employees who

22   fail to meet the second prong of the exemption.

23

24

25

26

---

27   [1] The Department of Labor regulations were amended effective September 23, 2004, but the requirement

28   of supervising two or more employees remains. Citations throughout will be to the pre-amended
    regulations with parallel citations to the regulations as amended in brackets

## IV.  A SUBSTANTIAL NUMBER OF CLASS MEMBERS ARE ENTITLED TO JUDGMENT BECAUSE THEY DO NOT REGULARLY AND CUSTOMARILY SUPERVISE AT LEAST TWO FULL-TIME EMPLOYEES

The Executive exemption created in 29 U.S.C. § 213 is expanded upon in regulations promulgated by the Department of Labor.  Department of Labor regulations provide that to be exempt as an Executive, the employee's management duties must include "the customary and regular direction of the work of two or more other employees therein." (29 C.F.R. 541.1(f); [29 C.F.R. 541.100(a)(3)].)  This requirement has two components requiring further definition.  The first is "customary and regular," the second is "two or more other employees."

### A.  Supervision Must Be of "Two or More Employees"

The first phrase requiring further definition is, "two other employees."  The Code of Federal Regulations states:

> An employee will qualify as an "executive" under § 541.1 only if he customarily and regularly supervises at least two full-time employees or the equivalent. For example, if the "executive" supervises one full-time and two part-time employees of whom one works morning and one, afternoons; or four part-time employees, two of whom work mornings and two afternoons, this requirement would be met. (29 C.F.R. § 541.105(a); [see also 29 C.F.R. § 541.104].)

There is a simple and well-accepted bright line test for determining whether the "executive" is supervising two or more employees – the 80 hour rule.  The court in *Secretary of Labor v. Daylight Dairy Products, Inc.* (1st Cir. 1985) 779 F.2d 784, discussed this specific issue and held that if a manager supervises any combination of employees whose total combined hours equal or exceed 80, the manager supervises the equivalent of two full-time employees.  (*Id.* at 787.)  The Court's discussion in *Daylight Dairy* is concise, logical, based on sound authority, and well-reasoned:

> In its Field Operations Handbook, the Department's Wage-Hour Division has established a bright-line rule: **The equivalent of two full-time employees working 40-hour weeks is any number of part-time employees, as long as the total number of hours supervised exceeds 80.**  For example, four persons each working 25 hours per week satisfy the requirement, because the hours supervised total 100. A district court has accepted the 80-hour rule. See *Marshall v. Hudson Stations, Inc.*, 86 Lab. Cas. (CCH) P 33,813 (D. Kan. 1979).  The employer argues that, because four part-time employees require more supervision than two full-time employees, managers who supervise four or more employees should be subject to exemption even if they supervise fewer than 80 person-hours. No

1   doubt four employees need more coordinating than two. **We conclude**
    **nevertheless that the 80-hour rule is reasonable: it is easy to apply and allows**
2   **employers to be confident that they are complying with the statute.** *Id.*
    (emphasis added).

3   The Eighth Circuit also recognizes that 80 hours is the standard. (*Murray v. Stuckey's* (8th

4   Cir. 1995) 50 F.3d 564, 568-569.)

5   Even after recently making major revisions to the regulations, the Department of Labor

6   rejected comments and requests of clarification of the term "full-time." In the Preamble to the

7   newly enacted regulations, it states:

8       The Department does not believe additional clarification is necessary, and stands
        by its current interpretation that an exempt supervisor generally must direct a total
9       of 80 employee-hours of work each week. As the Wage and Hour Division's
        Field Operations Handbook (FOH) states, however, circumstances might justify
10      lower standards. For example, firms in some industries have standard workweeks
        of 37 1/2 hours or 35 hours for their full-time employees. In such cases,
11      supervision of employees working a total of 70 or 75 hours in a workweek will
        constitute the equivalent of two full-time employees.
12      69 Fed. Reg. 22135 (April 23, 2004).

13  Significantly, the Department also rejected a request that the Department clarify the term

14  "full-time" to include a statement that the term should be defined by the employer's practices.

15  (*Id.*)

16  Moreover, the district court for the Northern District of Illinois, Eastern Division, has

17  accepted the 80-hour rule: "Sensibly, the Department of Labor has interpreted the "equivalent" to

18  two full-time employees as any combination of part-time employees collectively working at least

19  80 hours per week. [Citations.] The 80-hour rule has been upheld by the courts as reasonable.

20  [Citations.]" (*Herman v. Harmelech*, (D. Ill. 2000) 2000 U.S. Dist. LEXIS 5523, 19-20.)

21  Here, there are no unusual circumstances that might justify any deviation from the clear,

22  unambiguous, easy-to-apply rule that the equivalent of two full-time employees is 80 hours.

23  RadioShack stores are open much more than 40 hours per week and employees are routinely

24  scheduled to work eight-hour shifts and longer. (*See* Store Operating Manual (2001) § IV(G),

25  attached hereto as Exhibit 3; *see also* District Sales Manager Training Manual (2003) § G,

26  attached hereto as Exhibit 4.)

27

28

- 4 -

1   Therefore, 80 hours is the cutoff for determining which class members did not supervise
2   two or more employees.

### B. Supervision Must Be "Customarily and Regularly."

4   The phrase "customarily and regularly" from the statute was clarified by 29 C.F.R. §
5   541.107(b), which used the same phrase with respect to an employee's exercise of discretionary
6   powers. Section 541.107(b) stated:

7   > The phrase "customarily and regularly" signifies a frequency which must be
    > greater than occasional but which, of course, may be less than constant. The
8   > requirement will be met by the employee who normally and recurrently is called
    > upon to exercise and does exercise discretionary powers in the day-to-day
9   > performance of his duties. The requirement is not met by the occasional exercise
    > of discretionary powers.
10  > (29 C.F.R. 541.107(b); *see also* 29 C.F.R. 541.701].)

11  The meaning of "customarily and regularly" however, has been even further defined
12  through case law directly on point. The court in *Secretary of Labor v. Daylight Dairy Products,*
13  *Inc.* (1st Cir. 1985) 779 F.2d 784, focused on the percentage of time the managers actually spent
14  supervising employees in order to define the phrase "customarily and regularly". *Daylight*
15  *Dairy,* like the instant case, involved a claim for unpaid overtime wages for retail store
16  managers. There, the managing employees supervised the equivalent of two full-time employees
17  no more than 76% of the time and the court ruled that 76% fell short of being "customary and
18  regular" supervision of 80 hours of work. (*Id.* at 788.) Consequently, binding precedent
19  establishes that the standard for "customary and regular" in this context is something **more** than
20  76% of the time.

21  Subsequent to *Daylight Dairy*, this issue was addressed again in *Murray v. Stuckey's Inc.*
22  (8th Cir. 1995) 50 F.3d 564. There, the court held that employees who supervised two or more
23  full-time employees 98.2% of the time did so "customarily and regularly." The court in *Murray*
24  *v. Stuckey's* was not faced with employees who supervised two other people less than 98% of the
25  time, but in dictum, the Court indicated that it might find 76% to be customary and regular were
26  that issue before it. (*Id.* at 568.) There is no legal precedent for permitting the application of the
27  executive exemption to managers who supervise two other employees less than 76% of the time.
28  The standard announced in *Daylight Dairy* has been accepted in the 7th Circuit in the

1  unpublished *Jackson v. Go-Tane Servs.*, 56 Fed. Appx. 267, 272 (7th Cir. 2003). There, the

2  Appellate Court stated that a carwash supervisor did **not** "customarily and regularly" supervise

3  two full-time employees where the employees only worked their full time schedule less than the

4  76% mark the Court in *Daylight Dairy* held was too low. Critically, the court cited *Daylight*

5  *Dairy* for its reasoning, thereby affirming that managers must supervise two or more full time

6  employees or the equivalent at more than 76% of the time in order to meet the exemption. While

7  this case is unpublished and does not serve as legal authority, it does provide valuable insight

8  into the current thinking of the federal Circuit where this case is pending, and demonstrates the

9  Circuit's apparent willingness to accept the *Daylight Dairy* standard that supervision 76% of the

10  time is insufficient.

11       In summary, all of these cases on point establish that supervision of two or more full-time

12  employees 76% of the time is not sufficient to be "customary and regular," while 98%

13  supervision will suffice. Therefore, the minimum threshold for "customary and regular" must

14  fall somewhere above 76% and below 98%. Applying the decades-old rule that exemptions are

15  to be "narrowly construed against . . . employers and are to be withheld except as to persons

16  plainly and unmistakably within their terms and spirit," *Auer v. Robbins* (1997) 519 U.S. 452,

17  462, 117 S. Ct. 905, 137 L. Ed. 2d 79, that number should be set halfway between those two

18  extremes at 87% for RadioShack "Y" Store Managers.

19       Supervision of two full-time employees 87% of the time would require a manager to

20  spend only 43 1/2 weeks a year supervising two other employees to meet the customary and

21  regular requirement of the exemption. For 8 1/2 weeks, or greater than two months per year,

22  such store managers could fall below the 80 hour requirement while still meeting the customary

23  and regular test.

24       For all the foregoing reasons, in order for supervision of two or more employees to be

25  regular and customary, a manager must spend 87% of his or her time working with at least two

26  other full-time employees.

27

28

**C. RadioShack's Arguments for Interpretations More Favorable to its Position Are Contrary to Accepted Legal Standards.**

Because these issues have been briefed before the Court, RadioShack has already shared its arguments in favor of much more lenient standards that would somewhat reduce the number of affected employees. RadioShack's arguments are without legal foundation, however.

For example, RadioShack attempted to make the bizarre case that an employer is free to decide what constitutes full-time employment for purposes of the overtime exemption. RadioShack argued that it designates employees who work 32 hours per week "full-time" for purposes of benefits so it can therefore call 64 hours the equivalent of two full-time employees. Following RadioShack's logic, it could call **all** employees full-time, even if they only work one hour per day, and meet the requirements of the exemption if a manager only supervised two hours per week. RadioShack's argument is fatally flawed both legally and factually.

First, the legal basis of RadioShack's untenable position is a quotation from a general information "Find It!" webpage of the Department of Labor that is completely unrelated to the overtime exemption at issue. This quotation is located under the "Work Hours" category and has the obvious purpose of providing information to employees who feel they are being wrongly denied benefits. Overtime exemption information is kept under a completely different topic: "Wages." Additionally, RadioShack omits the very next sentence from the quoted portion of the website: "Whether an employee is considered full-time or part-time does not change the application of the FLSA." Meaning an employer is required to comply with the FLSA regardless of where the employer decides to draw the line for denying benefits to part-time employees. (*See* Affidavit of Judith Kramer, former Deputy Solicitor and Acting Solicitor for the United States Department of Labor, attached hereto as Exhibit 1.)

Moreover, it is simply not true that RadioShack considers 32 hours to be full-time employment. RadioShack defines the workweek for full-time employees as 40 hours per week, while the workweek for part-time employees is defined as less than 40 hours per week. (*See* ¶ 12 of Statement of Undisputed Material Facts.) Moreover, for purposes of vacation pay and other benefits, paying overtime to employees it classifies as non-exempt, and for giving credit for time

- 7 -

1    spent on company contest trips, RadioShack defines full-time status as 40 hours per week. (*Id.*)

2    RadioShack has similarly argued that "customarily and regularly" should be interpreted

3    broadly in its favor so as to extend coverage to employees who supervise two or more full-time

4    employees a mere 60% of the time – a proposition unsupported by any legal authority

5    whatsoever. (*See* Affidavit of Judith Kramer, former Deputy Solicitor and Acting Solicitor for

6    the United States Department of Labor, attached hereto as Exhibit 1.)  A standard that set

7    supervision at 60% would exempt a manager who supervised employees just over 7 months a

8    year *__and who supervised no employees whatsoever for almost 5 months a year!__*  Again, as

9    discussed above, legal authority establishes that "customary and regular" requires something

10   *greater than* 76% of a manager's time.

11   RadioShack has also made arguments that the Court should look to the class as a whole,

12   or just ignore large groups of the class such as short-tenured managers, or managers of new

13   stores in determining whether individual managers are exempt.  There is absolutely no legal

14   basis for these arguments. (*See* Affidavit of Judith Kramer, former Deputy Solicitor and Acting

15   Solicitor for the United States Department of Labor, attached hereto as Exhibit 1.)  To determine

16   the average time all managers, or some select group of managers, supervise two full-time

17   employees would permit employers to impermissibly expand the reach of the exemption to

18   managers who do little or no supervision.

19   There is an overriding flaw to all of RadioShack's arguments that was contained in its

20   July 7, 2004 brief submitted to the Court on these issues.  In that brief, RadioShack summed up

21   its positions thusly: "With respect to the legal issues, RadioShack believes the applicable rules

22   and case authorities mandate against a rigid interpretation and support a flexible approach that

23   **resolves doubts in favor of the employer**." (Emphasis added.)

24   Contrary to RadioShack's belief, the United States Supreme Court has repeatedly held, in

25   case after case going back decades, that "**FLSA exemptions are to be 'narrowly construed**

26   **against . . . employers**' and are to be withheld except as to persons 'plainly and unmistakably

27

28

- 8 -

1 within their terms and spirit.'" (*Auer v. Robbins* (1997) 519 U.S. 452, 462 (Emphasis added)).[2]

2      In light of this wealth of authority, the absurdity of RadioShack's attempts to carve out as

3 many class members as possible becomes crystal clear. Contrary to RadioShack's positions, the

4 requirements of the exemptions are clearly defined and easily applied. As discussed below, over

5 1521 class members unquestionably do not meet them.

6     **D. At Least 1521 Class Members Do Not Customarily and Regularly Supervise Two**

7         **or More Full-time Employees, or their Equivalent.**

8      RadioShack produced to Plaintiffs a computer report containing the total number of

9 subordinate employee hours worked on a weekly basis in the stores of some 2978 of the 3288

10 opt-in class members.[3] Plaintiffs reviewed that report to determine the percentage of weeks for

11 each class member in which subordinate hours were fewer than 80 in each store. (*See* Report,

12 attached to Statement of Undisputed Material Facts ("UMF") as Exhibit 1.) During the liability

13 period, many class members worked in more than one "Y" Store as a "Y" Store Manager.

14 Plaintiffs evaluated the exempt status of each manager separately for each store in which they

15 worked. For example, a manager might have supervised two or more employees 100% of the

16 time in Store A, and then been assigned to Store B where the manager did not ever supervise at

17

18 [2] *See also, Holly Farms Corp. v. Nat'l Labor Rels. Bd.* (1996) 517 U.S. 392, 399 ("We note, furthermore, that . . . reviewing courts must take care to assure that exemptions . . . are not so expansively interpreted

19 as to deny protection to workers the Act was designed to reach;") *Mareau v. Klevenhagen* (1993) 508 U.S. 22, 33 ("Respondents' broad interpretation of the . . . exemption is also in some tension with the

20 well-established rule that 'exemptions from the [FLSA] are to be narrowly construed;'") *Arnold v. Ben Kanowsky, Inc.* (1960) 361 U.S. 388, 392 ("We have held that these exemptions are to be narrowly

21 construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit;") *Mitchell v. Kentucky Finance Co.*

22 (1959) 359 U.S. 290, 295-96 (" is well settled that exemptions from the Fair Labor Standards Act are to

23 be narrowly construed;") *A. H. Phillips, Inc. v. Walling* (1945) 324 U.S. 490, 493 ("The Fair Labor Standards Act was designed to extend the frontiers of social progress" by 'insuring to all our able-bodied

24 working men and women a fair day's pay for a fair day's work.' [Citation] Any exemption from such humanitarian and remedial legislation must therefore be narrowly construed, giving due regard to the

25 plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to

26 frustrate the announced will of the people.")

[3] RadioShack offered no explanation why approximately 310 class members were not included among

27 this data, and in fact, never even mentioned that any class members were not included. Additionally, the data RadioShack provided only covers the liability period through May 7, 2004. No data pertaining to the

28 period since May 7, 2004 has been produced.

1   least two other employees. Such a manager would meet the prong of the exemption in the Store

2   A, but obviously would not in Store B.

3        RadioShack's records indicate that 1521 opt-in class members worked as the manager of

4   a "Y" Store where they supervised fewer than 80 subordinate hours 87% of the time or less. (*See*

5   Report, UMF Exhibit 1.) The facts contained in the report are not in dispute. Therefore, at least

6   1521 class members do not meet the "customarily and regularly" element of the exemption, and

7   are entitled to their unpaid overtime wages for all weeks they worked as managers of such stores.

8        Liability for this group is clear. The requirement that exempt executives supervise two

9   other employees is a bright-line test and an essential element of the exemption. The 1521

10  individuals identified in the attached report cannot qualify for the exemption because they spent

11  less than 87% of their time with at least two full-time employees. There are undoubtedly others

12  whose identities will be made clear when RadioShack produces the remaining data for the period

13  since July, 2004. The only issue remaining for these individuals is the amount of their damages;

14  but the facts to establish damages are also undisputed. RadioShack maintains records of the

15  number of hours worked each week by each class member. This data is not in dispute.

16  RadioShack also maintains records of the compensation paid to each class member. This data is

17  not in dispute. Therefore it is only a matter of accounting to calculate with precision the total

18  damages for each class member.

19      **V.**    **THE APPLICABLE STATUTORY PERIOD IS THREE YEARS**

20       The FLSA provides: "Any action . . . may be commenced within two years after the

21  cause of action accrued . . . , except that a cause of action arising out of a willful violation may

22  be commenced within three years after the cause of action accrued." (29 U.S.C. § 255.) To

23  show willfulness, Plaintiffs have the burden of showing that the employer "either knew or

24  showed reckless disregard for the matter of whether its conduct was prohibited by the statute."

25  (*McLaughlin v. Richland Shoe Co.* (1988) 486 U.S. 128, 133.) Reckless disregard may be shown

26  by the employer's "failure to make adequate inquiry into whether conduct is in compliance with

27  the [FLSA]." (5 C.F.R. § 104.) It is ordinarily a question for the jury to determine "which

28  limitations period, two or three years, applies in light of the plaintiffs' evidence that the

- 10 -

1   defendants acted willfully." (*Bankston v. Illinois*, (7th Cir., 1995) 60 F.3d 1249, 1253.)

2   However, as with all cases, where there are no genuine issues of material fact and where no

3   reasonable jury could find for the non-moving party, the court must grant summary judgment.

4   (*Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505.)

5   **A. RadioShack Knew it Was Violating the FLSA When it Failed to Pay Overtime**

6   **Wages to Managers Who Supervised Fewer than Two Full-time Employees.**

7   Here, the undisputed facts show that RadioShack not only showed reckless disregard, but

8   that it <u>knew</u> it was violating the law. As discussed above, at least 1521 Managers, or 46% of the

9   opt-in class, spent less than 87% of their work weeks supervising two or more employees. This

10  is not a fine point of hotly debated law. The rule requiring supervision of two other employees is

11  the simplest of bright line tests and RadioShack made no effort to comply with it.

12  Specifically, RadioShack made a determination that all new stores and all stores with

13  more than $500,000 in annual sales volume would be classified as "Y" Stores, and made the

14  decision that managers of those "Y" Stores would be classified as exempt. (See UMF ¶¶ 9, 16.)

15  When RadioShack arbitrarily divided its stores into "V" and "Y" Stores, it classified "V" Store

16  Managers as non-exempt on the basis that managers of these lower volume stores would not

17  regularly and customarily supervise two or more employees. (See UMF ¶ 16.) This shows

18  RadioShack had knowledge that it was required to comply with the supervision element in order

19  to classify managers as exempt.

20  RadioShack failed to do so, however. On a weekly basis, RadioShack District Sales

21  Managers review payroll data submitted by Store Managers. (See UMF ¶ 17.) Every week these

22  District Managers saw from the payroll reports that there were Managers working in stores with

23  fewer than 80 associate hours. RadioShack's district managers <u>knew</u> the store managers were

24  not supervising two other employees because they <u>knew</u> there weren't at least 80 hours in each

25  store. As discussed above, this data reveals that at least 1521 class members were clearly not

26  meeting the test of the exemption, and RadioShack knew it.

27  Moreover, every time RadioShack's payroll department cut a paycheck to "Y" Store

28  Manager assigned to a store where fewer than two other employees were also assigned,

- 11 -

1  RadioShack <u>knew</u> it was violating the law. It sent checks containing no overtime pay to

2  employees it knew to be supervising fewer than two other employees, and therefore knew it was

3  violating the requirements of the exemption.

4      **B.  <u>RadioShack Acted with Reckless Disregard When it Failed to Pay Overtime</u>**

5          **<u>Wages to Managers Who Supervised Fewer than Two Full-time Employees.</u>**

6      RadioShack's conduct in failing to pay overtime wages to Store Managers who spent less

7  than 87% of their time supervising two full-time employees was also done with reckless

8  disregard because RadioShack failed to conduct an adequate inquiry.

9      In 1992, 10 years before this suit was filed, RadioShack hired William M. Mercer, Inc. to

10 look into the compensation for store managers, all of whom were then paid overtime. As part of

11 that analysis, William Mercer advised RadioShack that they could **possibly** classify the store

12 manager position as exempt **if** the manager responsibilities were upgraded. (*See* UMF ¶ 18.)

13 This put RadioShack on notice that changes were required in order to insure compliance with the

14 FLSA. In spite of being put on notice of these requirements, RadioShack did not properly ensure

15 that the "Y" Store Managers supervised two or more full-time employees. As discussed above,

16 at least 1521 "Y" Store Managers routinely supervised fewer than 80 hours.

17     Even after being warned by William Mercer that it must comply with the FLSA,

18 RadioShack classified stores as "Y" Stores based on sales volume, and classified all managers of

19 "Y" Stores as exempt without verifying that those store managers did in fact supervise at least 80

20 hours. (*See* UMF ¶ 19.)

21     What is worse, brand new stores, with <u>no sales history whatsoever and where managers</u>

22 <u>were often required to work all alone because there were no other employees yet hired</u>, were

23 automatically classified as "Y" Stores <u>for a full year</u>. (*See* UMF ¶ 20.) Therefore managers of

24 new stores were denied overtime wages as exempt employees based on <u>no analysis whatsoever</u>.

25 At the end of the year, if it was determined that a new store's sales volume had been less than

26 $500,000, the store was reclassified as a "V" Store and the manager was reclassified as non-

27 exempt for the coming year. (*See* UMF ¶ 20.) But RadioShack never went back and paid

28 overtime wages to those managers it <u>knew</u> to have been misclassified as exempt for the prior

- 12 -

1 | year.

2 | Further putting RadioShack on notice that it's exempt classification of managers was

3 | suspect is the fact that RadioShack was sued for this very same violation in California in 2000.

4 | Plaintiffs' counsel Callahan, McCune & Willis represented a certified class of RadioShack "Y"

5 | Store Managers in California who, it was alleged, were misclassified as exempt under California

6 | state law because they did not spend the majority of their time engaged in exempt duties. (*See*

7 | UMF ¶ 21.) This lawsuit, dealing with identical factual issues, put RadioShack on notice that it's

8 | classification of "Y" Store Managers as exempt was suspect. Despite agreeing to pay $29.9

9 | million in settlement of that case, RadioShack undertook no investigation to insure compliance

10 | with the FLSA for any managers outside the state of California.

11 | Moreover, Plaintiffs have taken the depositions of most of RadioShack's management

12 | team in Fort Worth, Texas, and none of RadioShack's management team have been able to

13 | identify any investigation that may have been undertaken to ensure that managers classified as

14 | exempt customarily and regularly supervised two or more employees. (*See* UMF ¶ 22.) The

15 | only explanation provided by management has been that they relied upon the advice of legal in

16 | making the decision to classify the position as exempt. (*See* UMF ¶ 22.) RadioShack, however,

17 | has asserted attorney-client privilege with regard to all discussions with their legal department,

18 | and had thus foreclosed the possibility of introducing any testimony as to what investigation, if

19 | any, its legal department might have performed.

20 | The undisputed facts demonstrate RadioShack knew it was in violation of the law when it

21 | treated managers as exempt even when they did not supervise two or more full-time employees.

22 | The undisputed facts also demonstrate that RadioShack acted with reckless disregard for the

23 | legality of its actions because RadioShack did not conduct an adequate inquiry into whether all

24 | "Y" Store Managers were customarily and regularly supervising at least two full-time

25 | employees. Therefore, RadioShack acted willfully in failing to pay overtime to managers, giving

26 | rise to a three-year statute of limitations.

27 | **VI.   PLAINTIFFS ARE ENTITLED TO LIQUIDATED DAMAGES**

28 | The FLSA includes a liquidated damages provision in an amount equal to the monetary

- 13 -

1    damages. (29 U.S.C. § 216.) If the plaintiffs prevail, the court **must** award liquidated damages

2    unless the "employer shows to the satisfaction of the court that the act or omission giving rise to

3    such action was in good faith and that [the employer] had reasonable grounds for believing that

4    [the] act or omission was not a violation of the [FLSA]." (29 U.S.C. § 260.) "The good faith

5    defense requires proof of the employer's subjective intent to comply with the Act, as well as

6    evidence of objective reasonableness in the employer's application of the Act." (*Castro v. Chi.*

7    *Hous. Auth.* (7th Cir. 2004) 360 F.3d 721, 730.) "[O]bjective criteria are highly valued here as

8    in other inquiries into "good faith," not the least because corporations . . . do not have subjective

9    mental states." (*Walton v. United Consumers Club* (7th Cir., 1986) 786 F.2d 303, 312.)

10          Moreover, this good faith defense must be narrowly construed against the employer

11   because the employer "bears a *substantial burden* in showing that it acted reasonably and in good

12   faith." (*Castro v. Chi. Hous. Auth.* (7th Cir. 2004) 360 F.3d 721, 730 (quoting *Bankston v. State*

13   *of Ill.* (7th Cir. 1995) 60 F.3d 1249, 1254)(emphasis in original).) The Court in *Castro*

14   explained, "The good faith reduction is intended for circumstances where the employer

15   technically violates the law but shows that it did everything possible to ensure [compliance]."

16   (*Id.* at 731.)

17          The undisputed material facts discussed above show that RadioShack can not meet this

18   burden. The William Mercer Company advised RadioShack in 1992 that they could classify

19   some store managers as exempt **if** they upgraded manager duties. However, as discussed above,

20   RadioShack did not properly ensure that the "Y" Store Managers supervised two or more full-

21   time employees. They got advice from an expert about what was required and then blatantly

22   ignored that advice. The undisputed facts show more than a thousand managers regularly

23   supervised fewer than 80 hours.

24          RadioShack will be unable to prove that its violation with regard to those individuals who

25   did not customarily and regularly supervise at least two other full-time employees was done in

26   good faith. The evidence establishes that RadioShack knew it was violating the law. Moreover,

27   RadioShack will be unable to prove its actions were reasonable. Therefore, Plaintiffs are entitled

28   to liquidated damages.

## VII.   **PLAINTIFFS ARE ENTITLED TO ATTORNEYS' FEES AND COSTS**

The FLSA provides that in an action for overtime wages, "The court . . . shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorneys' fee to be paid by the defendant, and costs of the action." (29 U.S.C. § 216(b).) Here, as discussed above, at least 1521 class members are entitled to judgment. Therefore, RadioShack is liable for all reasonable attorneys' fees and costs incurred to date in the prosecution of this action.

## VIII.   **CONCLUSION**

For all the foregoing reasons, Plaintiffs are entitled to judgment in their favor for all those class members who spent less than 87% of their time as manager in a "Y" Store supervising at least 80 employee hours. At least 1521 class members, a full 46% of the class, fall into this group. Plaintiffs also request RadioShack be ordered to produce complete data for all class members for the entire class period through the present to ascertain the total number of class members involved.

Because RadioShack's actions were willful, Plaintiffs request the Court adopt a three year statute of limitations. Further, because RadioShack did not act in good faith, Plaintiffs are entitled to an award of liquidated damages. Moreover, Plaintiffs are entitled to their attorneys fees and costs.

Finally, because there is no dispute as to the number of hours worked and the compensation paid to each class member, Plaintiffs request that RadioShack be ordered to produce data showing the number of hours worked by each class member and the compensation paid to each class member so that Plaintiffs can prepare a judgment inclusive of the amount of damages.

DATED: 1-10-05

TOUHY & TOUHY

By: _____

Attorneys for Plaintiffs.

- 15 -

**Report of Expert**
**Judith E. Kramer**

I have been retained by Plaintiffs' counsel as an expert in the case of *Perez v. RadioShack Corporation*, No. 02-C-7884 (N.D. Ill). This report is based on my review and analysis of documents provided to me by plaintiffs' attorneys,[1] as well as on my knowledge and further review of Department of Labor regulations and procedures. My compensation in this matter is $450 per hour, plus reasonable expenses incurred.

I am a graduate of the Northwestern University School of Law and a member of the District of Columbia Bar. I am admitted to practice before the United States Supreme Court and a number of federal courts of appeals. From 1978 until June 2003, I was an attorney in the Office of the Solicitor, United States Department of Labor. From April 1987 until June 2003, I served as the Deputy Solicitor for Planning and Coordination, the highest-ranking career position in the Solicitor's Office. I also served as Acting Solicitor of Labor on several occasions. I was the Executive Assistant to the Solicitor of Labor from October 1982 until April 1987. Prior to my tenure at the Department of Labor, I served from 1972-1978 as a trial and appellate attorney in the Civil Rights Division of the Untied States Department of Justice.

As Deputy Solicitor and Acting Solicitor of Labor, I oversaw a staff of approximately 500 attorneys, many of whom were engaged in enforcing and administering the Fair Labor Standards Act (FLSA). I reviewed appellate briefs in FLSA cases and advised the Solicitor of Labor regarding the appeal of FLSA cases to the federal courts of appeals. I provided legal advice to the Administrator of the Wage and Hour Division and other high-ranking Department of Labor officials on matters relating to the enforcement of wage and hour laws and other federal statutes. In my capacity as Deputy Solicitor for Planning and Coordination, I testified before Congress on one occasion. During the last ten years, I have published one article: "Equal Access to Justice Act Amendments of 1996: A New Avenue for Recovering Fees from the Government," 51 Admin. Law Review 363 (Spring 1999).

I retired from the Department of Labor on June 3, 2003. In September 2003, I joined the law firm of Fortney & Scott, LLC in Washington, D.C. At Fortney & Scott, I have advised numerous clients regarding compliance with the FLSA. In particular, I have counseled clients on the "white-collar" exemptions under the FLSA and the application of the Department of Labor's regulations to their particular situations. I have helped them classify their employees as exempt or non-exempt in accordance with the statute and regulations. I have served as an expert for the defendant in *Vaughan v. E.I du*

---

[1] I relied on the following documents provided to me by Plaintiffs' attorneys: Sections II, III and IV of the RadioShack Store Operations Manual; Plaintiffs' Mediation Brief; Defendant RadioShack Corporation's Brief on Hours of Subordinate Supervision by "Y" Store Managers; Defendant RadioShack Corporation's Supplemental Brief on Hours of Subordinate Supervision by "Y" Store Managers; Judge Pallmeyer's Memorandum Opinion and Order of June 16, 2003, granting Plaintiffs' motion to proceed with notice; and a "Total Compensation Study for Store Managers," prepared for Tandy Corporation/Radio Shack in March 1991.

**EXHIBIT 7**

*Pont de Nemours and Co., Inc.*, C.A. No. 04-0086-SLR (D. Del.) on the issue of plaintiff's classification under the FLSA. I have not served as an expert in any other matter. I also served on a panel of FLSA specialists who addressed the impact of the Department of Labor's new white-collar regulations, which took effect in August 2004.

I have been asked by plaintiffs' attorneys to provide my opinion on the standard for determining whether members of the opt-in class in this case were properly classified as exempt executives. More specifically, I will provide my opinion regarding the requirement that, to be classified as exempt executives, class members must have engaged in the customary and regular direction of the work of two or more other employees. My opinion is based on the facts of this case and is rendered in accordance with the processes followed by the Department of Labor in determining the applicability of exemptions.

I.   Statutory and Regulatory Background

Under the FLSA, employees are entitled to overtime pay of 1½ times their regular rate of pay for each hour worked in excess of 40 during any given workweek. 29 U.S.C. § 207(a). The statute, however, provides a number of exemptions from the overtime requirement, including an exemption for executive, administrative, professional, and outside sales employees. 29 U.S.C. § 213(a)(1). The statute does not define these so-called "white-collar" exemptions, but, instead, provides that the terms of the exemption are to be "defined and delimited from time to time by regulations of the Secretary of Labor." *Id.* The relevant regulations are found at 29 C.F.R. Part 541. On April 23, 2004, the Department of Labor published new regulations implementing the white-collar exemptions. 69 Fed. Reg. 22122. Those regulations took effect on August 23, 2004.

My understanding is that the class includes both current and former employees of Radioshack. Therefore, since the class members' employment both predates and postdates the new regulations, both the current and former regulations are applicable to this case. The new and old regulations are identical, however, as to the "two or more other employees" issue.

The old regulation defining the executive exemption is found at 29 C.F.R. § 541.1 (2003). That regulation provides both a "long test" and a "short test" for determining the applicability of the exemption. I understand that the class members earned over $250 per week. Therefore, my opinion is based on the application of the "short test" of § 541.1(f).

Under the short test, if an employee is compensated on a salary basis at a rate of not less than $250 per week, and if the employee's primary duty consists of the "management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, **and includes the customary and regular direction of the work of two or more other employees therein,**" such employee "shall be deemed to meet all the requirements of this section." (emphasis added). The Department's interpretive regulations state that an employee will qualify as an executive under § 541.1 "only if he customarily and regularly supervises at least two full-time

2

employees or the equivalent." Thus, the hours of part-time employees may be combined to produce the equivalent of two full-time employees. 29 C.F.R. § 541.105.

Similarly, the new regulations provide that an employee who is compensated on a salary basis at the rate of not less than $455 per week, "whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, **who customarily and regularly directs the work of two or more other employees**" and who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight, is an exempt executive employee. 29 C.F.R. § 541.100 (2004) (emphasis added).

In the Preamble to the new regulations, the Department of Labor rejected comments and requests for clarification of the term "full-time," stating:

> The Department does not believe additional clarification is necessary, and stands by its current interpretation that an exempt supervisor generally must direct a total of 80 employee-hours of work each week. As the Wage and Hour Division's Field Operations Handbook (FOH) states, however, circumstances might justify lower standards. For example, firms in some industries have standard workweeks of 37 ½ hours or 35 hours for their full-time employees. In such cases, supervision of employees working a total of 70 or 75 hours in a workweek will constitute the equivalent of two full-time employees. FOH 22c00.

69 Fed. Reg. 22135 (April 23, 2004).

Significantly, the Department also rejected a request that the Department clarify the term "full-time" to include a statement that the term should be defined by the employer's practices. Id.

II.  What constitutes "the customary and regular direction of the work of two or more other employees"?

A.  How many employee hours must a manager supervise in a workweek, in order to qualify for the executive exemption?

The defendant in this case contends that two full-time equivalents does not necessarily mean 80 supervised hours per week, but that, instead, "establishing whether any given employee qualifies as full time or part time 'is a matter generally to be determined by the employer.'" Defendant RadioShack Corporation's Brief on Hours of Subordinate Supervision by "Y" Store Managers, filed July 7, 2004, at p. 6, quoting the Department of Labor's web site at www.dol.gov/dol/topic/workhours/full-time.htm. RadioShack states that, effective July 1, 2003, "RadioShack defined full-time employees

3

for benefits purposes as those who work 32 or more hours per week and part-time employees as those who work less than 32 hours per week. . . .Based on RadioShack's standard for full-time employment effective July 1, 2003, an employee need only work 32 hours per week to be classified as a full-time employee, meaning that the work of two full-time equivalents (i.e., a 'matter generally to be determined by the employer') would equate to 64 hours, not 80 hours." Defendant RadioShack Corporation's Supplemental Brief on Hours of Subordinate Supervision by "Y" Store Managers, filed August 17, 2004, at p. 2.

I am unaware of any support in the Department of Labor's regulations, the Department's FOH or the case law for the proposition that an employer's designation of who is a full-time employee for benefits purposes is determinative on the question of whether a manager supervises the equivalent of two full-time employees for purposes of the executive exemption. Nor am I aware of any support for the proposition that as few as 64 hours per week may constitute the equivalent of two full-time employees. I will address each of these points in turn:

### 1. Effect of the Employer's Designation of "Full-time" Employees

As noted above, RadioShack contends that "establishing whether any given employee qualifies as full time or part time 'is a matter generally to be determined by the employer.'" In citing the Department of Labor's web site for this proposition, however, RadioShack omits the sentence that immediately follows the quoted language, viz., "Whether an employee is considered full-time or part-time does not change the application of the FLSA." In other words, the FLSA and the Department of Labor require an employer to heed its obligations under the FLSA, regardless of whatever standards an employer may establish for itself to distinguish between full-time and part-time employment.

Moreover, in the Preamble to the new Part 541 regulations, the Department explicitly rejected a request made by the FLSA Reform Coalition that the Department clarify the term "full-time" by stating that the term should be defined by the employer's practices. Thus, the Department, in deciding to retain the requirement in the prior regulations that the employee must direct the work of two or more other employees, reiterated that the Department, not the employer, when it came to the applicability of the FLSA, would determine the parameters of what may be considered the supervision of two full-time employees; the employer would not have free rein to determine by fiat that this requirement had been met.

### 2. How Many Hours Constitutes the Equivalent of Two Full-Time Employees?

Section 22c00(b) of the FOH provides:

Two full-time employees or the equivalent within the meaning of Reg. 541.105(a) is generally considered to mean 80 hours of work by subordinate employees. In

other words, the total number of hours worked by subordinate employees in a w/w must equal 80 in order to constitute the equivalent of two full-time employees. Unusual circumstances might occasionally justify lower standards. For example, firms in some industries such as banking and insurance have standard w/w's of 35 or 37 ½ hours for their full-time employees. Where such is the case, supervision of employees working a total of 70-75 hours in a w/w may constitute the equivalent of two full-time employees.[2]

In the preamble to the new Part 541 regulations, the Department stated that it "stands by its current interpretation that an exempt supervisor generally must direct a total of 80 employee-hours of work each week," citing this provision of the FOH. 69 Fed. Reg. 22135 (April 23, 2004). Thus, under both the old and the new regulations, two full-time employees or the equivalent is considered to mean 80 hours of work by subordinate employees.

As noted in the FOH, the Department recognizes that firms in some industries have standard workweeks of 37 ½ or 35 hours for full-time employees. I am unaware of any instances in which the Department has determined that the equivalent of two full-time employees may be satisfied by fewer than 70 hours per week. I am also unaware of any instances in which the Department of Labor has determined, in the retail industry, which is the industry at issue in this case, that the equivalent of two full-time employees may be satisfied by fewer than 80 hours per week. Based on my review of Sections II, III, and IV of the RadioShack Store Operations Manual, I understand that the standard work week for RadioShack employees is 40 hours or more. Therefore, there would be no reason to find "unusual circumstances" within the meaning of the FOH.

B. What is the meaning of "customary and regular?"

RadioShack contends that a manager must supervise two full-time employees "at most 60%" of the time and that this percentage should be applied to the class of opt-ins as a whole and not individuals. Defendant RadioShack Corporation's Brief on Hours of Subordinate Supervision by "Y Store Managers, filed July 7, 2004, at p. 12.

In my experience, I am unaware of any support for either of these propositions in the Department of Labor's application of the executive exemption.

Under the old Part 541 interpretive regulations, the department interpreted "customarily and regularly" as follows:

> The phrase "customarily and regularly" signifies a frequency which must be greater than occasional but which, of course, may be less than constant. . . .

29 C.F.R. § 541.107(b).

---

[2] This provision of the FOH may be found at www.dol.gov/esa/whd/FOH/FOH_Ch22.pdf, at p. 12.

Section 541.701 of the new Part 541 regulations provides the following definition:

> The phrase "customarily and regularly" means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed "customarily and regularly" includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks.

In the Preamble to the new regulations, the Department made it clear that it was not making any significant changes to the old definition. 69 Fed. Reg. 22187 (April 23, 2004):

> A similar definition of the term "customarily and regularly" has appeared for decades in section 541.107(b) of the existing regulations, and case law does not indicate significant difficulties with applying the definition.

To my knowledge, the Department of Labor has never determined that "customarily and regularly" is met by supervision of two full-time employees only 60% of the time. The Department of Labor will look at the frequency with which individual managers supervise two full-time employees. There is no support for the proposition that a court would ever average all of the time that all managers supervise two-full time employees in order to determine whether particular managers qualify for the executive exemption.

RadioShack relies on *Murray v. Stuckey's Inc.*, 50 F.3d 564 (8th Cir. 1995), for the proposition that unusual circumstances might occasionally justify lower standards, and notes the court's citation of the FOH. Defendant RadioShack Corporation's Brief on Hours of Subordinate Supervision by "Y" Store Managers, filed July 7, 2004, at p. 8.

The "unusual circumstances" language of the FOH is relevant only to the "80 hours" issue; it does not speak to the "regular and customary" issue. I am aware of no precedent in the Department's interpretations or in the case law that would permit the application of the executive exemption where a manager supervised two full-time employees less than 76 percent of the time.

Specifically with regard to RadioShack's assertions, I am unaware of any case law or Department of Labor interpretation that would permit the application of the executive exemption for managers who supervised two full-time employees only 60% of the time. And the Department and the courts consistently examine the percentage of time individual managers supervise two full-time employees; to instead determine the average time all managers supervise two-full time employees would permit employers to impermissibly expand the reach of the exemption to managers who, in fact, do little supervision.

6

## III. Conclusion

During my time at the Department of Labor, I saw many close cases regarding the applicability of the Part 541 exemptions. In my view, this is not such a case. While many cases present difficult issues of coverage and exempt status, I do not believe the issues on which I have been asked to render an opinion are open to serious disagreement. Based on my experience, my analysis of Department of Labor regulations and the Department's interpretive guidance, as well as of the pertinent case law, it is my opinion that members of the class who supervised a total of only 64 employee hours per week would not be considered to have met the requirement of having supervised two full-time employees for purposes of application of the executive exemption. It is also my opinion that members of the class who supervised 80 employee hours less than 76% of the time would not be considered to have met the requirements of the exemption.

Being duly sworn under oath, and fully competent to testify, I hereby affirm that all matters contained in this report are based upon my personal knowledge and further affirm that all matters contained herein are true and correct, and that if called to testify at trial, I would testify consistent with all matters contained herein.

*Judith E. Kramer 1/7/05*
Judith E. Kramer/date

Signed and sworn to before me this __7__ day of January, 2005

*Ashley Bustamante*

OFFICIAL SEAL
NOTARY PUBLIC-COMMONWEALTH OF VIRGINIA
ASHLEY D. BUSTAMANTE
COUNTY OF FAIRFAX
My Commission Expires
Sept. 30, 2007

7

LEXSTAT 29 USC 207

UNITED STATES CODE SERVICE
Copyright © 2004 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

*** CURRENT THROUGH P.L. 108-498, APPROVED 12/23/04 ***
*** WITH GAPS OF 108-458, 108-484, 108-487 and 108-496 ***

TITLE 29. LABOR
CHAPTER 8. FAIR LABOR STANDARDS

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

*29 USCS § 207 (2004)*

§ 207. Maximum hours

(a) Employees engaged in interstate commerce; additional applicability to employees pursuant to subsequent amendatory provisions.

(1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

(2) No employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, and who in such workweek is brought within the purview of this subsection by the amendments made to this Act *[29 USCS §§ 201 et seq.]* by the Fair Labor Standards Amendments of 1966--

(A) for a workweek longer than forty-four hours during the first year from the effective date of the Fair Labor Standards Amendments of 1966 [effective Feb. 1, 1967],

(B) for a workweek longer than forty-two hours during the second year from such date, or

(C) for a workweek longer than forty hours after the expiration of the second year from such date,

unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

(b) Employment pursuant to collective bargaining agreement; employment by independently owned and controlled local enterprise engaged in distribution of petroleum products. No employer shall be deemed to have violated subsection (a) by employing any employee for a workweek in excess of that specified in such subsection without paying the compensation for overtime employment prescribed therein if such employee is so employed--

(1) in pursuance of an agreement, made as a result of collective bargaining by representatives of employees certified as bona fide by the National Labor Relations Board, which provides that no employee shall be employed more than one thousand and forty hours during any period of twenty-six consecutive weeks; or

(2) in pursuance of an agreement, made as a result of collective bargaining by representatives of employees certified as bona fide by the National Labor Relations Board, which provides that during a specified period of fifty-two consecutive weeks the employee shall be employed not more than two thousand two hundred and forty hours and shall be guaranteed not less than one thousand eight hundred and forty hours (or not less than forty-six weeks at the normal number of hours worked per week, but not less than thirty hours per week) and not more than two thousand and eighty hours of employment for which he shall receive compensation for all hours guaranteed or worked at rates not less than those

applicable under the agreement to the work performed and for all hours in excess of the guaranty which are also in excess of the maximum workweek applicable to such employee under subsection (a) or two thousand and eighty in such period at rates not less than one and one-half times the regular rate at which he is employed; or

(3) by an independently owned and controlled local enterprise (including an enterprise with more than one bulk storage establishment) engaged in the wholesale or bulk distribution of petroleum products if--

(A) the annual gross volume of sales of such enterprise is less than $ 1,000,000 exclusive of excise taxes,

(B) more than 75 per centum of such enterprise's annual dollar volume of sales is made within the State in which such enterprise is located, and

(C) not more than 25 per centum of the annual dollar volume of sales of such enterprise is to customers who are engaged in the bulk distribution of such products for resale,

and such employee receives compensation for employment in excess of forty hours in any work-week at a rate not less than one and one-half times the minimum wage rate applicable to him under section 6 *[29 USCS § 206]*,

and if such employee receives compensation for employment in excess of twelve hours in any workday, or for employment in excess of fifty-six hours in any workweek, as the case may be, at a rate not less than one and one-half times the regular rate at which he is employed.

(c), (d) [Repealed]

(e) "Regular rate" defined. As used in this section the "regular rate" at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee, but shall not be deemed to include--

(1) sums paid as gifts; payments in the nature of gifts made at Christmas time or on other special occasions, as a reward for service, the amounts of which are not measured by or dependent on hours worked, production, or efficiency;

(2) payments made for occasional periods when no work is performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar cause; reasonable payments for traveling expenses, or other expenses, incurred by an employee in the furtherance of his employer's interests and properly reimbursable by the employer; and other similar payments to an employee which are not made as compensation for his hours of employment;

(3) Sums paid in recognition of services performed during a given period if either, (a) both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly; or (b) the payments are made pursuant to a bona fide profit-sharing plan or trust or bona fide thrift or savings plan, meeting the requirements of the Administrator [Secretary] set forth in appropriate regulations which he shall issue, having due regard among other relevant factors, to the extent to which the amounts paid to the employee are determined without regard to hours of work, production, or efficiency; or (c) the payments are talent fees (as such talent fees are defined and delimited by regulations of the Administrator [Secretary]) paid to performers, including announcers, on radio and television programs;

(4) contributions irrevocably made by an employer to a trustee or third person pursuant to a bona fide plan for providing old-age, retirement, life, accident, or health insurance or similar benefits for employees;

(5) extra compensation provided by a premium rate paid for certain hours worked by the employee in any day or workweek because such hours are hours worked in excess of eight in a day or in excess of the maximum workweek applicable to such employee under subsection (a) or in excess of the employee's normal working hours or regular working hours, as the case may be;

(6) extra compensation provided by a premium rate paid for work by the employee on Saturdays, Sundays, holidays, or regular days of rest, or on the sixth or seventh day of the workweek, where such premium rate is not less than one and one-half times the rate established in good faith for like work performed in nonovertime hours on other days;

(7) extra compensation provided by a premium rate paid to the employee, in pursuance of an applicable employment contract or collective-bargaining agreement, for work outside of the hours established in good faith by the contract or agreement as the basic, normal, or regular workday (not exceeding eight hours) or workweek (not exceeding the maximum workweek applicable to such employee under subsection (a)[)], where such premium rate is not less than one and one-half times the rate established in good faith by the contract or agreement for like work performed during such workday or workweek; or

(8) any value or income derived from employer-provided grants or rights provided pursuant to a stock option, stock appreciation right, or bona fide employee stock purchase program which is not otherwise excludable under any of paragraphs (1) through (7) if--

(A) grants are made pursuant to a program, the terms and conditions of which are communicated to participating employees either at the beginning of the employee's participation in the program or at the time of the grant;

(B) in the case of stock options and stock appreciation rights, the grant or right cannot be exercisable for a period of at least 6 months after the time of grant (except that grants or rights may become exercisable because of an employee's death, disability, retirement, or a change in corporate ownership, or other circumstances permitted by regulation), and the exercise price is at least 85 percent of the fair market value of the stock at the time of grant;

(C) exercise of any grant or right is voluntary; and

(D) any determinations regarding the award of, and the amount of, employer-provided grants or rights that are based on performance are--

(i) made based upon meeting previously established performance criteria (which may include hours of work, efficiency, or productivity) of any business unit consisting of at least 10 employees or of a facility, except that, any determinations may be based on length of service or minimum schedule of hours or days of work; or

(ii) made based upon the past performance (which may include any criteria) of one or more employees in a given period so long as the determination is in the sole discretion of the employer and not pursuant to any prior contract.

(f) Employment necessitating irregular hours of work. No employer shall be deemed to have violated subsection (a) by employing any employee for a workweek in excess of the maximum workweek applicable to such employee under subsection (a) if such employee is employed pursuant to a bona fide individual contract, or pursuant to an agreement made as a result of collective bargaining by representatives of employees, if the duties of such employee necessitate irregular hours of work, and the contract or agreement (1) specifies a regular rate of pay of not less than the minimum hourly rate provided in subsection (a) or (b) of section 6 *[29 USCS § 206]*(a) or (b)] (whichever may be applicable) and compensation at not less than one and one-half times such rate for all hours worked in excess of such maximum workweek, and (2) provides a weekly guaranty of pay for not more than sixty hours based on the rates so specified.

(g) Employment at piece rates. No employer shall be deemed to have violated subsection (a) by employing any employee for a workweek in excess of the maximum workweek applicable to such employee under such subsection if, pursuant to an agreement or understanding arrived at between the employer and the employee before performance of the work, the amount paid to the employee for the number of hours worked by him in such workweek in excess of the maximum workweek applicable to such employee under such subsection--

(1) in the case of an employee employed at piece rates, is computed at piece rates not less than one and one-half times the bona fide piece rates applicable to the same work when performed during nonovertime hours; or

(2) in the case of an employee performing two or more kinds of work for which different hourly or piece rates have been established, is computed at rates not less than one and one-half times such bona fide rates applicable to the same work when performed during non-overtime hours; or

(3) is computed at a rate not less than one and one-half times the rate established by such agreement or understanding as the basic rate to be used in computing overtime compensation thereunder: Provided, That the rate so established shall be authorized by regulation by the Administrator [Secretary] as being substantially equivalent to the average hourly earnings of the employee, exclusive of overtime premiums, in the particular work over a representative period of time;

and if (i) the employee's average hourly earnings for the workweek exclusive of payments described in paragraphs (1) through (7) of subsection (e) are not less than the minimum hourly rate required by applicable law, and (ii) extra overtime compensation is properly computed and paid on other forms of additional pay required to be included in computing the regular rate.

(h) Sums excluded from regular rate; extra compensation creditable toward overtime compensation.

(1) Except as provided in paragraph (2), sums excluded from the regular rate pursuant to subsection (e) shall not be creditable toward wages required under section 6 *[29 USCS § 206]* or overtime compensation required under this section.

(2) Extra compensation paid as described in paragraphs (5), (6), and (7) of subsection (e) shall be creditable toward overtime compensation payable pursuant to this section.

(i) Employment by retail or service establishment. No employer shall be deemed to have violated subsection (a) by employing any employee at a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum

hourly rate applicable to him under section 6 *[29 USCS § 206]*, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services. In determining the proportion of compensation representing commissions, all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee.

(j) Employment in hospital or establishment engaged in care of sick, aged, or mentally ill. No employer engaged in the operation of a hospital or an establishment which is an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises shall be deemed to have violated subsection (a) if, pursuant to an agreement or understanding arrived at between the employer and the employee before performance of the work, a work period of fourteen consecutive days is accepted in lieu of the workweek of seven consecutive days for purposes of overtime computation and if, for his employment in excess of eight hours in any workday and in excess of eighty hours in such fourteen-day period, the employee receives compensation at a rate not less than one and one-half times the regular rate at which he is employed.

(k) Employment by public agency engaged in fire protection or law enforcement activities. No public agency shall be deemed to have violated subsection (a) with respect to the employment of any employee in fire protection activities or any employee in law enforcement activities (including security personnel in correctional institutions) if--

(1) in a work period of 28 consecutive days the employee receives for tours of duty which in the aggregate exceed the lesser of (A) 216 hours, or (B) the average number of hours (as determined by the Secretary pursuant to section 6(c)(3) of the Fair Labor Standards Amendments of 1974) *[29 USCS § 213* note] in tours of duty of employees engaged in such activities in work periods of 28 consecutive days in calendar year 1975; or

(2) in the case of such an employee to whom a work period of at least 7 but less than 28 days applies, in his work period the employee receives for tours of duty which in the aggregate exceed a number of hours which bears the same ratio to the number of consecutive days in his work period as 216 hours (or if lower, the number of hours referred to in clause (B) of paragraph (1)) bears to 28 days,

compensation at a rate not less than one and one-half times the regular rate at which he is employed.

(l) Employment in domestic service in one or more households. No employer shall employ any employee in domestic service in one or more households for a workweek longer than forty hours unless such employee receives compensation for such employment in accordance with subsection (a).

(m) Employment in tobacco industry. For a period or periods of not more than fourteen workweeks in the aggregate in any calendar year, any employer may employ any employee for a workweek in excess of that specified in subsection (a) without paying the compensation for overtime employment prescribed in such subsection, if such employee--

(1) is employed by such employer--

(A) to provide services (including stripping and grading) necessary and incidental to the sale at auction of green leaf tobacco of type 11, 12, 13, 14, 21, 22, 23, 24, 31, 35, 36, or 37 (as such types are defined by the Secretary of Agriculture), or in auction sale, buying, handling, stemming, redrying, packing, and storing of such tobacco,

(B) in auction sale, buying, handling, sorting, grading, packing, or storing green leaf tobacco of type 32 (as such type is defined by the Secretary of Agriculture), or

(C) in auction sale, buying, handling, stripping, sorting, grading, sizing, packing, or stemming prior to packing, of perishable cigar leaf tobacco of type 41, 42, 43, 44, 45, 46, 51, 52, 53, 54, 55, 61, or 62 (as such types are defined by the Secretary of Agriculture); and

(2) receives for--

(A) such employment by such employer which is in excess of ten hours in any workday, and

(B) such employment by such employer which is in excess of forty-eight hours in any workweek,

compensation at a rate not less than one and one-half times the regular rate at which he is employed.

An employer who receives an exemption under this subsection shall not be eligible for any other exemption under this section.

(n) Employment by street, suburban, or interurban electric railway, or local trolley or motorbus carrier. In the case of an

employee of an employer engaged in the business of operating a street, suburban or interurban electric railway, or local trolley or motorbus carrier (regardless of whether or not such railway or carrier is public or private or operated for profit or not for profit), in determining the hours of employment of such an employee to which the rate prescribed by subsection (a) applies there shall be excluded the hours such employee was employed in charter activities by such employer if (1) the employee's employment in such activities was pursuant to an agreement or understanding with his employer arrived at before engaging in such employment, and (2) if employment in such activities is not part of such employee's regular employment.

(o) Compensatory time.
   (1) Employees of a public agency which is a State, a political subdivision of a State, or an interstate governmental agency may receive, in accordance with this subsection and in lieu of overtime compensation, compensatory time off at a rate not less than one and one-half hours for each hour of employment for which overtime compensation is required by this section.
   (2) A public agency may provide compensatory time under paragraph (1) only--
      (A) pursuant to--
         (i) applicable provisions of a collective bargaining agreement, memorandum of understanding, or any other agreement between the public agency and representatives of such employees; or
         (ii) in the case of employees not covered by subclause (i), an agreement or understanding arrived at between the employer and employee before the performance of the work; and
      (B) if the employee has not accrued compensatory time in excess of the limit applicable to the employee prescribed by paragraph (3).
   In the case of employees described in clause (A)(ii) hired prior to April 15, 1986, the regular practice in effect on April 15, 1986, with respect to compensatory time off for such employees in lieu of the receipt of overtime compensation, shall constitute an agreement or understanding under such clause (A)(ii). Except as provided in the previous sentence, the provision of compensatory time off to such employees for hours worked after April 14, 1986, shall be in accordance with this subsection.
   (3) (A) If the work of an employee for which compensatory time may be provided included work in a public safety activity, an emergency response activity, or a seasonal activity, the employee engaged in such work may accrue not more than 480 hours of compensatory time for hours worked after April 15, 1986. If such work was any other work, the employee engaged in such work may accrue not more than 240 hours of compensatory time for hours worked after April 15, 1986. Any such employee who, after April 15, 1986, has accrued 480 or 240 hours, as the case may be, of compensatory time off shall, for additional overtime hours of work, be paid overtime compensation.
      (B) If compensation is paid to an employee for accrued compensatory time off, such compensation shall be paid at the regular rate earned by the employee at the time the employee receives such payment.
   (4) An employee who has accrued compensatory time off authorized to be provided under paragraph (1) shall, upon termination of employment, be paid for the unused compensatory time at a rate of compensation not less than--
      (A) the average regular rate received by such employee during the last 3 years of the employee's employment, or
      (B) the final regular rate received by such employee,
   whichever is higher[.]
   (5) An employee of a public agency which is a State, political subdivision of a State, or an interstate governmental agency--
      (A) who has accrued compensatory time off authorized to be provided under paragraph (1), and
      (B) who has requested the use of such compensatory time,
   shall be permitted by the employee's employer to use such time within a reasonable period after making the request if the use of the compensatory time does not unduly disrupt the operations of the public agency.
   (6) The hours an employee of a public agency performs court reporting transcript preparation duties shall not be considered as hours worked for the purposes of subsection (a) if--
      (A) such employee is paid at a per-page rate which is not less than--
         (i) the maximum rate established by State law or local ordinance for the jurisdiction of such public agency,
         (ii) the maximum rate otherwise established by a judicial or administrative officer and in effect on July 1, 1995, or
         (iii) the rate freely negotiated between the employee and the party requesting the transcript, other than the judge who presided over the proceedings being transcribed, and
      (B) the hours spent performing such duties are outside of the hours such employee performs other work (including hours for which the agency requires the employee's attendance) pursuant to the employment relationship with such

public agency.

For purposes of this section, the amount paid such employee in accordance with subparagraph (A) for the performance of court reporting transcript preparation duties, shall not be considered in the calculation of the regular rate at which such employee is employed.

(7) For purposes of this subsection--

(A) the term "overtime compensation" means the compensation required by subsection (a), and

(B) the terms "compensatory time" and "compensatory time off" mean hours during which an employee is not working, which are not counted as hours worked during the applicable workweek or other work period for purposes of overtime compensation, and for which the employee is compensated at the employee's regular rate.

(p) Special detail work for fire protection and law enforcement employees; occasional or sporadic employment; substitution.

(1) If an individual who is employed by a State, political subdivision of a State, or an interstate governmental agency in fire protection or law enforcement activities (including activities of security personnel in correctional institutions) and who, solely at such individual's option, agrees to be employed on a special detail by a separate or independent employer in fire protection, law enforcement, or related activities, the hours such individual was employed by such separate and independent employer shall be excluded by the public agency employing such individual in the calculation of the hours for which the employee is entitled to overtime compensation under this section if the public agency--

(A) requires that its employees engaged in fire protection, law enforcement, or security activities be hired by a separate and independent employer to perform the special detail,

(B) facilitates the employment of such employees by a separate and independent employer, or

(C) otherwise affects the condition of employment of such employees by a separate and independent employer.

(2) If an employee of a public agency which is a State, political subdivision of a State, or an interstate governmental agency undertakes, on an occasional or sporadic basis and solely at the employee's option, part-time employment for the public agency which is in a different capacity from any capacity in which the employee is regularly employed with the public agency, the hours such employee was employed in performing the different employment shall be excluded by the public agency in the calculation of the hours for which the employee is entitled to overtime compensation under this section.

(3) If an individual who is employed in any capacity by a public agency which is a State, political subdivision of a State, or an interstate governmental agency, agrees, with the approval of the public agency and solely at the option of such individual, to substitute during scheduled work hours for another individual who is employed by such agency in the same capacity, the hours such employee worked as a substitute shall be excluded by the public agency in the calculation of the hours for which the employee is entitled to overtime compensation under this section.

(q) Maximum hour exemption for employees receiving remedial education. Any employer may employ any employee for a period or periods of not more than 10 hours in the aggregate in any workweek in excess of the maximum workweek specified in subsection (a) without paying the compensation for overtime employment prescribed in such subsection, if during such period or periods the employee is receiving remedial education that is--

(1) provided to employees who lack a high school diploma or educational attainment at the eighth grade level;

(2) designed to provide reading and other basic skills at an eighth grade level or below; and

(3) does not include job specific training.

**HISTORY:**

(June 25, 1938, ch 676, § 7, 52 Stat. 1063; Oct. 29, 1941, ch 461, 55 Stat. 756; July 20, 1949, ch 352, § 1, 63 Stat. 446; Oct. 26, 1949, ch 736, § § 7, 16(f), 63 Stat. 912, 920; May 5, 1961, P.L. 87-30, § 6, 75 Stat. 69; Sept. 23, 1966, P.L. 89-601, Title II, § § 204(c), (d), 212(b), Title IV, § § 401-403, 80 Stat. 835-837, 841, 842; April 8, 1974, P.L. 93-259, § § 6(c)(1)(A), 7(b)(2), 9(a), 12(b), 19(a)-(c), 21(a), 88 Stat. 60, 62, 64, 66, 68; Nov. 13, 1985, P.L. 99-150, § § 2(a), 3(a), (b), (c)(1), 99 Stat. 787, 789; Nov. 17, 1989, P.L. 101-157, § 7, 103 Stat. 944.)

(As amended Sept. 6, 1995, P.L. 104-26, § 2, 109 Stat. 264; May 18, 2000, P.L. 106-202, § 2(a), (b), 114 Stat. 308.)

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

Explanatory notes:

The bracketed word "Secretary", referring to the Secretary of Labor, has been inserted on authority of 1950 Reorg.

Plan No. 6, set out as transfer of functions note to *29 USCS § 1.*

The bracketed closing parenthesis has been inserted in subsec. (e)(7) to indicate the probable intent of Congress to include such punctuation.

The bracketed period has been inserted in subsec. (o)(4) to indicate the probable intent of Congress to include such punctuation.

Amendments:

1941. Act Oct. 29, 1941, in subsec. (b), paragraph (2), inserted "and eighty" after "two thousand".

1949. Act July 20, 1949, added subsec. (e)

Act Oct. 26, 1949 (effective 90 days after enactment, as provided by § 16(a) of such Act, which appears as *29 USCS § 202* note), in subsec. (a), transposed the words "no employer shall" at the beginning of the subsec. to follow "section" and substituted "for a workweek longer than forty hours" for former paragraphs (1)-(3); and in subsec. (b), clause (1), inserted "and forty" following "one thousand" and substituted "; or" for the comma at the end, and substituted clause (2), for the former clause (2); and in subsec. (c), inserted "buttermilk," following "milk,"; and substituted subsec. (d), for former subsec. (d); and substituted subsec. (e) for one which read "For the purpose of computing overtime compensation payable under this section to an employee--

"(1) who is paid for work on Saturdays, Sundays, or holidays, or on the sixth or seventh day of the workweek, at a premium rate not less than one and one-half times the rate established in good faith for like work performed in nonovertime hours on other days, or

"(2) who, in pursuance of an applicable employment contract or collective bargaining agreement, is paid for work outside of the hours established in good faith by the contract or agreement as the basic, normal, or regular workday (not exceeding eight hours) or workweek (not exceeding forty hours), at a premium rate not less than one and one-half times the rate established in good faith by the contract or agreement for like work performed during such workday or workweek, the extra compensation provided by such premium rate shall be deemed part of the regular rate at which the employee is employed and may be credited toward any premium compensation due him under this section for overtime work."

Such Act further (effective as above) added subsecs. (f) and (g).

1961. Act May 5, 1961 (effective upon expiration of 120 days after enactment, as provided by § 14 of that Act, which appears as *29 USCS § 203* note), in subsec. (a), redesignated former subsec. (a) as (a)(1), inserted after the word "who" the words "in any workweek", substituted "; and" for the period at the end, and added paragraph (2), except as modified by later amendments; in subsec. (b), para. (2), substituted "in excess of the maximum workweek applicable to such employee under subsection (a)" for "in excess of forty hours in the workweek"; in subsec. (d), para. (5), substituted "in excess of the maximum workweek applicable to such employee under subsection (a)" for "forty in a workweek"; substituted, in para. (7), "the maximum workweek applicable to such employee under subsection (a)" for "forty hours"; and in subsec. (e), substituted "the maximum workweek applicable to such employee under subsection. (a)" for "forty hours", "subsection (a) or (b) of section 6 (whichever may be applicable)" for "section 6(a)", and "such maximum" for "forty in any"; and in subsec. (f), substituted "the maximum workweek applicable to such employee under such subsection" for "forty hours" in two places; and added subsec. (h).

1966. Act Sept. 23, 1966 (effective 2/1/67, as provided by § 602 of such Act), in subsec. (a), inserted ", or is employed in an enterprise engaged in commerce or in the production of goods for commerce," and substituted a period for "; and" at the end of paragraph (1), substituted "is engaged in commerce or in the production of goods for commerce, or" for "(i)", "in such workweek" for "except for the enactment of the Fair Labor Standards Amendments of 1961, would not be within the purview of this subsection, or (ii)", "1966" for "1961" in two places, "first" for "third", and "second" for "fourth" in two places, deleted "as defined in section 3(s)(1) or (4), or by an establishment described in section 3(s)(3)," before "and who" and "section 13 of" before "this Act", and inserted "or" at the end of clause (B) of paragraph (2); in subsec. (b), substituted clause (3) for former clause (3); and substituted subsec. (c), for former subsec. (c); and redesignated subsec. (d) as subsec. (e), inserted subsec. (d); redesignated subsecs. (e)-(h) as (f)-(i), substituted "(e)" for "(d)" in newly-redesignated subsecs. (g) and (h); added the last sentence of subsec. (i); and added subsec. (j).

1974. Act April 8, 1974 (effective 5/1/74, as provided by § 29(a) of such Act), in subsec. (c), substituted "seven workweeks" for "ten workweeks", "ten workweeks" for "fourteen workweeks" and "forty-eight hours" for "fifty hours"; and in subsec. (d), substituted "seven workweeks" for "ten workweeks" and "ten workweeks" for "fourteen workweeks"; and in subsec. (j), inserted "or an establishment which is an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises" following "a hospital"; and added subsecs. (l)-(n).

Such Act further (effective 1/1/75, as provided by § 19(c) of such Act), in subsecs. (c), and (d), substituted "five

workweeks" for "seven workweeks" and "seven workweeks" for "ten workweeks"; and added subsec. (k).

Such Act further (effective 1/1/76, as provided by § 19(d) of such Act), in subsecs. (c) and (d), substituted "three workweeks" for "five workweeks" and "five workweeks" for "seven workweeks".

Such Act further (effective 1/1/76, as provided by § 6(c)(1)(B) of such Act) in subsec. (k), substituted "232 hours" for "240 hours" each place it occurs.

Such Act further (effective 12/31/76, as provided by § 19(e) of such Act) repealed subsecs. (c) and (d).

Such Act further (effective 1/1/77, as provided by § 6(c)(1)(C) of such Act) in subsec. (k) substituted "216 hours" for "232 hours".

Such Act further (effective 1/1/78 as provided by § (6)(1)(D) of such Act), in subsec. (k), substituted in para. (1) "exceed the lesser of (A) 216 hours, or (B) the average number of hours (as determined by the Secretary pursuant to section 6(c)(3) of the Fair Labor Standards Amendments of 1974) in tours of duty of employees engaged in such activities in work periods of 28 consecutive days in calendar year 1975" for "exceed 216 hours", and in para. (2) "as 216 hours (or if lower, the number of hours referred to in clause (B) of paragraph (1)) bears to 28 days" for "as 216 hours bears to 28 days".

1985. Act Nov. 13, 1985 (effective 4/15/86, as provided by § 6 of such act, which appears as *29 USCS § 203* note), added subsecs. (o) and (p).

1989. Act Nov. 17, 1989 added subsec. (q).

1995. Act Sept. 6, 1995 (applicable as provided by § 3 of such Act, which appears as a note to this section), in subsec. (o), redesignated para. (6) as para. (7), and added a new para. (6).

2000. Act May 18, 2000 (effective 90 days after enactment, as provided by § 2(c) of such Act, which appears as a note to this section), in subsec. (e), in para. (6), deleted "or" following the concluding semicolon, in para. (7), substituted "; or" for a concluding period, and added para. (8); and, in subsec. (h), substituted "(2) Extra" for "Extra" and inserted para. (1).

Transfer of functions:

Transfer of functions of all other officers, employees, and agencies of Department of Labor to Secretary of Labor by 1950 Reorg. Plan No. 6, see transfer of functions note to *29 USCS § 1*.

Other provisions:

**Study of excessive overtime.** Act Sept. 23, 1966, P.L. 89-601, Title VI, § 603, 80 Stat. 844, provides: "The Secretary of Labor is hereby instructed to commence immediately a complete study of present practices dealing with overtime payments for work in excess of forty hours per week and the extent to which such overtime work impedes the creation of new job opportunities in American industry. The Secretary is further instructed to report to the Congress by July 1, 1967, the findings of such survey with appropriate recommendations."

**Forty-eight hour wartime workweek.** Executive Order No. 9301, which established a minimum wartime workweek of forty-eight hours, was revoked by Exec. Or. No. 9607, of Aug. 30, 1945, *10 Fed. Reg. 11191.*

**Rules and regulations prescribed by Secretary.** For provisions in 1966 and 1974 amendments authorizing Secretary to prescribe rules and regulations, see other provisions notes to *29 USCS § § 203* and 202, respectively.

**Existing collective bargaining agreements.** Act Nov. 13, 1985, P.L. 99-150, § 2(b), 99 Stat. 788, effective April 15, 1986, as provided by § 6 of such act, which appears as *29 USCS § 203* note, provides: "A collective bargaining agreement which is in effect on April 15, 1986, and which permits compensatory time off in lieu of overtime compensation shall remain in effect until its expiration date unless otherwise modified, except that compensatory time shall be provided after April 14, 1986, in accordance with section 7(o) of the Fair Labor Standards Act of 1938 [subsection (o) of this section] (as added by subsection (a))."

**Payment of overtime compensation.** Act Nov. 13, 1985, P.L. 99-150, § 2(c)(2), 99 Stat. 789, effective April 15, 1986, as provided by § 6 of such act, which appears as *29 USCS § 203* note, provides: "A State, political subdivision of a State, or interstate governmental agency may defer until August 1, 1986, the payment of monetary overtime compensation under section 7 of the Fair Labor Standards Act of 1938 [this section] for hours worked after April 14, 1986."

**Application of Sept. 6, 1995 amendments.** Act Sept. 6, 1995, P.L. 104-26, § 3, 109 Stat. 265, provides: "The amendments made by section 2 [amending seusec. (o) of this section] shall apply after the date of the enactment of this Act and with respect to actions brought in a court after the date of the enactment of this Act."

**Effective date of May 18, 2000 amendments.** Act May 18, 2000, P.L. 106-202, § 2(c), 114 Stat. 309, provides: "The amendments made by this section [amending subsecs. (e) and (h) of this section] shall take effect on the date that is

90 days after the date of enactment of this Act.".

**Stock option rights, etc.; failure to include in employee's regular rate; liability of employer.** Act May 18, 2000, P.L. 106-202, § 2(d), 114 Stat. 309, provides:

"No employer shall be liable under the Fair Labor Standards Act of 1938 *[29 USCS § § 201* et seq.] for any failure to include in an employee's regular rate (as defined for purposes of such Act) any income or value derived from employer-provided grants or rights obtained pursuant to any stock option, stock appreciation right, or employee stock purchase program if--

"(1) the grants or rights were obtained before the effective date described in subsection (c) [note to this section];

"(2) the grants or rights were obtained within the 12-month period beginning on the effective date described in subsection (c) [note to this section], so long as such program was in existence on the date of enactment of this Act and will require shareholder approval to modify such program to comply with section 7(e)(8) of the Fair Labor Standards Act of 1938 [subsec. (e)(8) of this section] (as added by the amendments made by subsection (a)); or

"(3) such program is provided under a collective bargaining agreement that is in effect on the effective date described in subsection (c) [note to this section].".

**May 18, 2000 amendments; regulations.** Act May 18, 2000, P.L. 106-202, § 2(e), 114 Stat. 309, provides: "The Secretary of Labor may promulgate such regulations as may be necessary to carry out the amendments made by this Act [amending subsecs. (e) and (h) of this section].".

29 USCS § 213

LEXSTAT 29 USCS § 213

UNITED STATES CODE SERVICE
Copyright © 2004 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

\*\*\* CURRENT THROUGH P.L. 108-498, APPROVED 12/23/04 \*\*\*
\*\*\* WITH GAPS OF 108-458, 108-484, 108-487 and 108-496 \*\*\*

TITLE 29. LABOR
CHAPTER 8. FAIR LABOR STANDARDS

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

*29 USCS § 213* (2004)

§ 213. Exemptions

(a) Minimum wage and maximum hour requirements. The provisions of sections 6 (except section 6(d) in the case of paragraph (1) of this subsection) and 7 *[29 USCS § § 206,* 207] shall not apply with respect to--

(1) any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary, subject to the provisions of the Administrative Procedure Act *[5 USCS § § 551* et seq.] except than [that] an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities); or

(2) [Repealed]

(3) any employee employed by an establishment which is an amusement or recreational establishment, organized camp, or religious or non-profit educational conference center, if (A) it does not operate for more than seven months in any calendar year, or (B) during the preceding calendar year, its average receipts for any six months of such year were not more than 33 1/3 per centum of its average receipts for the other six months of such year, except that the exemption from sections 6 and 7 *[29 USCS § § 206* and 207] provided by this paragraph does not apply with respect to any employee of a private entity engaged in providing services or facilities (other than, in the case of the exemption from section 6 *[29 USCS § 206],* a private entity engaged in providing services and facilities directly related to skiing) in a national park or a national forest, or on land in the National Wildlife Refuge System, under a contract with the Secretary of the Interior or the Secretary of Agriculture; or

(4) [Repealed]

(5) any employee employed in the catching, taking, propagating, harvesting, cultivating, or farming of any kind of fish, shellfish, crustacea, sponges, seaweeds, or other aquatic forms of animal and vegetable life, or in the first processing, canning or packing such marine products at sea as an incident to, or in conjunction with, such fishing operations, including the going to and returning from work and loading and unloading when performed by any such employee; or

(6) any employee employed in agriculture (A) if such employee is employed by an employer who did not, during any calendar quarter during the preceding calendar year, use more than five hundred man-days of agriculture labor, (B) if such employee is the parent, spouse, child, or other member of his employer's immediate family, (C) if such employee (i) is employed as a hand harvest laborer and is paid on a piece rate basis in an operation which has been, and is customarily and generally recognized as having been, paid on a piece rate basis in the region of employment, (ii) commutes daily from his permanent residence to the farm on which he is so employed, and (iii) has been employed in

agriculture less than thirteen weeks during the preceding calendar year, (D) if such employee (other than an employee described in clause (C) of this subsection) (i) is sixteen years of age or under and is employed as a hand harvest laborer, is paid on a piece rate basis in an operation which has been, and is customarily and generally recognized as having been, paid on a piece rate basis in the region of employment, (ii) is employed on the same farm as his parent or person standing in the place of his parent, and (iii) is paid at the same piece rate as employees over age sixteen are paid on the same farm, or (E) if such employee is principally engaged in the range production of livestock; or

(7) any employee to the extent that such employee is exempt by regulations, order, or certificate of the Secretary issued under section 14 *[29 USCS § 214]*; or

(8) any employee employed in connection with the publication of any weekly, semiweekly, or daily newspaper with a circulation of less than four thousand the major part of which circulation is within the county where published or counties contiguous thereto; or

(9) [Repealed]

(10) any switchboard operator employed by an independently owned public telephone company which has not more than seven hundred and fifty stations; or

(11) [Repealed]

(12) any employee employed as a seaman on a vessel other than an American vessel; or

(13), (14) [Repealed]

(15) any employee employed on a casual basis in domestic service employment to provide babysitting services or any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary); or

(16) a criminal investigator who is paid availability pay under section 5545a of title 5, United States Code; or

(17) any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is--

(A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;

(B) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;

(C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or

(D) a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills, and

who, in the case of an employee who is compensated on an hourly basis, is compensated at a rate of not less than $ 27.63 an hour.

(b) Maximum hour requirements. The provisions of section 7 *[29 USCS § 207]* shall not apply with respect to--

(1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act, 1935 *[49 USCS § 31502]*; or

(2) any employee of an employer engaged in the operation of a rail carrier subject to part A of subtitle IV of title 49, United States Code *[49 USCS §§ 10101 et seq.]*; or

(3) any employee of a carrier by air subject to the provisions of title II of the Railway Labor Act *[45 USCS §§ 181-188]*; or

(4) [Repealed]

(5) any individual employed as an outside buyer of poultry, eggs, cream, or milk, in their raw or natural state; or

(6) any employee employed as a seaman; or

(7), (8) [Repealed]

(9) any employee employed as an announcer, news editor, or chief engineer by a radio or television station the major studio of which is located (A) in a city or town of one hundred thousand population or less according to the latest available decennial census figures as compiled by the Bureau of the Census, except where such city or town is part of a standard metropolitan statistical area, as defined and designated by the Bureau of the Budget, which has a total population in excess of one hundred thousand, or (B) in a city or town of twenty-five thousand population or less, which is part of such an area but is at least 40 airline miles from the principal city in such area; or

(10) (A) any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm

implements, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers; or

(B) any salesman primarily engaged in selling trailers, boats, or aircraft, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling trailers, boats, or aircraft to ultimate purchasers; or

(11) any employee employed as a driver or driver's helper making local deliveries, who is compensated for such employment on the basis of trip rates, or other delivery payment plan, if the Secretary shall find that such plan has the general purpose and effect of reducing hours worked by such employees to, or below, the maximum workweek applicable to them under section 7(a) *[29 USCS § 207*(a)]; or

(12) any employee employed in agriculture or in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways, not owned or operated for profit, or operated on a sharecrop basis, and which are used exclusively for supply and storing of water, at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year; or

(13) any employee with respect to his employment in agriculture by a farmer, notwithstanding other employment of such employee in connection with livestock auction operations in which such farmer is engaged as an adjunct to the raising of livestock, either on his own account or in conjunction with other farmers, if such employee (A) is primarily employed during his workweek in agriculture by such farmer, and (B) is paid for his employment in connection with such livestock auction operations at a wage rate not less than that prescribed by section 6(a)(1) *[29 USCS § 206*(a)(1)]; or

(14) any employee employed within the area of production (as defined by the Secretary) by an establishment commonly recognized as a country elevator, including such an establishment which sells products and services used in the operation of a farm, if no more than five employees are employed in the establishment in such operations; or

(15) any employee engaged in the processing of maple sap into sugar (other than refined sugar) or syrup; or

(16) any employee engaged (A) in the transportation and preparation for transportation of fruits or vegetables, whether or not performed by the farmer, from the farm to a place of first processing or first marketing within the same State, or (B) in transportation, whether or not performed by the farmer, between the farm and any point within the same State of persons employed or to be employed in the harvesting of fruits or vegetables; or

(17) any driver employed by an employer engaged in the business of operating taxicabs; or

(18), (19) [Repealed]

(20) any employee of a public agency who in any workweek is employed in fire protection activities or any employee of a public agency who in any workweek is employed in law enforcement activities (including security personnel in correctional institutions), if the public agency employs during the workweek less than 5 employees in fire protection or law enforcement activities, as the case may be; or

(21) any employee who is employed in domestic service in a household and who resides in such household; or

(22), (23) [Repealed]

(24) any employee who is employed with his spouse by a nonprofit educational institution to serve as the parents of children--

(A) who are orphans or one of whose natural parents is deceased, or

(B) who are enrolled in such institution and reside in residential facilities of the institution,

while such children are in residence at such institution, if such employee and his spouse reside in such facilities, receive, without cost, board and lodging from such institution, and are together compensated, on a cash basis, at an annual rate of not less than $ 10,000; or

(25), (26) [Repealed]

(27) any employee employed by an establishment which is a motion picture theater; or

(28) any employee employed in planting or tending trees, cruising, surveying, or felling timber, or in preparing or transporting logs or other forestry products to the mill, processing plant, railroad, or other transportation terminal, if the number of employees employed by his employer in such forestry or lumbering operations does not exceed eight;

(29) any employee of an amusement or recreational establishment located in a national park or national forest or on land in the National Wildlife Refuge System if such employee (A) is an employee of a private entity engaged in providing services or facilities in a national park or national forest, or on land in the National Wildlife Refuge System, under a contract with the Secretary of the Interior or the Secretary of Agriculture, and (B) receives compensation for employment in excess of fifty-six hours in any workweek at a rate not less than one and one-half times the regular rate at which he is employed; or

(30) a criminal investigator who is paid availability pay under section 5545a of title 5, United States Code.

(c) Child labor requirements.

(1) Except as provided in paragraph (2) or (4), the provisions of section 12 *[29 USCS § 212]* relating to child labor shall not apply to any employee employed in agriculture outside of school hours for the school district where such employee is living while he is so employed, if such employee—

(A) is less than twelve years of age and (i) is employed by his parent, or by a person standing in the place of his parent, on a farm owned or operated by such parent or person, or (ii) is employed, with the consent of his parent or person standing in the place of his parent, on a farm, none of the employees of which are (because of section 13(a)(6)(A) [subsec. (a)(6)(A) of this section]) required to be paid at the wage rate prescribed by section 6(a)(5) *[29 USCS § 206(a)(5)]*,

(B) is twelve years or thirteen years of age and (i) such employment is with the consent of his parent or person standing in the place of his parent, or (ii) his parent or such person is employed on the same farm as such employee, or

(C) is fourteen years of age or older.

(2) The provisions of section 12 *[29 USCS § 212]* relating to child labor shall apply to an employee below the age of sixteen employed in agriculture in an occupation that the Secretary of Labor finds and declares to be particularly hazardous for the employment of children below the age of sixteen, except where such employee is employed by his parent or by a person standing in the place of his parent on a farm owned or operated by such parent or person.

(3) The provisions of section 12 *[29 USCS § 212]* relating to child labor shall not apply to any child employed as an actor or performer in motion pictures or theatrical productions, or in radio or television productions.

(4) (A) An employer or group of employers may apply to the Secretary for a waiver of the application of section 12 *[29 USCS § 212]* to the employment for not more than eight weeks in any calendar year of individuals who are less than twelve years of age, but not less than ten years of age, as hand harvest laborers in an agricultural operation which has been, and is customarily and generally recognized as being, paid on a piece rate basis in the region in which such individuals would be employed. The Secretary may not grant such a waiver unless he finds, based on objective data submitted by the applicant, that—

(i) the crop to be harvested is one with a particularly short harvesting season and the application of section 12 *[29 USCS § 212]* would cause severe economic disruption in the industry of the employer or group of employers applying for the waiver;

(ii) the employment of the individuals to whom the waiver would apply would not be deleterious to their health or well-being;

(iii) the level and type of pesticides and other chemicals used would not have an adverse effect on the health or well-being of the individuals to whom the waiver would apply;

(iv) individuals age twelve and above are not available for such employment; and

(v) the industry of such employer or group of employers has traditionally and substantially employed individuals under twelve years of age without displacing substantial job opportunities for individuals over sixteen years of age.

(B) Any waiver granted by the Secretary under subparagraph (A) shall require that—

(i) the individuals employed under such waiver be employed outside of school hours for the school district where they are living while so employed;

(ii) such individuals while so employed commute daily from their permanent residence to the farm on which they are so employed; and

(iii) such individuals be employed under such waiver (I) for not more than eight weeks between June 1 and October 15 of any calendar year, and (II) in accordance with such other terms and conditions as the Secretary shall prescribe for such individuals' protection.

(5) (A) In the administration and enforcement of the child labor provisions of this Act *[29 USCS § § 201 et seq.]*, employees who are 16 and 17 years of age shall be permitted to load materials into, but not operate or unload materials from, scrap paper balers and paper box compactors—

(i) that are safe for 16- and 17-year-old employees loading the scrap paper balers or paper box compactors; and

(ii) that cannot be operated while being loaded.

(B) For purposes of subparagraph (A), scrap paper balers and paper box compactors shall be considered safe for 16- or 17-year-old employees to load only if—

(i) (I) the scrap paper balers and paper box compactors meet the American National Standards Institute's Standard ANSI Z245.5-1990 for scrap paper balers and Standard ANSI Z245.2-1992 for paper box compactors; or

(II) the scrap paper balers and paper box compactors meet an applicable standard that is adopted by the American National Standards Institute after the date of enactment of this paragraph and that is certified by the Secretary to be at least as protective of the safety of minors as the standard described in subclause (I);

(ii) the scrap paper balers and paper box compactors include an on-off switch incorporating a key-lock or other system and the control of the system is maintained in the custody of employees who are 18 years of age or older;

(iii) the on-off switch of the scrap paper balers and paper box compactors is maintained in an off position when the scrap paper balers and paper box compactors are not in operation; and

(iv) the employer of 16- and 17-year-old employees provides notice, and posts a notice, on the scrap paper balers and paper box compactors stating that--

(I) the scrap paper balers and paper box compactors meet the applicable standard described in clause (i);

(II) 16- and 17-year-old employees may only load the scrap paper balers and paper box compactors; and

(III) any employee under the age of 18 may not operate or unload the scrap paper balers and paper box compactors.

The Secretary shall publish in the Federal Register a standard that is adopted by the American National Standards Institute for scrap paper balers or paper box compactors and certified by the Secretary to be protective of the safety of minors under clause (i)(II).

(C) (i) Employers shall prepare and submit to the Secretary reports--

(I) on any injury to an employee under the age of 18 that requires medical treatment (other than first aid) resulting from the employee's contact with a scrap paper baler or paper box compactor during the loading, operation, or unloading of the baler or compactor; and

(II) on any fatality of an employee under the age of 18 resulting from the employee's contact with a scrap paper baler or paper box compactor during the loading, operation, or unloading of the baler or compactor.

(ii) The reports described in clause (i) shall be used by the Secretary to determine whether or not the implementation of subparagraph (A) has had any effect on the safety of children.

(iii) The reports described in clause (i) shall provide--

(I) the name, telephone number, and address of the employer and the address of the place of employment where the incident occurred;

(II) the name, telephone number, and address of the employee who suffered an injury or death as a result of the incident;

(III) the date of the incident;

(IV) a description of the injury and a narrative describing how the incident occurred; and

(V) the name of the manufacturer and the model number of the scrap paper baler or paper box compactor involved in the incident.

(iv) The reports described in clause (i) shall be submitted to the Secretary promptly, but not later than 10 days after the date on which an incident relating to an injury or death occurred.

(v) The Secretary may not rely solely on the reports described in clause (i) as the basis for making a determination that any of the employers described in clause (i) has violated a provision of section 12 *[29 USCS § 212]* relating to oppressive child labor or a regulation or order issued pursuant to section 12 *[29 USCS § 212]*. The Secretary shall, prior to making such a determination, conduct an investigation and inspection in accordance with section 12(b) *[29 USCS § 212(b)]*.

(vi) The reporting requirements of this subparagraph shall expire 2 years after the date of enactment of this subparagraph [enacted August 6, 1996].

(6) In the administration and enforcement of the child labor provisions of this Act *[29 USCS §§ 201* et seq.], employees who are under 17 years of age may not drive automobiles or trucks on public roadways. Employees who are 17 years of age may drive automobiles or trucks on public roadways only if--

(A) such driving is restricted to daylight hours;

(B) the employee holds a State license valid for the type of driving involved in the job performed and has no records of any moving violation at the time of hire;

(C) the employee has successfully completed a State approved driver education course;

(D) the automobile or truck is equipped with a seat belt for the driver and any passengers and the employee's employer has instructed the employee that the seat belts must be used when driving the automobile or truck;

(E) the automobile or truck does not exceed 6,000 pounds of gross vehicle weight;

(F) such driving does not involve--

(i) the towing of vehicles;

(ii) route deliveries or route sales;

(iii) the transportation for hire of property, goods, or passengers;

(iv) urgent, time-sensitive deliveries;

(v) more than two trips away from the primary place of employment in any single day for the purpose of delivering goods of the employee's employer to a customer (other than urgent, time-sensitive deliveries);

(vi) more than two trips away from the primary place of employment in any single day for the purpose of transporting passengers (other than employees of the employer);

(vii) transporting more than three passengers (including employees of the employer); or

(viii) driving beyond a 30 mile radius from the employee's place of employment; and

(G) such driving is only occasional and incidental to the employee's employment.

For purposes of subparagraph (G), the term "occasional and incidental" is no more than one-third of an employee's worktime in any workday and no more than 20 percent of an employee's worktime in any workweek.

(7) (A)

(i) Subject to subparagraph (B), in the administration and enforcement of the child labor provisions of this Act *[29 USCS § § 201 et seq.]*, it shall not be considered oppressive child labor for a new entrant into the workforce to be employed inside or outside places of business where machinery is used to process wood products.

(ii) In this paragraph, the term "new entrant into the workforce" means an individual who--

(I) is under the age of 18 and at least the age of 14, and

(II) by statute or judicial order is exempt from compulsory school attendance beyond the eighth grade.

(B) The employment of a new entrant into the workforce under subparagraph (A) shall be permitted--

(i) if the entrant is supervised by an adult relative of the entrant or is supervised by an adult member of the same religious sect or division as the entrant;

(ii) if the entrant does not operate or assist in the operation of power-driven woodworking machines;

(iii) if the entrant is protected from wood particles or other flying debris within the workplace by a barrier appropriate to the potential hazard of such wood particles or flying debris or by maintaining a sufficient distance from machinery in operation; and

(iv) if the entrant is required to use personal protective equipment to prevent exposure to excessive levels of noise and saw dust.

(d) Delivery of newspapers and wreathmaking. The provisions of sections 6, 7 and 12 *[29 USCS § § 206,* 207, and 212] shall not apply with respect to any employee engaged in the delivery of newspapers to the consumer or to any homeworker engaged in the making of wreaths composed primarily of natural holly, pine, cedar, or other evergreens (including the harvesting of the evergreens or other forest products used in making such wreaths).

(e) Maximum hour requirements and minimum wage employees. The provisions of section 7 *[29 USCS § 207]* shall not apply with respect to employees for whom the Secretary of Labor is authorized to establish minimum wage rates as provided in section 6(a)(3) *[29 USCS § 206(a)(3)]*, except with respect to employees for whom such rates are in effect; and with respect to such employees the Secretary may make rules and regulations providing reasonable limitations and allowing reasonable variations, tolerances, and exemptions to and from any or all of the provisions of section 7 *[29 USCS § 207]* if he shall find, after a public hearing on the matter, and taking into account the factors set forth in section 6(a)(3) *[29 USCS § 206(a)(3)]*, that economic conditions warrant such action.

(f) Employment in foreign countries and certain United States territories. The provisions of sections 6, 7, 11, and 12 *[29 USCS § § 206,* 207, 211, 212] shall not apply with respect to any employee whose services during the workweek are performed in a workplace within a foreign country or within territory under the jurisdiction of the United States other than the following: a State of the United States; the District of Columbia; Puerto Rico; the Virgin Islands; outer Continental Shelf lands defined in the Outer Continental Shelf Lands Act (ch. 345, 67 Stat. 462) *[43 USCS § § 1331* et seq.]; American Samoa; Guam; Wake Island; Eniwetok Atoll; Kwajalein Atoll; and Johnston Island.

(g) Certain employment in retail or service establishments, agriculture. The exemption from section 6 *[29 USCS § 206]* provided by paragraph (6) of subsection (a) of this section shall not apply with respect to any employee employed by an establishment (1) which controls, is controlled by, or is under common control with, another establishment the activities of which are not related for a common business purpose to, but materially support the activities of the establishment employing such employee; and (2) whose annual gross volume of sales made or business done, when combined with the annual gross volume of sales made or business done by each establishment which controls, is controlled by, or is under common control with, the establishment employing such employee, exceeds $ 10,000,000 (exclusive of excise taxes at the retail level which are separately stated).

(h) Maximum hour requirement; fourteen workweek limitation. The provisions of section 7 *[29 USCS § 207]* shall not apply for a period or periods of not more than fourteen workweeks in the aggregate in any calendar year to any employee who--
    (1) is employed by such employer--
    (A) exclusively to provide services necessary and incidental to the ginning of cotton in an establishment primarily engaged in the ginning of cotton;
    (B) exclusively to provide services necessary and incidental to the receiving, handling, and storing of raw cotton and the compressing of raw cotton when performed at a cotton warehouse or compress-warehouse facility, other than one operated in conjunction with a cotton mill, primarily engaged in storing and compressing;
    (C) exclusively to provide services necessary and incidental to the receiving, handling, storing, and processing of cottonseed in an establishment primarily engaged in the receiving, handling, storing, and processing of cottonseed; or
    (D) exclusively to provide services necessary and incidental to the processing of sugar cane or sugar beets in an establishment primarily engaged in the processing of sugar cane or sugar beets; and
    (2) receives for--
    (A) such employment by such employer which is in excess of ten hours in any workday, and
    (B) such employment by such employer which is in excess of forty-eight hours in any workweek,
    compensation at a rate not less than one and one-half times the regular rate at which he is employed.

Any employer who receives an exemption under this subsection shall not be eligible for any other exemption under this section or section 7 *[29 USCS § 207]*.

(i) Cotton ginning. The provisions of section 7 *[29 USCS § 207]* shall not apply for a period or periods of not more than fourteen workweeks in the aggregate in any period of fifty-two consecutive weeks to any employee who--
    (1) is engaged in the ginning of cotton for market in any place of employment located in a county where cotton is grown in commercial quantities; and
    (2) receives for any such employment during such workweeks--
    (A) in excess of ten hours in any workday, and
    (B) in excess of forty-eight hours in any workweek,
    compensation at a rate not less than one and one-half times the regular rate at which he is employed. No week included in any fifty-two week period for purposes of the preceding sentence may be included for such purposes in any other fifty-two week period.

(j) Processing of sugar beets, sugar beet molasses, or sugar cane. The provisions of section 7 *[29 USCS § 207]* shall not apply for a period or periods of not more than fourteen workweeks in the aggregate in any period of fifty-two consecutive weeks to any employee who--
    (1) is engaged in the processing of sugar beets, sugar beet molasses, or sugar cane into sugar (other than refined sugar) or syrup; and
    (2) receives for any such employment during such workweeks--
    (A) in excess of ten hours in any workday, and
    (B) in excess of forty-eight hours in any workweek,
    compensation at a rate not less than one and one-half times the regular rate at which he is employed. No week included in any fifty-two week period for purposes of the preceding sentence may be included for such purposes in any other fifty-two week period.

**HISTORY:**
(June 25, 1938, ch 676, § 13, 52 Stat. 1067; Aug. 9, 1939, ch 605, 53 Stat. 1266; Oct. 26, 1949, ch 736, § 11, 63 Stat. 917; Aug. 8, 1956, ch 1035, § 3, 70 Stat. 1118; Aug. 30, 1957, P.L. 85-231, § 1(1), 71 Stat. 514; July 12, 1960, P.L. 86-624, § 21(b), 74 Stat. 417; May 5, 1961, P.L. 87-30, § § 9, 10, 75 Stat. 71, 74; Sept. 23, 1966, P.L. 89-601, Title II, § § 201-204(b), 205-212(a), 213, 214, 215(b), (c), 80 Stat. 833-838; Oct. 15, 1966, P.L. 89-670, § 8(e), 80 Stat. 943; June 23, 1972, P.L. 92-318, Title IX, § 906(b)(1), 86 Stat. 375; April 8, 1974, P.L. 93-259, § § 6(c)(2), 7(b)(3), (4), 8(a), 9(b), 10(a), (b)(1), 11(a), 12(a), 13(a), 14, 15(a), 16(a), (b), 17, 18, 20(a), (b)(1), (b)(2), (c)(1), (c)(2), 21(b)(1), 22, 23, 25(b), 88 Stat. 61-69, 72; Nov. 1, 1977, P.L. 95-151, § § 4-8, 9(d), 11, 14(a), (b) 91 Stat. 1249-1252; Sept. 27, 1979, P.L. 96-70, Title I, ch 2, Subch II, § 1225(a), 93 Stat. 468; Nov. 17, 1989, P.L. 101-157, § 3(c), 103

Stat. 939.)

(As amended Sept. 30, 1994, P.L. 103-329, Title VI, § 633(d), 108 Stat. 2428; Dec. 29, 1995, P.L. 104-88, Title III, Subtitle B, § 340, 109 Stat. 955; Aug. 6, 1996, P.L. 104-174, § 1, 110 Stat. 1553; Aug. 20, 1996, P.L. 104-188, Title II, § 2105(a), 110 Stat. 1929; Nov. 13, 1997, P.L. 105-78, Title I, § 105, 111 Stat. 1477; Oct. 31, 1998, P.L. 105-334, § 2(a), 112 Stat. 3137; Jan. 23, 2004, P.L. 108-199, Div E, Title I, § 108, 118 Stat. 236.)

## HISTORY; ANCILLARY LAWS AND DIRECTIVES

References in text:

The "Administrative Procedure Act,", referred to in subsec. (a)(1), is Act June 11, 1946, ch 324, 60 Stat. 237, which was repealed as part of the general revision and enactment into positive law of Title 5 by Act Sept 6, 1966, P.L. 89-554, § 1, 80 Stat. 378. Similar provisions are now located at *5 USCS §§ 551* et seq., and § § 701 et seq.

"Section 204 of the Motor Carrier Act, 1935", referred to in subsec. (b)(1), is Act Aug. 9, 1935, ch 498, § 204, 49 Stat. 546, which was classified to *49 USCS § 304,* prior to the enactment of a portion of Title 49 into positive law by Act Jan. 12, 1983, P.L. 97-449, 96 Stat. 2413. Similar provisions are now located at *49 USCS § 3102.*

Explanatory notes:

In subsec. (a)(1), the word "that" has been inserted in brackets as the word probably intended by Congress.

In subsec. (a)(1), "*5 USCS §§ 551* et seq." has been inserted in brackets pursuant to § 7(b) of Act Sept. 6, 1966, P.L. 89-554, which appears as a note preceding *5 USCS § 101.* Section 1 of such Act enacted Title 5 as positive law, and § 7(b) of such Act provided that a reference to a law replaced by § 1 of such Act is deemed to refer to the corresponding provision enacted by such Act.

In subsec. (b)(1), "*49 USCS § 31502*" has been inserted in brackets pursuant to § 6(b) of Act July 5, 1994, P.L. 103-272, which appears as a note preceding *49 USCS § 101.* Section 1 of such Act enacted Subtitles II, III, and V-X of Title 49 as positive law, and § 6(b) of such Act provided that a reference to a law replaced by § 1 of such Act is deemed to refer to the corresponding provision enacted by such Act. (Section 204 of the Motor Carrier Act, 1935, had previously been repealed and reenacted as *49 USCS § 3102* by Act Jan. 12, 1983, P.L. 97-449, which enacted Subtitle I and part of Subtitle II of Title 49 as positive law.)

Amendments:

1939. Act Aug. 9, 1939, in subsec. (a), added clause (11), which read "any employee or proprietor in a retail or service establishment which qualifies as an exempt retail or service establishment under clause (2) of this subsection with respect to whom the provisions of sections 6 and 7 would not otherwise apply, engaged in handling telegraphic messages for the public under an agency or contract arrangement with a telegraph company where the telegraph message revenue of such agency does not exceed $ 500 a month; or".

1949. Act Oct. 26, 1949 (effective 90 days after enactment, as provided by § 16(a) of such Act, which appears as *29 USCS § 202* note) , in subsec. (a), for substituted clauses (2)-(4), new clauses which read "(2) any employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located. A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry; or (3) any employee employed by any establishment engaged in laundering, cleaning or repairing clothing or fabrics, more than 50 per centum of which establishment's annual dollar volume of sales of such services is made within the State in which the establishment is located: *Provided,* That 75 per centum of such establishment's annual dollar volume of sales of such services is made to customers who are not engaged in a mining, manufacturing, transportation, or communications business; or (4) any employee employed by an establishment which qualifies as an exempt retail establishment under clause (2) of this subsec. and is recognized as a retail establishment in the particular industry notwithstanding that such establishment makes or processes at the retail establishment the goods that it sells: *Provided,* That more than 85 per centum of such establishment's annual dollar volume of sales of goods so made or processed is made within the State in which the establishment is located; or", substituted, in clause (5), "(other than canning)" for "canning", substituted, for former clause (6), "(6) any employee employed in agriculture or in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways, not owned or operated for profit, or operated on a sharecrop basis, and which are used exclusively for supply and storing of water for agricultural purposes; or", substituted, in clause (8), ", semiweekly, or daily" for "or semiweekly" and "four" for "three" and inserted "or counties contiguous thereto", deleted, at the beginning

of clause (10), "to", substituted, in clause (11), "not more" for "less" and "seven hundred and fifty" for "five hundred", and added clauses (12)-(15) which read "(12) any employee of an employed engaged in the business of operating taxicabs; or (13) any employee or proprietor in a retail or service establishment as defined in clause (2) of this subsec. with respect to whom the provisions of § § 6 and 7 would not otherwise apply, engaged in handling telegraphic messages for the public under an agency or contract arrangement with a telegraph company where the telegraph message revenue of such agency does not exceed $ 500 a month; or (14) any employee employed as a seaman; or (15) any employee employed in planting or tending trees, cruising, surveying, or felling timber, or in preparing or transporting logs or other forestry products to the mill, processing plant, railroad, or other transportation terminal, if the number of employees employed by his employer in such forestry or lumbering operations does not exceed twelve."; in subsec. (b), added clause (3), clause (5), and clause (4); in subsec. (c), substituted "outside of school hours for the school district where such employee is living while he is so employed" for "while not legally required to attend school", and inserted "or performer" following "as an actor" and ", or in radio or television productions" following "theatrical productions"; in subsec. (d).

1956. Act Aug. 8, 1956, added subsec. (e).

1957. Act Aug. 30, 1957 (effective 90 days from date of enactment as provided by § 2 of that Act), added subsec. (f).

1960. Act July 12, 1960, in subsec. (f), deleted "Alaska; Hawaii;".

1961. Act May 5, 1961 (effective upon expiration of 120 days after enactment, as provided by § 14 of that Act, which appears as 29 USCS § 203 note), generally amended subsecs. (a) and (b) to modify clauses into paragraph form; and, in subsec. (a), amended clauses (1) and (2) to read as follows:

"(a) The provisions of sections 6 and 7 shall not apply with respect to--

"(1) any employee employed in a bona fide executive, administrative, or professional capacity, or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary, subject to the provisions of the Administrative Procedure Act, except than an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities); or

"(2) any employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, if such establishment--

"(i) is not in an enterprise described in section 3(s), or

"(ii) is in such an enterprise and is a hotel, motel, restaurant, or motion picture theater; or is an amusement or recreational establishment that operates on a seasonal basis, or

"(iii) is in such an enterprise and is a hospital, or an institution which is primarily engaged in the care of the sick, the aged, the mentally ill or defective, residing on the premises of such institution, or a school for physically or mentally handicapped or gifted children, or

"(iv) is in such an enterprise and has an annual dollar volume of sales (exclusive of excise taxes at the retail level which are separately stated) which is less than $ 250,000.

A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry; or".

Such Act further (effective as above), in subsec. (a), clause (9), substituted "not in an enterprise described in section 3(s)(2)" for "not included in other exemptions contained in this section", deleted, from clause (10), the word "ginning" and substituted "Secretary" for "Administrator", substituted, in clause (11), "employed by an independently owned public telephone company" for "employed in a public telephone exchange", substituted, in clause (13) "which qualifies as an exempt retail or service establishment under clause (2) of this subsection" for "as defined in clause (2) of this subsection", inserted, in clause (14), following "seaman", "on a vessel other than an American vessel", and added clauses (16)-(22); in subsec. (b), clause (4), inserted ", processing, marketing, freezing, curing, storing, packing for shipment, or distributing" following "canning", and added clauses (6)-(11); in subsec. (d), inserted language beginning "or to any homeworker" and continuing to the end of the subsection.

1966. Act Sept. 23, 1966 (effective 2/1/67, as provided by § 602 of such Act), in subsec. (a), paragraph (1), inserted "(including any employee employed in the capacity of academic administrative personnel or teacher in elementary of secondary schools)", redesignated paragraphs (11), (13), (14), (15), and (21) to be paragraphs (10), (11), (12), (13), (14), respectively, substituted a period for "; or" at the end of newly redesignated paragraph (14), substituted ", order, or

certificate" for "or order" in paragraph (7), deleted, in paragraph (2), everything preceding "A 'retail or service establishment' and inserted a new paragraph (2) which provided "any employee employed by any retail or service establishment (except an establishment or employee engaged in laundering, cleaning, or repairing clothing or fabrics or an establishment engaged in the operation of a hospital, institution, or school described in § 3(s)(4), if more than 50 per centum of such establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, and such establishment is not in an enterprise described in section 3(s) or such establishment has an annual dollar volume of sales which is less than $ 250,000 (exclusive of excise taxes at the retail level which are separately stated).", substituted paragraph (3) for former paragraph (3), substituted paragraph (6) for former paragraph (6), repealed paragraphs (9), (10), (12), (16), (17), (18), (19), (20) and (22) substituted in paragraph (8) "where published" for "where printed and published", added paragraph (9) which provided "any employee employed by an establishment which is a motion picture theater; or", substituted, in paragraph (15), "eight" for "twelve"; in subsec. (b), added paragraph (8), substituted in paragraph (11), "; or" for the period at the end thereof, added paragraphs (12) and (13), added paragraphs (14) and (16), and added a paragraph (15) which provided "any employee engaged in ginning of cotton for market, in any place of employment located in a county where cotton is grown in commercial quantities, or in the processing of sugar beets, sugar-beet molasses, sugarcane, or maple sap, into sugar (other than refined sugar) or syrup; or", added paragraph (17), and substituted, for paragraph (7), a new paragraph (7) which provided "any driver, operator, or conductor employed by an employer engaged in the business of operating a street, suburban or interurban electric railway, or local trolley or motor bus carrier, if the rates and services of such railway or carrier are subject to regulation by a State or local agency; or", added paragraph (10), added paragraph (18), added paragraph (19), and repealed paragraph (8) and paragraph (10); and subsec. (c) to read as follows:

"(c)(1) Except as provided in paragraph (2), the provisions of section 12 relating to child labor shall not apply with respect to any employee employed in agriculture outside of school hours for the school district where such employee is living while he is so employed.

"(2) The provisions of section 12 relating to child labor shall apply to an employee below the age of sixteen employed in agriculture in an occupation that the Secretary of Labor finds and declares to be particularly hazardous for the employment of children below the age of sixteen, except where such employee is employed by his parent or by a person standing in the place of his parent on a farm owned or operated by such parent or person.

"(3) The provisions of section 12 relating to child labor shall not apply to any child employed as an actor or performer in motion pictures or theatrical productions, or in radio or television productions."

Such Act further (effective as above), in subsec. (f), substituted "Eniwetok Atoll; Kwajalein Atoll; Johnston Island; and the Canal Zone" for "and the Canal Zone".

Act Oct. 15, 1966 (effective 4/1/67, as prescribed by the President and published in the Federal Register, as provided by §16(a) [15(a)] of that Act and Ex. Or. No 11340 of March 30, 1967, which appear as notes to 49 USCS § 1651) in subsec. (b), paragraph (1), substituted "Secretary of Transportation" for "Interstate Commerce Commission".

1972. Act June 23, 1972, amended subsec. (a) inserting after the words "the provisions of section 6" the following: "(except section 6(d) in the case of paragraph (1) of this subsection)".

1974. Act April 8, 1974 (effective 5/1/74, as provided by § 6(c)(2)(A) of such Act) added para. (20).

Such Act further (effective 5/1/74, as provided by § 29(a) of such Act) in subsec. (a), repealed para. (9), repealed para. (11), repealed paras. (13)-(14) and added para. (15); in subsec. (b), in para. (2), inserted "engaged in the operation of a common carrier by rail and", in para. (4), added "who is" following "employee" and inserted language beginning "and who receives compensation" and continuing to the end, in para. (7), substituted "(regardless of whether or not such railway or carrier is public or private or operated for profit or not for profit), if such employee receives compensation for employment in excess of forty-eight hours in any work week at a rate not less than one and one-half times the regular rate at which he is employed" for ", if the rates and services of such railway or carrier are subject to regulation by a State or local agency", in para. (8), deleted "any employee who (A) is employed by an establishment which is an institution (other than a hospital) primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises, and (B) receives compensation for employment in excess of forty-eight hours in any workweek at a rate not less than one and one-half times the regular rate at which he is employed; or" following "restaurant; or", and substituted "(A) any employee (other than an employee of a hotel or motel who performs maid or custodial services) who is" for "any employee," and inserted text following "hotel, motel, or restaurant" including subparagraph (B), amended para. (10) generally, amended para. (15) generally, in para. (18), inserted language beginning "and who receives compensation", and added paras. (21)-(28); amended subsec. (c)(1) generally; and added subsecs. (g) and (h).

Such Act further (effective 1/1/75, as provided by § 8(a) of such Act), in subsec. (a), para. (2), substituted "$ 225,000" for "$ 250,000".

Such Act further (effective one year after 5/1/74, as provided by § 11(b) of such Act), in subsec. (b)(4), substituted "forty-four" for "forty-eight".

Such Act further (effective one year after 5/1/74, as provided by § 21(b)(2) of such Act) in subsec. (b)(7), substituted "forty-four" for "forty-eight".

Such Act further (effective one year after 5/1/74, as provided by § 13(b) of such Act), in subparagraphs (A) and (B) of subsec. (b)(8), substituted "forty-six" for "forty-eight".

Such Act further (effective one year after 5/1/74, as provided by § 15(b) of such Act) in subsec. (b)(18) substituted "forty-four" for "forty-eight".

Such Act further (effective one year after 5/1/74, as provided by § 16(a) of such Act) in subsec. (b)(19), substituted "forty-four" for "forty-eight".

Such Act further (effective 1/1/75. as provided by § 6(c)(2)(B) of such Act), in subsec. (b), substituted paragraph (20) for one which read "Any employee of a public agency who is employed in fire protection or law enforcement activities (including security personnel in correctional institutions)".

Such Act further (effective one year after 5/1/74, as provided by § 10(b)(2) of such Act), in subsec. (b)(23), substituted "forty-four" for "forty-eight".

Such Act further (effective 1/1/75, as provided by § 20(b)(2) of such Act) in para. (25), substituted "sixty-six" for "seventy-two", "sixty" for "sixty-four", "fifty" for "fifty-four", and substituted subparagraph (D) for one which read "forty-eight hours in any other work week from that year,", deleted "and" which appeared at the end of subparagraph (C), and added subparagraph (E).

Such Act further (effective 1/1/75, as provided by § 20(c)(2) of such Act), in para. (26) substituted "sixty-six" for "seventy-two", "sixty" for "sixty-four", "fifty" for "fifty-four", substituted subpara. (D) for one which read "forty-eight hours in any workweek in that year,", deleted "and" which appeared at the end of subparagraph (C), and added subparagraph (E).

Such Act further (effective 1/1/76, as provided by § 8(b) of such Act), in subsec. (a)(2), substituted "$ 200,000" for "$ 225,000".

Such Act further (effective two years after 5/1/74, as provided by § 11(c) of such Act) repealed subsec. (b)(4).

Such Act further (effective two years after 5/1/74, as provided by § 21(b)(3) of such Act) repealed subsec. (b)(7).

Such Act further (effective two years after 5/1/74, as provided by § 13(c) of such Act), in subparagraph (B) of subsec. (b)(8), substituted "forty-four" for "forty-six".

Such Act further (effective two years after 5/1/74, as provided by § 15(c) of such Act) repealed subsec. (b)(18).

Such Act further (effective two years after 5/1/74, as provided by § 16(b) of such Act) repealed subsec. (b)(19).

Such Act further (effective two years after 5/1/74, as provided by § 10(b)(3) of such Act) repealed subsec. (b)(23).

Such Act further (effective 1/1/76 as provided by § 20(b)(3) of such Act) in subsec. (b)(25), substituted "sixty" for "sixty-six", "fifty-six" for "sixty", "forty-eight" for "fifty", "forty-four" for "forty-six", and "forty" for "forty-four".

Such Act further (effective 1/1/76 as provided by § 20(c)(3) of such Act) in subsec. (b)(26), substituted "sixty" for "sixty-six", "fifty-six" for "sixty", "forty-eight" for "fifty","forty-four" for "forty-six", and "forty" for "forty-four".

Such Act further (effective 1/1/77, as provided by § 8(c) of such Act), in subsec. (a)(2), deleted "or such establishment has an annual dollar volume of sales which is less than $ 200,000 (exclusive of excise taxes at the retail level which are separately stated)" following "enterprise described in section 3(s)".

Such Act further (effective three years after 5/1/74, as provided by § 13(d) of such Act) in subsec. (b)(8), deleted (A) following (8), and deleted subpara. (B), which read: "(B) any employee of a hotel or motel who performs maid or custodial services and who receives compensation for employment in excess of forty-four hours in any workweek at a rate not less than one and one-half times the regular rate at which he is employed; or".

1977. Act Nov. 1, 1977 (effective upon enactment as provided by § 15(b) of such Act), in subsec. (a), in para. (2), substituted "section 3(s)(5)" for "section 3(s)(4), in para. (3), inserted "organized camp, or religious or non-profit educational conference center," and in subsec. (c), in para (1), in the introductory material, inserted "or (4)", and added para (4).

Such Act further (effective 1/1/78, as provided by § 15(a) of such Act, which appears as *29 USCS § 203* note) in subsec. (a)(3), inserted ",except that the exemption from sections 6 and 7 provided by this paragraph does not apply with respect to any employee of a private entity engaged in providing services or facilities (other than, in the case of the exemption from section 6, a private entity engaged in providing services and facilities directly related to skiing) in a national park or a national forest, or on land in the National Wildlife Refuge System, under a contract with the Secretary of the Interior or the Secretary of Agriculture"; in subsec. (b), deleted para. (22), which read: "(22) any agricultural employee employed in the growing and harvesting of shade-grown tobacco who is engaged in the processing (including,

but not limited to, drying, curing, fermenting, bulking, rebulking, sorting, grading, aging, and baling) of such tobacco, prior to the stemming process, for use as cigar wrapper tobacco; or", and deleted paras. (25) and (26), which read:

"(25) any employee who is engaged in ginning of cotton for market in any place of employment located in a county where cotton is grown in commercial quantities and who receives compensation for employment in excess of--

"(A) sixty hours in any workweek for not more than six workweeks in a year,

"(B) fifty-six hours in any workweek for not more than four workweeks in that year,

"(C) forty-eight hours in any workweek for not more than two workweeks in that year,

"(D) forty-four hours in any workweek for not more than two workweeks in that year, and

"(E) forty hours in any other workweek in that year,

at a rate not less than one and one-half times the regular rate at which he is employed; or"

"(26) any employee who is engaged in the processing of sugar beets, sugar beet molasses, or sugarcane into sugar (other than refined sugar) or syrup and who receives compensation for employment in excess of--

"(A) sixty hours in any workweek for not more than six workweeks in a year,

"(B) fifty-six hours in any workweek for not more than four workweeks in that year,

"(C) forty-eight hours in any workweek for not more than two workweeks in that year,

"(D) forty-four hours in any workweek for not more than two workweeks in that year, and

"(E) forty hours in any other workweek in that year, at a rate not less than one and one-half times the regular rate at which he is employed; or".

Such Act further (effective as above), in subsec. (b)(28), substituted "; or" for the period at the end; and added subsec. (b)(29); and added subsecs. (i) and (j).

Such Act further (effective 1/1/78, as provided by § 14(a) of such Act) in subsec. (b), in para. (8), substituted "forty-four" for "forty-six".

Such Act Nov. 1, 1977 (effective 1/1/79, as provided by § 14(b) of such Act), deleted subsec. (b)(8) which read: "any employee (other than an employee of a hotel or motel who performs maid or custodial services) who is employed by an establishment which is a hotel, motel, or restaurant and who receives compensation for employment in excess of forty-four hours in any workweek at a rate not less than one and one-half times the regular rate at which he is employed; or".

1979. Act Sept. 27, 1979 (effective on the date on which the Panama Canal Treaty of 1977 enters into force [Oct. 1, 1979], as provided by § 3304 of said Act, which appears as 22 USCS § 3601 note), in subsec. (f), substituted "and Johnston Island" for "Johnston Island; and the Canal Zone.".

1989. Act Nov. 17, 1989 (effective 4/1/90, as provided by § 3(e) of such Act, which appears as 29 USCS § 203 note), in subsec. (a), deleted para. (2), which read: "(2) any employee employed by any retail or service establishment (except an establishment or employee engaged in laundering, cleaning, or repairing clothing or fabrics or an establishment engaged in the operation of a hospital, institution, or school described in section 3(s)(5), if more than 50 per centum of such establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, and such establishment is not in an enterprise described in section 3(s). A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry; or", and deleted para. (4), which read: "(4) any employee employed by an establishment which qualifies as an exempt retail establishment under clause (2) of this subsection and is recognized as a retail establishment in the particular industry notwithstanding that such establishment makes or processes at the retail establishment the goods that it sells: Provided, That more than 85 per centum of such establishment's annual dollar volume of sales of goods so made or processed is made within the State in which the establishment is located; or".

Such Act further (effective as provided above), in subsec. (g), substituted "paragraph" for "paragraphs (2) and", and a concluding period for ", except that the exemption from section 6 provided by paragraph (2) of subsection (a) of this section shall apply with respect to any establishment described in this subsection which has an annual dollar volume of sales which would permit it to qualify for the exemption provided in paragraph (2) of subsection (a) if it were in an enterprise described in section 3(s).".

1994. Act Sept. 30, 1994 (effective as provided by § 633(e) of such Act, which appears as 5 USCS § 5545a note), in subsec. (a), in para. (15), substituted "; or" for a concluding period, and added para. (16); and, in subsec. (b), in para. (28), deleted "or" after the concluding semicolon, in para. (29), substituted "; or" for a concluding period, and added para. (30).

1995. Act Dec. 29, 1995 (effective 1/1/96, as provided by § 2 of such Act, which appears as 49 USCS § 701 note), in subsec. (b)(2), substituted "rail carrier subject to part A of subtitle IV of title 49, United States Code" for "common carrier by rail and subject to the provisions of part I of the Interstate Commerce Act".

1996. Act Aug. 6, 1996, in subsec. (c), added para. (5).

Act Aug. 20, 1996, in subsec. (a), in para. (16), substituted "; or" for a concluding period, and added para. (17).

1997. Act Nov. 13, 1997, in subsec. (b)(12), substituted "water, at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year" for "water for agricultural purposes".

1998. Act Oct. 31, 1998 (effective and applicable as provided by § 2(b) of such Act, which appears as a note to this section), in subsec. (c), added para. (6).

2004. Act Jan. 23, 2004, in subsec. (c), added para. (7).

Transfer of functions:

Transfer of functions of all other officers, employees, and agencies of Department of Labor to Secretary of Labor by 1950 Reorg. Plan No. 6, see transfer of functions note to *29 USCS § 1*.

All functions vested by law (including reorganization plans) in the Bureau of the Budget or the Director of the Bureau of the Budget were transferred to the President of the United States by 1970 Reorg. Plan No. 2, which appears as a note to *5 USCS § 903*. The Bureau of the Budget was redesignated as the Office of Management and Budget by § 102 of 1970 Reorg. Plan No. 2.

Other provisions:

**Rules and regulations prescribed by Secretary.** Rules and regulations with regard to 1966 amendment, see note to *29 USCS § 203*.

**Secretary of Labor to make studies.** Act April 8, 1974, P.L. 93-259, § 6(c)(3), 88 Stat. 61, provides: "The Secretary of Labor shall in the calendar year beginning January 1, 1976, conduct (A) a study of the average number of hours in tours of duty in work periods in the preceding calendar year of employees (other than employees exempt from section 7 of the Fair Labor Standards Act of 1938 by section 13(b)(20) of such Act) of public agencies who are employed in fire protection activities, and (B) a study of the average number of hours in tours of duty in work periods in the preceding calendar year of employees (other than employees exempt from section 7 of the Fair Labor Standards Act of 1938 by section 13(b)(20) of such Act) of public agencies who are employed in law enforcement activities (including security personnel in correctional institutions). The Secretary shall publish the results of each such study in the Federal Register.".

**Regulations concerning certain employees.** Act Nov. 15, 1990, P.L. 101-583, § 2, 104 Stat. 2871, provides: "Not later than 90 days after the date of enactment of this Act, the Secretary of Labor shall promulgate regulations that permit computer systems analysts, computer programmers, software engineers, and other similarly skilled professional workers as defined in such regulations to qualify as exempt executive, administrative, or professional employees under section 13(a)(1) of the Fair Labor Standards Act of 1938 *(29 U.S.C. 213*(a)(1)). Such regulations shall provide that if such employees are paid on an hourly basis they shall be exempt only if their hourly rate of pay is at least 6 1/2 times greater than the applicable minimum wage rate under section 6 of such Act *(29 U.S.C. 206)*.".

**Addition of subsec. (c)(5); construction.** Act Aug. 6, 1996, P.L. 104-174, § 3, 110 Stat. 1555, provides: "Section 1 [adding subsec. (c)(5) of this section] shall not be construed as affecting the exemption for apprentices and student learners published in *section 570.63 of title 29, Code of Federal Regulations*.".

**Effective date of Oct. 31, 1998 amendment.** Act Oct. 31, 1998, P.L. 105-334, § 2(b), 112 Stat. 3138, provides:

"(1) In general. This Act [adding subsec. (c)(6) of this section] shall become effective on the date of the enactment of this Act.

"(2) Exception. The amendment made by subsection (a) [adding subsec. (c)(6) of this section] defining the term 'occasional and incidental' shall also apply to any case, action, citation, or appeal pending on the date of the enactment of this Act unless such case, action, citation, or appeal involves property damage or personal injury.".

29 CFR § 541.1
29 C.F.R. § 541.1

CODE OF FEDERAL REGULATIONS
TITLE 29--LABOR
SUBTITLE B--REGULATIONS RELATING
TO LABOR
CHAPTER V--WAGE AND HOUR DIVISION,
DEPARTMENT OF LABOR
SUBCHAPTER A--REGULATIONS
PART 541--DEFINING AND DELIMITING
THE TERMS "ANY EMPLOYEE EMPLOYED
IN A BONA
FIDE EXECUTIVE, ADMINISTRATIVE, OR
PROFESSIONAL CAPACITY (INCLUDING
ANY
EMPLOYEE        EMPLOYED        IN        THE
CAPACITY        OF        ACADEMIC
ADMINISTRATIVE PERSONNEL OR
TEACHER       IN       ELEMENTARY       OR
SECONDARY       SCHOOLS),       OR       IN       THE
CAPACITY OF OUTSIDE
SALESMAN"
SUBPART A--GENERAL REGULATIONS
Current through October 18, 2002; 67 FR 64512

§ 541.1 Executive.

The term employee employed in a bona fide executive * * * capacity in section 13(a)(1) of the act shall mean any employee:

(a) Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and

(b) Who customarily and regularly directs the work of two or more other employees therein; and

(c) Who has the authority to hire or fire other employees       or       whose       suggestions       and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

(d) Who customarily and regularly exercises discretionary powers; and

(e) Who does not devote more than 20 percent, or, in the case of an employee of a retail or service establishment who does not devote as much as 40 percent, of his hours of work in the workweek to

activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of this section: Provided, That this paragraph shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who owns at least a 20-percent interest in the enterprise in which he is employed; and

(f) Who is compensated for his services on a salary basis at a rate of not less than $155 per week (or $130 per week, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands, or American Samoa), exclusive of board, lodging, or other facilities: Provided, That an employee who is compensated on a salary basis at a rate of not less than $250 per week (or $200 per week, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands or American Samoa), exclusive of board, lodging, or other facilities, and whose primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to meet all the requirements of this section.

[38 FR 11390, May 7, 1973, as amended at 40 FR 7092, Feb. 19, 1975]

Effective Date Note: Paragraph (f) in § 541.1 was revised at 46 FR 3013, Jan. 13, 1981. In accordance with the President's Memorandum of January 29, 1981 (46 FR 11227, Feb. 6, 1981), the effective date was postponed indefinitely at 46 FR 11972, Feb. 12, 1981.

The text of paragraph (f) set forth above remains in effect pending further action by the issuing agency. The text of the postponed regulation appears below.

§ 541.1 Executive.

(f) Who is compensated for his services on a salary·

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

29 CFR § 541.1
29 C.F.R. § 541.1

basis at a rate of not less than $225 per week beginning February 13, 1981 and $250 per week beginning February 13, 1983 (or $180 per week beginning February 13, 1981 and $200 per week beginning February 13, 1983. If employed by other than the Federal Government in Puerto Rico, the Virgin Islands, or American Samoa), exclusive of board, lodging, or other facilities: Provided, That an employee who is compensated on a salary basis at a rate of not less than $320 per week beginning February 13, 1981 and $345 per week beginning February 13, 1983 (or $260 per week beginning February 13, 1981 and $285 per week beginning February 13, 1983, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands or American Samoa), exclusive of board, lodging, or other facilities, and whose primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to meet all the requirements of this section.

<General Materials (GM) - References,
Annotations, or Tables>

29 C. F. R. § 541.1

29 CFR § 541.1

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

LEXSTAT 29 CFR 541.100

LEXIS PUBLISHING'S CODE OF FEDERAL REGULATIONS
Copyright (C) 2005, LEXIS Publishing

*** THIS SECTION IS CURRENT THROUGH THE JANUARY 6, 2005 ISSUE OF ***
*** THE FEDERAL REGISTER ***

TITLE 29 -- LABOR
SUBTITLE B -- REGULATIONS RELATING TO LABOR
CHAPTER V -- WAGE AND HOUR DIVISION, DEPARTMENT OF LABOR
SUBCHAPTER A -- REGULATIONS
PART 541 -- DEFINING AND DELIMITING THE EXEMPTIONS FOR EXECUTIVE, ADMINISTRATIVE,
PROFESSIONAL, COMPUTER AND OUTSIDE SALES EMPLOYEES
SUBPART B -- EXECUTIVE EMPLOYEES

*29 CFR 541.100*

§ 541.100 General rule for executive employees.

(a) The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:

(1) Compensated on a salary basis at a rate of not less than $ 455 per week (or $ 380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

(b) The phrase "salary basis" is defined at § 541.602; "board, lodging or other facilities" is defined at § 541.606; "primary duty" is defined at § 541.700; and "customarily and regularly" is defined at § 541.701.

**HISTORY:** *[69 FR 22122, 22260,* Apr. 23, 2004]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*29 U.S.C. 213;* Public Law 101-583, 104 Stat. 2871; Reorganization Plan No. 6 of 1950 (3 CFR 1945-*53 Comp. p. 1004);* Secretary's Order No. 4-2001 *(66 FR 29656).*

**NOTES:** [EFFECTIVE DATE NOTE: *69 FR 22122, 22260,* Apr. 23, 2004, added this section as part of the revision of Part 541, effective Aug. 23, 2004.]

NOTES APPLICABLE TO ENTIRE SUBTITLE:
CROSS REFERENCES: Railroad Retirement Board: See Employees' Benefits, 20 CFR chapter II.
Social Security Administration: See Employees' Benefits, 20 CFR chapter III.
EDITORIAL NOTE: Other regulations issued by the Department of Labor appear in 20 CFR chapters I, IV, V, VI, VII; 30 CFR chapter I; 41 CFR chapters 50, 60, and 61; and 48 CFR chapter 29.

LEXSTAT 29 CFR 541.105

LEXIS PUBLISHING'S CODE OF FEDERAL REGULATIONS
Copyright (C) 2005, LEXIS Publishing

\*\*\* THIS SECTION IS CURRENT THROUGH THE JANUARY 6, 2005 ISSUE OF \*\*\*
\*\*\* THE FEDERAL REGISTER \*\*\*

TITLE 29 -- LABOR
SUBTITLE B -- REGULATIONS RELATING TO LABOR
CHAPTER V -- WAGE AND HOUR DIVISION, DEPARTMENT OF LABOR
SUBCHAPTER A -- REGULATIONS
PART 541 -- DEFINING AND DELIMITING THE EXEMPTIONS FOR EXECUTIVE, ADMINISTRATIVE,
PROFESSIONAL, COMPUTER AND OUTSIDE SALES EMPLOYEES
SUBPART B -- EXECUTIVE EMPLOYEES

*29 CFR 541.105*

§ 541.105 Particular weight.

To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

**HISTORY:** *[38 FR 11390*, May 7, 1973; *69 FR 22122, 22260*, Apr. 23, 2004]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*29 U.S.C. 213;* Public Law 101-583, 104 Stat. 2871; Reorganization Plan No. 6 of 1950 (3 CFR 1945-*53 Comp. p. 1004);* Secretary's Order No. 4-2001 *(66 FR 29656).*

**NOTES:** [EFFECTIVE DATE NOTE: *69 FR 22122, 22260*, Apr. 23, 2004, revised Part 541, effective Aug. 23, 2004.]

NOTES APPLICABLE TO ENTIRE SUBTITLE:
CROSS REFERENCES: Railroad Retirement Board: See Employees' Benefits, 20 CFR chapter II.
Social Security Administration: See Employees' Benefits, 20 CFR chapter III.
EDITORIAL NOTE: Other regulations issued by the Department of Labor appear in 20 CFR chapters I, IV, V, VI, VII; 30 CFR chapter I; 41 CFR chapters 50, 60, and 61; and 48 CFR chapter 29.

159 words

LEXSEE 69 FED REG 22187

FEDERAL REGISTER

Vol. 69, No. 79

Rules and Regulations

DEPARTMENT OF LABOR (DOL)

Employment Standards Administration (ESA)

Wage and Hour Division

**29 CFR Part 541**

**RIN 1215-AA14**

**Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees**

Part II

*69 FR 22122*

**DATE:** Friday, April 23, 2004

**ACTION:** Final rule.

**SUMMARY:** This document provides the text of final regulations under the Fair Labor Standards Act implementing the exemption from minimum wage and overtime pay for executive, administrative, professional, outside sales and computer employees. These exemptions are often referred to as the "white collar" exemptions. To be considered exempt, employees must meet certain minimum tests related to their primary job duties and, in most cases, must be paid on a salary basis at not less than minimum amounts as specified in pertinent sections of these regulations.

**EFFECTIVE DATE:** These rules are effective on August 23, 2004.

**FOR FURTHER INFORMATION CONTACT:** Richard M. Brennan, Senior Regulatory Officer, Wage and Hour Division, Employment Standards Administration, U.S. Department of Labor, Room S-3506, 200 Constitution Avenue, NW., Washington, DC 20210. Telephone: (202) 693-0745 (this is not a toll-free number). For an electronic copy of this rule, go to DOL/ESA's Web site (*http://www.dol.gov/esa*), select **"Federal Register** " under "Laws and Regulations," and then "Final Rules." Copies of this rule may be obtained in alternative formats (Large Print, Braille, Audio Tape or Disc), upon request, by calling (202) 693-0023 (not a toll-free number). TTY/TDD callers may dial toll-free 1-877-889-5627 to obtain information or request materials in alternative formats.

Questions of interpretation and/or enforcement of regulations issued by this agency or referenced in this notice may be directed to the nearest Wage and Hour Division District Office. Locate the nearest office by calling our toll-free help

rule. The Department agrees with the comments opposing this change, and has rejected the "leadership" modification because the present requirement provides a well established, easily applied, bright-line test for exemption, and the ambiguity attached to the term "lead," the Department believes, could spark needless litigation. Also, an employee whose primary duty is management and who customarily and regularly leads other employees, alone or with another, may qualify for exemption under the administrative exemption.

The Department also received a number of other comments and requests for clarification on this section. The FLSA Reform Coalition asks that the Department clarify what the term "full-time" means, and requests that the clarification include a statement that the term should be defined by the employer's practices. The Department does not believe additional clarification is necessary, and stands by its current interpretation that an exempt supervisor generally must direct a total of 80 employee-hours of work each week. As the Wage and Hour Division's Field Operations Handbook (FOH) states, however, circumstances might justify lower standards. For example, firms in some industries have standard workweeks of 37 1/2 hours or 35 hours for their full-time employees. In such cases, supervision of employees working a total of 70 or 75 hours in a workweek will constitute the equivalent of two full-time employees. FOH 22c00.

Several commenters, such as the Financial Services Roundtable and the Mortgage Bankers Association of America, urge the Department to clarify the phrase "in the manager's actual absence" in subsection (c). The Department continues to believe that the phrase provides useful guidance in defining the exempt executive, and intends that this phrase be interpreted to mean that an employee who simply supervises on a short-term basis, such as during a lunch break or while a manager is on vacation, is not meeting the requirement of customarily and regularly supervising two or more employees.

Several commenters ask that the requirement of directing two or more employees be eliminated. Other commenters state that the requirement should be lowered to directing only one other employee. Yet others argue that the number of employees supervised should be raised. For example, the National Association of Federal Wage Hour Consultants states that the requirement should be five employees while the Labor Board, Inc. suggests the number should be four employees. The Department continues to believe that the current requirement of directing two or more employees is an appropriate measure of exempt status and to raise the threshold would disproportionately harm small businesses that may not have a large number of employees. *see* 1940 Weiss Report at 45-46.

Several commenters question whether the requirement that an employee direct two or more other "employees" includes employees of a contractor. Several commenters also urge the Department to expand this requirement to two or more "individuals" so as to count the supervision of volunteers, contractors, and other non-employees. The Department has evaluated these comments and determined that no changes should be made. The FLSA itself defines the term "employee" as an "individual employed by an employer," and this definition has been subject to extensive judicial interpretation. *see 29 U.S.C. § 203*(e)(1). The Department also observes, however, that the administrative exemption may apply to the employee who supervises contractors, volunteers or other non-employees if the other requirements for that exemption are met.

Section 541.105 Particular Weight

Section 541.105 of the final rule contains a new definition of the phrase "particular weight" as follows:

To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

This definition has been added in response to comments received from groups such as the Society for Human Resource Management, Leggett & Platt, the Food Marketing Institute, the League of Minnesota Cities and the American Council of Engineering Companies, who indicate that this phrase is extremely vague and needs clarification. As one of the Department's goals is to provide clarity to the terms contained in the regulations, we have defined "particular weight"

by incorporating factors relied on by the courts to define this term under the current regulations. *See, e.g., Baldwin v. Trailer Inns, Inc., 266 F.3d 1104, 1116 (9th Cir. 2001); Molina v. Sea Land Services, Inc., 2 F. Supp. 2d 185, 188 (D.P.R. 1998); Wendt v. New York Life Insurance Co., 1998 WL 118168,* at *6 (S.D.N.Y. 1998); Passer v. American Chemical Society, 749 F. Supp. 277, 280 (D.D.C. 1990); Wright v. Zenner & Ritter, Inc., 1986 WL 6152,* at *2 (W.D.N.Y. 1986); Kuhlmann v. American College of Cardiology, 1974 WL 1344,* at *1 (D.D.C. 1974); Marchant v. Sands Taylor & Woods Co., 75 F. Supp. 783, 786 (D. Mass. 1948); Anderson v. Federal Cartridge Corp., 62 F. Supp. 775, 781 (D. Minn. 1945).*

As illustrated by these cases, factors such as the frequency of making recommendations, frequency of an employer's relying on an employee's recommendations, as well as evidence that the employee's job duties explicitly include the responsibility to make such recommendations, are important considerations in determining whether "particular weight" is given to the employee's recommendations. Thus, for example, an employee who provides few recommendations which are never followed would not meet the "hire or fire" requirement in final section 541.100(a)(4). Evidence that an employee's recommendation are given "particular weight" could include witness testimony that recommendations were made and considered; the exempt employee's job description listing responsibilities in this area; the exempt employee's performance reviews documenting the employee's activities in this area; and other documents regarding promotions, demotions or other change of status that reveal the employee's role in this area.

Section 541.106 Concurrent Duties (Proposed § § 541.106 and 541.107)

Proposed section 541.106 entitled "Working supervisors" stated: "Employees, sometimes called working foremen' or working supervisors,' who [*22136] have some supervisory functions, such as directing the work of other employees, but also perform work unrelated or only remotely related to the supervisory activities are not exempt executives if, instead of having management as their primary duty as required in § 541.100, their primary duty consists of either the same kind of work as that performed by their subordinates; work that, although not performed by their own subordinates, consists of ordinary production or sales work; or routine, recurrent or repetitive tasks." Proposed section 541.107 entitled "Supervisors in retail establishments" stated: "Supervisors in retail establishments often perform work such as serving customers, cooking food, stocking shelves, cleaning the establishment or other nonexempt work. Performance of such nonexempt work by a supervisor in a retail establishment does not disqualify the employee from the exemption if the requirements of § 541.100 are otherwise met. Thus, an assistant manager whose primary duty includes such activities as scheduling employees, assigning work, overseeing product quality, ordering merchandise, managing inventory, handling customer complaints, authorizing payment of bills or performing other management functions may be an exempt executive even though the assistant manager spends the majority of the time on nonexempt work."

As the Department explained in the preamble to the proposed rule, both proposed section 541.106 and proposed section 541.107 were meant to address the difficult issue of classifying employees who have both exempt supervisory duties and nonexempt duties. The Department invited comments on whether these sections have appropriately distinguished exempt and nonexempt employees. *61 FR 15565.*

Based on the comments received, the Department has decided to combine these two proposed sections into one section entitled "concurrent duties." The Department believes that a unified section on this topic will better illustrate when an employee satisfies the requirements of the executive exemption. The final section 541.106 incorporates the general principles and examples from both proposed section 541.106 and proposed section 541.107. The final section 541.106(a) thus provides: "Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met." To further distinguish exempt executives from nonexempt workers, the final subsection 541.106(a) also states: "Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work. In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods. An employee whose primary duty is ordinary production work or routine, recurrent or repetitive tasks cannot qualify for exemption as an executive." Final subsections 541.106(b) and (c) contain examples to further illustrate these general principles.

The final section provides, as in the current regulations, that an employee with a primary duty of ordinary production work is not exempt even if the employee also has some supervisory responsibilities. As explained in the

The final rule lists the same four non-exclusive factors as the proposal for determining the primary duty of an employee: (1) The relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the same kind of nonexempt work. The time spent performing exempt work has always been, and will continue to be, just one factor for determining primary duty. Spending more than 50 percent of the time performing exempt work has been, and will continue to be, indicative of exempt status. Spending less than 50 percent of the time performing exempt work has never been, and will not be, dispositive of nonexempt status.

Several commenters request clarification as to whether the determination of an employee's primary duty is made by looking to a single duty or many duties. The Morgan, Lewis & Bockius law firm, for example, suggests that the Department change "primary duty" to "primary duties," in order to reduce the perception that any single task, rather than the aggregate of job tasks, defines an employee's primary duty. In contrast, the AFL-CIO asserts that the term is properly considered in the singular.

The current law is actually somewhere in the middle of these two viewpoints. Although "primary duty" is generally singular, an employee's primary duty can encompass multiple tasks. Thus, for example, an employee would have "management" as his primary duty if he performed tasks such as preparing budgets, negotiating contracts, planning the work, and reporting on performance. As stated in the 1949 Weiss Report at 61, the search for an employee's primary duty is a search for the "character of the employee's job as a whole." Thus, both the current and final regulations "call for a holistic approach to determining an employee's primary duty," not "day-by-day scrutiny of the tasks of managerial or administrative employees." *Counts v. South Carolina Electric & Gas Co., 317 F.3d 453, 456 (4th Cir. 2003)* ("Nothing in the FLSA compels any particular time frame for determining an employee's primary duty"). To clarify this "holistic approach," the Department has reinserted in subsection (a) the language from current 541.304 that the determination of an employee's primary duty must be based on all the facts in a particular case " *with the major emphasis on the character of the employee's job as a whole.* "

The Department considered but has not incorporated in the final rule other various proposals to add, delete or modify section 541.700. For example, because the Department does not intend to eliminate the amount of time spent on exempt tasks as a factor for determining primary duty, we reject the suggestion of the Morgan, Lewis & Bockius law firm and others to remove the language stating that time is a "useful guide." The Smith Currie law firm proposes adding "in the discretion of the employer" to the definition of primary duty. However, the primary duty determination is based on all the facts and circumstances of each case, not upon the "discretion" of the employer. Similarly, the National Association of Chain Drug Stores (NACDS) proposes allowing employers the opportunity, as they have under the Americans with Disabilities Act, to create a "rebuttable presumption" regarding an employee's primary duty by identifying the principal duties of the employee in a job description. NACDS suggests adding "as determined or expressed by the employer in any agreement, job status form, job offer, job description or other document created by the employer in good faith and acknowledged by the employee verbally **[*22187]** or in writing." The Department recognizes that such documents or agreements may be of some evidentiary value. However, the work actually performed by an employee-not any description or agreement-controls the determination of the employee's primary duty. *see* 1949 Weiss Report at 86 (rejecting proposal to permit employer and employee to reach agreement as to whether exemptions apply); 1940 Stein Report at 25 ("a title alone is of little or no assistance in determining the true importance of an employee to the employer. Titles can be had cheaply and are of no determinative value"). The Food Marketing Institute comments that the definition should explicitly state that employees, such as managers in retail establishments, "should not be subject to arbitrary calculations of the time they spend performing manual labor. * * *" As set forth in the cases cited above, and in the examples in the final rule, the Department has made clear that managers may perform exempt work less than 50 percent of the time and nevertheless have a primary duty of management, depending upon the collective weight of the factors. Final section 541.106 also provides that an employee's managerial duties can be performed concurrently with nonexempt tasks. No further clarification of this point is necessary. Finally, the Fisher & Phillips law firm seeks modification of the wage comparison factor to reflect that exempt employees are frequently eligible for other forms of compensation not widely available to nonexempt employees. Because final section 541.700(a) already provides that all the facts and circumstances of each case are relevant, such facts may be taken into account in determining primary duty without further changes in this section.

Section 541.701 Customarily and Regularly

Proposed section 541.701 defined the phrase "customarily and regularly" to mean "a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks."

The final section 541.701 retains the proposed language without change.

The Department received a few comments on section 541.701 that the "every workweek" requirement in section 541.701 does not reflect that some exempt tasks may not be performed every week or only once each week. The Grocery Manufacturers of America (GMA), for example, states that this language is ambiguous and does not take into account that certain activities, such as lengthy preparation and presentation time that often goes into significant sales efforts, may not take place "recurrently" within a given week. GMA proposes that the term "customarily and regularly" should mean "duties performed at least once in each workweek." Similarly, the McInroy & Rigby law firm and the Miller Canfield law firm seek clarification of the "workweek-by-workweek" timeframe and its application in determining exempt activities.

The Department does not believe any changes to section 541.701 are necessary. A similar definition of the term "customarily and regularly" has appeared for decades in section 541.107(b) of the existing regulations, and case law does not indicate significant difficulties with applying the definition. The term "customarily and regularly" requires a case-by-case determination, based on all the facts and circumstances, over a time period of sufficient duration to exclude anomalies. *See, e.g., Wage and Hour Opinion of August 20, 1992, 1992 WL 845098* (analysis should be "over a significant time span, especially in smaller organizations * * * to eliminate the possibility of significant cycles in work requirements and to support that there are sufficient exempt duties on a week-in-week-out basis to support the exemption claimed"); Wage and Hour Field Operations Handbook, section 22c00(d) ("The determination as to whether an employee customarily and regularly supervises other employees * * * depends on all the facts and circumstances"). Nothing in this section requires that, to meet the definition of "customarily and regularly," a task be performed more than once a week or that a task be performed each and every workweek.

Section 541.702 Exempt and Nonexempt Work

Proposed section 541.702 stated, "The term exempt work' means all work described in §§ 541.100, 541.101, 541.102, 541.200, 541.206, 541.300, 541.301, 541.302, 541.303, 541.304, 541.400 and 541.500, and the activities directly and closely related to such work. All other work is considered nonexempt.' " The final rule deletes the inadvertent reference to a non-existent section 541.206 and the reference to the now-deleted "sole charge" exemption in proposed section 541.102. The Department received no significant comments on this section, and thus has made no other changes.

Section 541.703 Directly and Closely Related

Proposed section 541.703 defined the phrase "directly and closely related" to mean "tasks that are related to exempt duties and that contribute to or facilitate performance of exempt work." Subsection (a) further explains that "directly and closely related" work "may include physical tasks and menial tasks that arise out of exempt duties, and the routine work without which the exempt employee's more important work cannot be performed properly. Work directly and closely related' to the performance of exempt duties may also include recordkeeping; monitoring and adjusting machinery; taking notes; using the computer to create documents or presentations; opening the mail for the purpose of reading it and making decisions; and using a photocopier or fax machine. Work is not directly and closely related' if the work is remotely related or completely unrelated to exempt duties." Proposed section 541.703(b) set forth 10 examples to illustrate the type of work that is and is not normally considered as directly and closely related to exempt work.

The final section 541.703 retains the proposed language without change.

The AFL-CIO comments that under the proposed section, "it is hard to imagine any type of nonexempt work failing to qualify as directly and closely related.' "

The Department notes that the explanation of the phrase "directly and closely related" in final section 541.703(a) is taken from the current sections 541.108 and 541.202, including the specific language concerning what is not "directly and closely related" to which the AFL-CIO objected. *see* current 29 CFR 541.202(d) ("These directly and closely related' duties are distinguishable from * * * *those which are remotely related or completely unrelated to the more*

*important tasks* ") (emphasis added). Similarly, the notion that "directly and closely related" work contributes to or facilitates the performance of exempt work is a long-standing and common sense concept reflected in the current rule. *see* current 29 CFR 541.202(c). The Department did not intend any substantive change to the meaning of the phrase "directly and closely related" and intends that the term be interpreted in accordance with the long-standing meaning under the current rule. *See Harrison v. Preston Trucking Co., 201 F. Supp. 654, 658-59 (D. Md. 1962)* ("[T]he test is not whether the work is essential to the proper [*22188] performance of the more important work, but whether it is related").

The International Association of Fire Fighters comments, without offering any specific suggestions, that the Department should add examples to the section concerning what is not "directly and closely related" to exempt work. Other commenters make specific suggestions for additional tasks and examples including, among others, computer employees performing software debugging and other tasks (Contract Services Association), therapists or counselors participating in outdoor activities with patients as part of a treatment program (FLSA Reform Coalition) and financial consultants engaging in activities related to acquiring customers (Securities Industry Association).

The Department has retained the proposed rule without any additions. The question of whether work is "directly and closely related" to the performance of exempt work is "one of fact depending upon the particular situation involved." *see* 1949 Weiss Report at 30. The final rule provides 10 representative examples to assist in illustrating the "directly and closely related" concept. Each of the examples is taken directly from the current rule. In the interest of streamlining the regulations, the proposed and final rule consolidated the most salient examples. Given the fact-intensive nature of the inquiry, the Department believes that, similar to the approach taken in the current rule, providing guiding principles and these specific illustrative examples best enables a determination of what is and is not "directly and closely related." The Department believes final section 541.703 is straightforward and amply offers guiding principles that readily can be applied.

Section 541.704 Use of Manuals

Subpart H of the final regulations moves regulatory language on the use of manuals from proposed section 541.204, regarding the administrative exemption, to a new section 541.704 because the section is equally applicable to the other section 13(a)(1) exemptions. Final section 541.704 makes a number of minor editorial changes to the proposed language, none of which are intended as substantive. Final section 541.704 states:

The use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption under section 13(a)(1) of the Act or the regulations in this part. Such manuals and procedures provide guidance in addressing difficult or novel circumstances and thus use of such reference material would not affect an employee's exempt status. The section 13(a)(1) exemptions are not available, however, for employees who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances.

Some commenters object to the language in proposed subsections 541.204(b) and (c) regarding the use of manuals, although most commenters are supportive of the proposed language. One commenter suggests that the Department eliminate the phrase "very difficult or novel circumstances" so as not to exclude from the exemptions a highly skilled employee who must rely on or comply with manuals in other routine circumstances. Other commenters suggest that the regulations should distinguish manuals used to apply prescribed skills and knowledge in recurring and routine situations from manuals that simply set forth the bounds within which discretion and independent judgment are to be exercised with substantial leeway. These commenters state that the regulations should reinforce the idea that sharply-constrained authority to make day-to-day decisions within a narrow range of options will not satisfy the tests for exemption.

The Department has retained the provision on manuals in final section 541.704, with only minor wording changes. The proposal appropriately differentiated between manuals that dictate how an employee must apply prescribed skills in recurring and routine situations, and manuals that provide guidance involving highly complex information pertinent to difficult or novel circumstances. The provision adopted by the Department is consistent with existing case law. The employee in *McAllister v. Transamerica Occidental Life Insurance Co., 325 F.3d 997 (8th Cir. 2003),* for example, was a claims coordinator responsible for handling the most complex death and disability insurance claims independently, including the complex and large dollar cases involving contestable claims, fraud and disappearances. The employee oversaw the investigation of claims, reviewed investigation files and determined if further investigation was necessary.

LEXSTAT 29 CFR 541.701/

LEXIS PUBLISHING'S CODE OF FEDERAL REGULATIONS
Copyright (C) 2005, LEXIS Publishing

*** THIS SECTION IS CURRENT THROUGH THE JANUARY 6, 2005 ISSUE OF ***
*** THE FEDERAL REGISTER ***

TITLE 29 -- LABOR
SUBTITLE B -- REGULATIONS RELATING TO LABOR
CHAPTER V -- WAGE AND HOUR DIVISION, DEPARTMENT OF LABOR
SUBCHAPTER A -- REGULATIONS
PART 541 -- DEFINING AND DELIMITING THE EXEMPTIONS FOR EXECUTIVE, ADMINISTRATIVE,
PROFESSIONAL, COMPUTER AND OUTSIDE SALES EMPLOYEES
SUBPART H -- DEFINITIONS AND MISCELLANEOUS PROVISIONS

*29 CFR 541.701*

§ 541.701 Customarily and regularly.

The phrase "customarily and regularly" means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed "customarily and regularly" includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks.

**HISTORY:** *[69 FR 22122, 22260, Apr. 23, 2004]*

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*29 U.S.C. 213;* Public Law 101-583, 104 Stat. 2871; Reorganization Plan No. 6 of 1950 (3 CFR 1945-*53 Comp. p. 1004);* Secretary's Order No. 4-2001 *(66 FR 29656).*

**NOTES:** [EFFECTIVE DATE NOTE: *69 FR 22122, 22260,* Apr. 23, 2004, added this section as part of the revision of Part 541, effective Aug. 23, 2004.]

NOTES APPLICABLE TO ENTIRE SUBTITLE:
CROSS REFERENCES: Railroad Retirement Board: See Employees' Benefits, 20 CFR chapter II.
Social Security Administration: See Employees' Benefits, 20 CFR chapter III.
EDITORIAL NOTE: Other regulations issued by the Department of Labor appear in 20 CFR chapters I, IV, V, VI, VII; 30 CFR chapter I; 41 CFR chapters 50, 60, and 61; and 48 CFR chapter 29.

53 words

**Rev. 608**   FIELD OPERATIONS HANDBOOK - 5/9/94

## Chapter 22

## EXECUTIVE, ADMINISTRATIVE, PROFESSIONAL, AND OUTSIDE SALESPERSON EXEMPTIONS - FLSA SEC 13(a)(1)

### Table of Contents

**22a   GENERAL CONSIDERATIONS**

22a00   Regulations and Interpretations 541.
22a01   Exemption period.
22a03   Enforcement policy in Reg 541.602 not limited to "main" store employees.

**22b   SALARY BASIS**

22b00   Salary reduction as result of reduced w/w.
22b01   Extra compensation paid for OT.
22b02   Salaries paid by joint employers.
22b03   Computation of salary on an hourly rate basis.
22b04   Offsetting subsistence allowance paid military personnel.
22b05   Deduction of extra compensation paid for extended w/w.
22b06   Deductions for infraction of security regulations.
22b07   Deductions for disability insurance benefit payments.
22b08   Deductions for board, lodging, and other facilities.
22b09   Application of Reg 541.5a to TV film and videotape production employees.
22b11   Annual salary earned in a shorter period.
22b12   Effective date of revised salary tests for the executive, administrative, and professional exemptions pursuant to Reg 541.
22b13   Salary tests.
22b14   Deductions for cash register shortages.
22b15   Salary basis of payment for State and local government employees.

**22c   OTHER CRITERIA**

22c00   Supervision of two or more other employees.
22c01   Sole charge of establishment.
22c02   Primary duty.
22c03   Primary duty during a strike period.
22c04   Professional or occupational Licenses.

**22d   SPECIFIC OCCUPATIONS - 541.1, 541.2, 541.3**

22d01   Auto damage appraisers.
22d02   Die, jig, and fixture designers.
22d03   Dispatchers - Reg 541.1.
22d04   Dispatchers - Reg 541.2.
22d05   Exempt and nonexempt drafting when performed by a professional employee.

Rev. 608                        FIELD OPERATIONS HANDBOOK - 5/9/94

Chapter 22

Table of Contents - Page 2

22d06    Junior geophysicists.
22d07    News editors in a broadcasting company.
22d08    Technical writers.
22d09    Photogrammetry - Stereotopographer.
22d10    Field representatives.
22d11    Executive secretaries.
22d12    Display advertising installers.
22d13    Port stewards, inventory and receiving clerks.
22d14    Oil well logging and core analysis crews.
22d15    Nurses.
22d16    Pharmacists.
22d17    Foreign physicians and surgeons.
22d18    School librarian.
22d19    Flight instructors.
22d20    Teachers and academic administrative personnel in Job Corps centers.
22d21    Other occupations.
22d22    Preschool "teachers".
22d23    Physician assistants.
22d24    Dental hygienists.
22d25    Systems Analysts/Computer Programmers.
22d26    Application of Reg 541.3 to certain workers employed in computer-related occupations.
22d27    ParaLegals.

22e    OUTSIDE SALESMEN - 541.5

22e00    Nonexempt work test.
22e01    Outside sales from hand trucks, push carts or other vehicles.
22e02    Finance company employees obtaining or soliciting mortgages.
22e03    Copywriting, layout, and display work by newspaper advertising salespersons.
22e04    Soliciting business through a dealer.
22e05    Industrial insurance agents.
22e06    Real estate salespersons.
22e07    Timeshare salespersons at condominium resorts or campground.

Chapter 22

EXECUTIVE, ADMINISTRATIVE, PROFESSIONAL, AND OUTSIDE SALESMAN - FLSA
SEC 13(a)(1)

22a     GENERAL CONSIDERATIONS

22a00  Regulations and Interpretations 541.  The terms "executive",
"administrative", "professional", and "outside salesman" are defined in
Reg 541, Subpart A, Wage-Hour interpretations of the terms in Reg
541, Subpart A, are contained in the Reg 541, Subpart B.

22a01  Exemption period.  The Sec 13(a)(1) exemptions are applied on the
basis that each w/w constitutes a separate period of exemption.  However,
certain of the tests are so worded that a determination of exemption must
be made by considering the conditions of employment over a more extended
period.  For example, an employee may be paid the salary required during
certain w/w's, but an analysis of his pay over a longer period may reveal
that he is not actually compensated "on a salary basis".  In other
situations, investigation may disclose that a supervisor does not "custom-
arily and regularly" direct the work of two or more employees in his
department, despite the fact that he may in particular w/w's have more than
one employee under his supervision.  It must always be kept in mind, however,
that a change in an employee's duties, responsibility, or salary (even
though temporary) may bring a change in exemption status.

22a03  Enforcement policy in Reg 541.602 not limited to "main" store employees.
The enforcement policy set out in Reg 541.602 is not limited in application
to executive and administrative employees in the "main" store of a multi-
unit enterprise.  Where an executive or administrative employee who works in
a branch store otherwise meets all of the requirements, the enforcement
policy shall be applied.

**22b    SALARY BASIS**

**22b00  Salary reduction as result of reduced workweek.** A reduction in
salary to not less than the applicable minimum salary because of a re-
duction in the normal scheduled w/w is permissible and will not defeat
the exemption, provided that the reduction in salary is a bona fide
reduction which is not designed to circumvent the salary basis requirement.

**22b01  Extra compensation paid for OT.** Extra compensation may be paid for
OT to an exempt employee on any basis. The OT payment need not be at time
and one-half, but may be at straight time, or flat sum, or on any other
basis.

**22b02  Salaries paid by joint employers.** When an otherwise exempt employee
is jointly employed by two or more employers (see IB 791), each of whom
pays him on a salary basis as defined in Reg 541, his salaries may be com-
bined for purposes of meeting the minimum salary requirement.

**22b03  Computation of a salary on an hourly rate basis.** An employee whose
salary is computed on an hourly rate basis will be considered as employed
"on a salary basis" if he is guaranteed a salary which is at least equal
to the salary prescribed by Reg 541 and if there is a reasonable relationship
between the hourly rate, the regular or normal working hours and the amount
of the weekly guarantee. The "reasonable relationship" test will be met
if the weekly guarantee is roughly equivalent to the employee's earnings
at the assigned hourly rate for his normal w/w.

**22b04  Offsetting subsistence allowance paid military personnel.** Military
subsistence allowances may not be included in the amounts offset against
the salary required by Reg 541 since such payments constitute payment for
board, lodging, or other facilities. (However, see Reg 541.118(a)(4)
regarding military pay.)

**22b05  Deduction of extra compensation paid for extended workweek.** (a)
Extra compensation paid to an exempt employee on a scheduled extended
w/w may be deducted from his pay if the employee fails to work the full
extended w/w schedule. Since the payment of extra compensation is an
addition to, rather than a part of an employee's predetermined salary,
the deduction of all or part of this additional amount, when an exempt
employee fails to work the full extended w/w schedule, will not be a
deduction from the employee's predetermined salary.

(b) An extended w/w schedule is a definite schedule of hours longer
than the regular w/w for a temporary period, usually a month or more,
with OT generally paid for the extra hours or days worked. For example,
an employee on an eight-hour day, five-day week schedule may work five
days of nine hours each or six days of eight hours. A change in the w/w
which is intended to be or is in fact permanent is not an extended w/w
as herein used.

(c) Where an extended w/w has been in effect for some time, the CO shall bring to the employer's attention the fact that the extended w/w schedule may actually represent the regular schedule for the employee and the "OT" paid is part of the employee's predetermined salary. However, no other action shall be taken by the CO.

22b06 Deductions for infraction of security regulations . Deductions or penalties imposed on employees for infraction of security regulations required by a government agency will not defeat the exemption.

22b07 Deductions for disability insurance benefit payments. (a) When an insurance plan is bona fide, compliance with its terms is compliance with the salary basis of payment even though a waiting period in excess of one or more days is required before the employee becomes eligible for inclusion in the insurance plan, or there is a waiting period for each illness before benefits are paid.

(b) The fact that the employee receives no pay for some period during an illness, or that the employee's leave pay is less than his predetermined salary will not defeat the salary basis requirement, so long as the plan is a bona fide insurance plan.

22b08 Deductions for board, lodging, and other facilities. (a) Deduction for such purposes may be made without causing loss of exemption under Reg 541, provided the remaining portion of the salary is paid free and clear, and it meets the appropriate minimum salary test.

(b) Reg 541.117(c) provides in part that "the regulations in Subpart A of this part do not prohibit the sale of such facilities to executives on a cash basis if they are negotiated in the same manner as similar transactions with other persons". This principle does not apply in situations where the required $125 per week salary for an otherwise exempt apartment house manager is made up in part by housing furnished and the nature of the job requires him to reside on the premises. In such cases, the housing facility may be treated as part of the salary only to the extent that any deduction (as set out in (a) above) does not reduce the actual cash amount paid below the $125 per week salary required for exemption. For example, if the agreed salary for an apartment house manager is $135 per week, no more than $10 can be deducted from his pay for the apartment in which he lives on the premises. Also, a separate transaction in which the apartment house manager pays the employer an amount as rent so as to reduce the employee's salary below that required by the regulations would make the exemption inapplicable. However, the usual Sec 3(m) rules will apply with respect to statutory "wages" in the case of an apartment house manager or any other employee who does not qualify for exemption under Reg 541.

22b09 Application of Reg 541.5a to TV film and videotape production employees. Reg 541.5a provides an exception to the salary requirements for otherwise exempt executive, administrative, and professional employees in the motion picture producing industry. This special proviso is also applicable to such employees of producers of television films and videotapes. (See also Reg 541.601.)

FOH INSERT #1598
Page 22b11 - 22b12

FIELD OPERATIONS HANDBOOK - 2/12/81  *SEE INSERT #1603*

The following SUPERSEDES FOH 22b12 and 22b13:

22b12 Revised salary tests and their effective dates

(a) On 1/13/81 revisions to amend the salary tests of Reg 541 were published in the Federal Register. These revisions apply to Subpart A--General Regulations and are reflected in the following tables:

|  | Executive and Administrative | Professional | "Upset" Salary Test |
|---|---|---|---|
| Present Salary Test | $155 | $170 | $250 |
| Effective 2/13/81 | $225 | $250 | $320 |
| Effective 2/13/83 | $250 | $280 | $345 |

For employees in Puerto Rico, the Virgin Islands or American Samoa, the corresponding tests are:

|  | | | |
|---|---|---|---|
| Present Salary Test | $130 | $150 | $200 |
| Effective 2/13/81 | $180 | $225 | $260 |
| Effective 2/13/83 | $200 | $250 | $285 |

The special compensation test (see Reg 541.5a and 541.601) for employees in the motion picture industry will be $320 per week beginning 2/13/81 and $345 per week beginning 2/13/83.

(b) The effective date of the revised salary tests for the Reg 541 exemption is 2/13/81. In administering these revised regulations, Wage-Hour will consider them applicable to employees paid weekly salaries for the first w/w beginning on or after 2/13/81. For employees paid salaries for pay periods of longer than a week (monthly, semi-monthly, biweekly) the revised salary tests shall be considered applicable for the first such pay period beginning on or after 2/13/81.

FOH INSERT #1603
Page 22b11 - 22b12

FIELD OPERATIONS HANDBOOK - 2/5/81

The following applies to FOH 22b12 on FOH Insert #1598:

> The new higher salary tests of Reg 541, transmitted to
> you on FOH Insert #1598, were to have gone into effect
> on 2/13/81.  They will not go into effect on that date.
>
> Consequently, former Sec 22b13 is hereby reinstated.

-o-

NOTE:  THIS INSERT IS REISSUED TO CORRECT THE INSERT NUMBER, WHICH SHOULD BE
       1603 INSTEAD OF 1602.  PLEASE CORRECT YOUR ENTRY ON FORM WH-100 ACCORDINGLY.

FOH INSERT #1689
Page 22b11 — 22b12

FIELD OPERATIONS HANDBOOK — 9/7/84

ADD the following new Sec to text and Table of Contents:

22b14  Deductions for cash register shortages

Deductions from an otherwise exempt employee's salary may not be
made for cash register shortages.  Deductions may be made only
for the reasons stated in Reg 541.118(a).  An employer may not
artificially divide a salary into two parts and subject one part
to deductions for cash register shortages.  For example, a salary
of $200 per week may not be divided into $155 (the guaranteed
minimum) and an additional $45 which is made subject to deductions
not permitted under Reg 541.118(a).

FOH INSERT #1753
Page 22b11 - 22b12

FIELD OPERATIONS HANDBOOK ~ 8/28/87

ADD the following new sec to text:

22b15  Salary basis of payment for State and local government employees

(a)  Provided the conditions in (b) are met, WH will not deny an exemption
     under sec 13(a)(1) to an otherwise exempt State or local government
     employee whose pay is reduced by deductions for absence(s) of less than
     a day for personal reasons, or due to illness, because such employee does
     not have, or has exhausted, available paid leave for such absence(s).

(b)  This enforcement policy will apply only where the public agency can show
     that an applicable State or local law or ordinance in effect prior to
     4/15/86 (the effective date of the 1985 FLSA Amendments) prohibits
     payments for such absences if the employees have exhausted their available
     paid leave.

(c)  This enforcement policy is not intended to affect employees' rights
     under FLSA sec 16(b).

-o-

Rev. 445        FIELD OPERATIONS HANDBOOK - 6/15/79        22b11-22b12

22b11  Annual salary earned in a shorter period.  Certain employment
such as that provided by schools does not normally constitute twelve
months of work each year.  For the convenience of the employees,
the salary earned during the duty months  is often paid in equal
monthly installments throughout the year.  If the minimum salary
requirement for exemption under Reg 541 is met considering the
period of time the employee is actually employed the fact that he
draws less than the required amount prorated over a longer period
will not disqualify him for the exemption.  For example, a cafeteria
supervisor in a school (with respect to whose employment there
is a salary test for exemption) is paid $7,000 for a 10-month contract
and thus earns $700 per month during his duty period but draws only
$583.33 per month over the full year.  The salary test under Reg
541.1(f) would be met in this case.

22b12  Effective date of revised salary tests for the executive,
administrative; and professional exemptions pursuant to Reg 541.
The effective date of the revised salary tests for the Reg 541
exemption is 4/1/75.  In administering these revised regulations,
Wage-Hour will consider them applicable to employees paid weekly
salaries for the first w/w beginning on or after 4/1/75.  For
employees paid salaries for pay periods of longer than a week
(monthly, semi-monthly, biweekly) the revised salary tests shall
be considered applicable for the first such pay period beginning
on or after 4/1/75.

*SEE INSERTS #1598 + #1603*

22b13  Salary tests.  The present salary tests have been in effect
since 4/11/75 and, consequently, many employees who now meet the
salary tests, including the upset salary, may not meet one or more
other tests for exemption.  Thus, it will be necessary to carefully
review the exempt status of employees for whom exemption is claimed,
including relatively highly paid employees, and pay closer attention
to the duties, responsibilities, and other criteria.

22b14 - SEE INSERT #1689

22b15 - SEE INSERT #1753

22c-22l02        FIELD OPERATIONS HANDBOOK - 4/15/75

## 22c    OTHER CRITERIA

SEE INSERT #1677 — ~~22c00   Supervision of two or more other employees. If any employee supervises one employee and on fairly frequent occasions, as the need arises, supervises additional temporary employees, he meets Reg 541.1(b) in those weeks when he supervises more than one employee. However, if he occasionally supervises more than one employee, he does not qualify for exemption even in those weeks when he supervises two or more employees, unless there is a change of status as when he acts as foreman during the latter's vacation.~~

**22c0l   Sole charge of establishment.** (a) Employees whose duties involve establishing and supervising offices in cities where their employer has been engaged to conduct a survey, publish a city directory, or do similar work may be in sole charge of an independent establishment as defined in Reg 541.1(e). The fact that the locations are established for relatively short periods and are only temporary does not diminish the fact that when such an office is functioning it has a fixed location and is geographically separated from other property of the employer.

(b)   For purposes of the "sole charge" exception, the premises of a customer being serviced by an independent contractor would not constitute "an independent establishment or a physically separated branch establishment" of the contractor pursuant to Reg 541.113. This would be the case where any independent contractor (guard service, janitorial firm, accounting firm, etc.) performs a service or activity on the premises of a client or customer who has contracted to have such a function performed on their premises.

SEE INSERT #1627 — ~~22c02   Primary duty. Reg 541.103 provides that the 50% test is not a hard and fast rule but rather a flexible rule of thumb. In some cases an exempt employee may spend less than 50% of his time in managerial duties but still have management as his primary duty. This is of significance with respect to an employee to whom the limitation on nonexempt work does not apply (for example, an employee in charge of a separate branch or one who is paid at or above the special proviso for high salaried employees).~~

22c03 →

SEE INSERT #1620 — ## 22d   SPECIFIC OCCUPATIONS - 541.1, 541.2, 541.3

22c04
SEE INSERT #1833

**22d0l   Auto damage appraisers.** Appraisers whose functions are to inspect damaged motor vehicles in order to estimate the cost of the necessary repairs, and who also reached an "agreed" price with the repair shop on the cost of repairs, do not customarily and regularly exercise discretion and independent judgment as required by Reg 541.2. Their work consists essentially of the determination of facts, and in making their estimates they are guided primarily by their skill and experience and by written manuals of established labor and material costs. However, there may be sufficient elements in the job to permit the application of the upset salary rule.

**22d02   Die, jig, and fixture designers.** Die, jig, and fixture designers apply specialized skills acquired by experience and do not exercise the discretion and independent judgment required for administrative employees.

FOH INSERT #1677
Page 22c - 22d02

FIELD OPERATIONS HANDBOOK - 4/18/84

The following SUPERSEDES FOH 22c00:

22c00  Supervision of two or more other employees

(a)  If an employee supervises one permanent employee and, on fairly frequent
     occasions, as the need arises, supervises additional temporary employees,
     the test in Reg 541.1(b) is met in those weeks when he or she supervises
     two or more employees for a total of 80 hours of work.

(b)  Two full-time employees or the equivalent within the meaning of
     Reg 541.105(a) is generally considered to mean 80 hours of work by
     subordinate employees.  In other words, the total number of hours worked
     by subordinate employees in a w/w must equal 80 in order to constitute
     the equivalent of two full-time employees.  Unusual circumstances might
     occasionally justify lower standards.  For example, firms in some
     industries such as banking and insurance have standard w/w's of 35 or
     37½ hours for their full-time employees.  Where such is the case,
     supervision of employees working a total of 70-75 hours in a w/w may
     constitute the equivalent of two full-time employees.

(c)  However, if the employee supervises two or more employees only on
     rare occasions, he or she does not qualify for exemption even in those
     w/w's when two or more employees are supervised, unless there is a
     change of status as when the employee acts for his/her supervisor
     during the latter's vacation.

(d)  The determination as to whether an employee customarily and regularly
     supervises other employees within the meaning of Reg 541.1(b) depends on
     all the facts and circumstances.  In certain instances, a supervisor
     (i.e., a district sales manager) may not work at the same time or within the
     same establishment as his/her subordinates.  Such a supervisor may
     satisfy the criteria of 541.1(b), provided the supervisor does in fact
     customarily and regularly direct the subordinate employees' work.

Distribution: Vol. 2-3-4

FOH INSERT #1627
Page 10b25 - 10b29
22c - 22d 02

FIELD OPERATIONS HANDBOOK - 4/20/82

The following SUPERSEDES FOH 22c02:

22c02  Primary duty

(a)  Reg 541.103 provides that the 50% test is not a hard-and-fast rule
     but rather a flexible rule of thumb. In many cases an exempt employee
     may spend less than 50% of his time in managerial duties but still have
     management as his primary duty.

     Where an employee is in charge of an establishment, or a customarily
     recognized department thereof, during his tour of duty, and satisfies
     the "other pertinent factors" set out in Sec 541.103, he will be
     considered to have management as his primary duty. Those factors are
     the following:

     (1)  Relative importance of managerial duties as compared with
          other types of duties.

     (2)  Frequency with which the employee exercises discretionary
          powers.

     (3)  Relative freedom from supervision.

     (4)  Relationship between employee's salary and wages paid other
          employees for the kind of work performed by the supervisor.

     The fact that an employer has well-defined operating policies and also
     specifies tasks to be performed by managers in great detail will not
     necessarily diminish their managerial status.

(b)  For example, management personnel in small retail or service establishments
     who are in charge of the establishment during their tour of duty and are
     paid substantially higher wages than their subordinates will typically
     meet the primary duty test.

FIELD OPERATIONS HANDBOOK - 7/9/81

Add the following new Sec to text and Table of Contents:

22c03  Primary duty during a strike period

During a strike, highly paid executive, administrative, and professional employees often perform the work of nonexempt rank and file employees. This raises a question as to their exemption status under Reg 541. The "primary duty" test does not expressly apply on a w/w basis. Thus it is unlike the 20 percent and 40 percent tolerances for nonexempt work, which do expressly apply on a w/w basis. On the basis of this distinction, the Court held in Marshall v. Western Union Telegraph Co., 24 WH Cases 704 (C.A. 3, 1980), which involved a three-month strike, that the primary duty requirement in the short test could not be applied on a w/w basis, or over any specific timeframe, until such time as Reg 541 is amended to specify a timeframe. On the basis of this ruling and until further notice, Wage-Hour will, on a nationwide basis, deem the primary duty test to be satisfied during a strike period, provided that the otherwise exempt employee who takes on rank and file work during that period (1) satisfied the primary duty test prior to the strike and (2) is paid no less than the upset salary during the strike.

FOH Insert #1833
Page 22c - 22d02

FIELD OPERATIONS HANDBOOK - 5/22/95

ADD the following new Sec to text and Table of Contents:

## 22c04   Professional or occupational licenses.

The possession by an employee of a license to practice a certain profession or occupation may be considered along with other criteria in determining the exempt status of such employee. However, the possession of a license permitting an employee to perform duties which would meet the tests of an exempt employee pursuant to Reg 541 does not make that employee exempt. In order for an employee to meet the duties tests under Reg 541, the employee must actually perform exempt duties.

**22d03   Dispatchers - Reg 541.1.**   When making a determination of the status of dispatchers employed by bus companies and trucking concerns, Reg 541.105(b) and 541.107 should be considered. It may be that the dispatcher has as his primary duty the routing of drivers and trucks as a routine duty performed for the executive who is actually managing the department. It is possible, however, for a dispatcher to be exempt as an executive employee where the facts show that his primary duty is the management of the terminal or a subdivision thereof and he meets all other requirements of Reg 541.1.

**22d04   Dispatchers - Reg 541.2.**   (a)  As pointed out in Reg 541.207(c), the exercise of discretion and independent judgment is different from the application of skills and procedures. Dispatchers who apply their knowledge in following prescribed procedures and techniques are not exercising discretion and independent judgment within the meaning of the Reg. The exempt status of individual dispatchers will depend upon the facts in each case. In this connection, the possible application of the upset-salary rule should not be overlooked.

(b)  Truck dispatchers' duties of routing trucks and assigning drivers are, for the most part, dependent upon their knowledge of types of trucks required for various kinds of goods, their knowledge of the city and suburbs, and their knowledge of the locations of various factories and buildings. Such duties do not ordinarily involve discretion and independent judgment at the level contemplated by the Reg. However, where the company does not operate over regular routes, or where there is a choice between using the company's own trucks or a contract carrier's trucks or where dispatchers handle emergency situations, there may be the exercise of discretion and independent judgment.

(c)  Bus dispatchers' duties ordinarily include assigning drivers and routing buses over predetermined routes, calling out bus arrivals and departures, furnishing information to bus passengers, collecting and recording cash fares turned in by bus drivers, and maintaining and filling out various detailed forms and records. This work consists of the application of skills and procedures based upon the dispatchers' knowledge gained by experience and reference to routes assigned by the various public utility commissions. They also determine the need for extra buses, decide whether to cancel runs and take actions on accident reports. The latter duties may on certain occasions require the use of discretion and independent judgment but such occasions ordinarily arise only infrequently. Typically, bus dispatchers performing the above duties do not qualify for exemption as administrative employees.

**22d05   Exempt and nonexempt drafting when performed by a professional employee.**   (a)  Drafting performed by a bona fide professional employee in connection with his own engineering work is considered to be an essential part of, and necessarily incident to his professional

engineering work. Such drafting, regardless of how routine or the
amount of time thus spent is exempt work so long as the drafting work
relates to the development and execution of his own professional work.

(b)  Routine drafting done in connection with the professional work of
someone else is non-exempt work.

22d06  _Junior geophysicists._  Junior geophysicists are usually not exempt
under Reg. 541.3.  Employees in this occupation normally spend over
20% of their time "running the horizon", performing routine surveying
work, making weekly reports of the group, and making tracings and draw-
ings.

22d07  _News editors in a broadcasting company._  (a)  Such duties as
analysis of the station's news presentations in order to improve news
coverage, deciding what features should be highlighted by special pro-
grams, and other similar duties are administrative functions.

(b)  Non-exempt work includes routine announcing, the announcing of
straight news, coverage of events as a news reporter, and the routine
editing and rewriting of news stores received from direct sources and
news and radio wires.  However, the upset salary test should not be
overlooked.

22d08  _Technical writers._  Technical writers who translate scientific
or engineering data into instruction form, when the work requires
knowledge of a type commensurate with a professional education, are
performing work of a professional nature.

22d09  _Photogrammetry - Stereotopographer._  (a)  The job of compiling maps
by use of Kelsh and Multiplex instruments is not true professional work
since

    (1)  The requisite knowledge is not of an advanced type.
    Stereo-plotters are generally trained through an appren-
    ticeship program.

    (2)  Specialized intellectual instruction is provided in the
    field of photogrammetry, but the goal of this instruction is
    not to train operators.  It is not necessary for an instru-
    ment operator to be educated in the theory of photogrammetry.

    (3)  The training period is not prolonged to the same extent
    as medical, legal, or engineering education and the skill is
    acquired through practice rather than intellectual exercise.

    (4)  Although an operator is required to exercise discretion
    and judgment, the work is essentially mechanical and routine.

**22d10  Field representatives.**  Field representative, product consultant, service and sales engineer, factory representative and similar titles are frequently given to employees who visit their employers' customers for the purpose of advising them on the use or acquisition of their employers' products.  Where their duties involve a comparison and evaluation of alternative courses of conduct with respect to matters of significance, as, for example, a determination as to the product best suited to the customers' needs or recommendations regarding alternative uses for particular products, their work normally calls for the exercise of independent judgment and discretion within the meaning of Reg 541.  On the other hand, advising customers as to the operation, maintenance, and repair of their employers' products is work which calls for the application of skill in applying techniques based on experience rather than the exercise of the requisite independent judgment and discretion in matters of significance.

**22d11  Executive secretaries.**  Duties of an exempt executive secretary are distinguished from those of the usual "private secretary" in that they customarily and regularly involve the exercise of discretion and independent judgment in matters of significance rather than adherence to prescribed procedures or specific instructions.  Such employees may, for example, arrange interviews and meetings, and handle interviews and meetings themselves where in their judgment the executive's attention is not required.  They may also, in connection with the responsibility for replying to correspondence, make the decision as to whether they should answer the executive's correspondence themselves, prepare a reply for the executive's signature, or route it to someone else for handling.

**22d12  Display advertising installers.**  An employee who installs advertising matter in the sales establishments of his employer's customers, checks the employer's product in the customer's sales establishment for established quality standards, and checks the customer's inventory for purposes of assuring adequate supplies of his employer's goods on hand for sale is ordinarily performing specialized work along standardized lines involving well-established techniques and procedures rather than work which involves the exercise of discretion and independent judgment.

**22d13  Port stewards, inventory and receiving clerks.**  An employee who inspects and checks inventories of materials and supplies, and also checks and examines the articles themselves as they are received in order to make sure that both as to quantity and quality sufficient materials and supplies are on hand for proper operation, or in the case of a port steward to be certain that the ship is properly outfitted for its voyage, is performing work in accordance with objective standards which requires skill and experience rather than the exercise of discretion and independent judgment.

**22d14  Oil well logging and core analysis crews.**  A field employee engaged in furnishing well logging and core analysis service to oil well drilling

companies who on the basis of his tests, exercises considerable discretion
and independent judgment in recommending the suspension, commencement, or
continuation of drilling operations may qualify as an administrative employee.
The professional exemption is not usually applicable to this type of employee.

22415  Nurses.  The Sec 13(a)(1) exemption for professional employees may be
applicable to nurses provided all tests of Reg 541.3 are met  (see Reg 541.302(e)(1)).
However, it should be noted that the exception from the salary or fee require-
ments (see Reg 541.314) does not apply to nurses as they are not engaged in
the "practice of medicine or any of its branches" within the meaning of Reg
541.3(e).

22416  Pharmacists.  The Sec 13(a)(1) exemption for professional employees
may be applicable to pharmacists provided all tests of Reg 541.3 are met.
However, it should be noted that the exception from the salary or fee require-
ments (see Reg 541.314) does not apply to pharmacists as they are not engaged
in the "practice of medicine or any of its branches" within the meaning of
Reg 541.3(e).

22417  Foreign physicians and surgeons.  A foreign physician or surgeon may
qualify for exemption as a professional employee if he meets all the pertinent
tests relating to duties and responsibilities (see Reg 541.3).  A foreign
license and the standard ECFMG certificate from the Educational Council for
Foreign Medical Graduates are regarded as a "valid license or certificate" for
purposes of the proviso in Reg 541.3(e).

22418  School librarian.  (a)  A school librarian whose typical duties are
to run a school library, stock the library, keep a budget on the library
books, instruct the students in library procedure, as well as to spend
considerable time in assisting teachers and students in research and the
composition of reading lists to meet the reading levels of various classes,
may qualify for exemption as "academic administrative personnel".  See
Reg 541.201(c) and 541.202(e).

(b)  A school librarian may also instruct and tutor students in the use of
the library.  Such instruction and tutoring is not considered to be "teaching"
within the intent of Reg 541.302(g)(2) but is merely a necessary incident to
the normal duties of a librarian.

22d19.  Flight instructors.  (a)  A flight instructor may qualify for
exemption as a teacher under Reg 541.3(a)(3) if (1) he is certified in
accordance with Part 61 of the Federal Aviation Reg (14 CFR Part 61), and
(2) is engaged and employed as an instructor by a flight school approved
by the FAA under FAA Reg 14, CFR Part 141.  A flight school which is approved
under FAA Reg, Part 141, would constitute an "educational establishment"
pursuant to Reg 541.215.

(b)  Although there is no salary requirement for exemption as a teacher, a
flight instructor must, however, meet the 20% limitation on the performance
of nonexempt work.  Wage-Hour will consider exempt activities to include,
among other things, all student flight instruction including related
ground training such as the maintenance of an airplane engine, instruction
in FAA regulations, navigation, meteorology, radio procedure, maintenance
of student progress and accomplishment records, scheduling of students and
aircraft used for instruction, as well as maintaining liaison with the FAA
for current teaching techniques and requirements.  Also considered as an
exempt activity would be the performance of minor repairs on aircraft the
instructor uses in training.

22d20.  Teachers and academic administrative personnel in Job Corps centers.
A Job Corps center which provides basic educational instruction and vocational
training, as well as training in personal care, to enable academically
deficient enrollees to be self-supporting, (see FOH 10b22) is considered
an "other educational establishment or institution" (see Reg 541.215) for
purposes of the Sec 13(a)(1) exemption.  Consequently, teachers or academic
administrative personnel employed by such centers may qualify for the
exemption for teachers and academic administrative personnel under Sec 13(a)(1),
provided all the tests are met.

22d21  Other occupations.  Amendments to Part 541 (29 CFR) dated 5/7/73
make reference to numerous job titles not appearing in the "Occupational
Index" in Reg 541.  These job titles which will be incorporated into the
Index in the next amendment to the Regulations are listed below for easy
reference:

| | |
|---|---|
| Assistant supervisor | 541.105 |
| Branch manager | 541.113 |
| Buyer | 541.105 |
| Chiropodist | 541.314 |
| District manager | 541.113 |
| Floorman, sales person | 541.108 |
| Laboratory assistant | 541.306, 541.307 |
| Laboratory technicians | 541.306, 541.308 |
| Manager | 541.108 |
| Medical technologist | 541.302 |
| Nurse | 541.302 |
| Practitioner | 541.302, 541.314 |

Rev. 409          FIELD OPERATIONS HANDBOOK - 9/16/77          22d21 - 22/^?

| | |
|---|---|
| Programmer | 541.103 |
| Salesman, outside | 541.600 |
| Systems analyst | 541.205, 541.207, 541.302 |
| Teacher | 541.2, 541.3, 541.56, 541.314 |
| Trainee, Programmer | 541.207 |
| Working foreman | 541.105 |

22d22  Preschool "teachers".  (a)  While preschools in most cases engage in some educational activities for the children attending, preschool employees whose primary duty is to care for the physical needs of the children would ordinarily not meet the requirements for exemption as teachers under Reg 541. Generally such employees do not meet the Reg 541.3(b), (c), and (d).  This is true even though the term "kindergarten" may be applied to the ordinary day care center.  However, bona fide teachers in a kindergarten are still considered exempt under the same conditions as a teacher in an elementary or secondary school.

(b)  Work which can be performed by employees with education and training below the college level would not be work of a bona fide professional level within the meaning of Reg 541.3.  Such work, even though basically teaching or instructing, could not, pursuant to the exemption, meet the requirement for the consistent exercise of discretion and judgment nor would it be predominantly intellectual and varied in character.

22d23  Physician assistants.

(a)  A physician assistant may qualify for exemption under Reg 541.3 under the following conditions:

    (1)  The physician assistant functions in material support of a licensed physician and performs tasks or combinations of tasks traditionally performed by the physician himself; and

    (2)  is engaged in direct patient contact or performs tasks well-defined by statute or recognized custom of medical practice such as –

        a.  performs initial and periodic physical examinations, mental status examinations, and medical history examinations;

        b.  makes appropriate records of findings during examinations to be reviewed and countersigned by the supervising physician;

        c.  prepares narrative summaries on patients' conditions when they are admitted for medical or psychiatric services or discharged following medical or psychiatric services;

        d.  orders and interprets laboratory studies and x-ray examinations to determine treatment, orders medication and other forms of treatment ordered by the physician, starts intravenous procedures;

        e.  writes orders to increase, decrease, or change medication (subject to checking and signing by physician);

        f.  assists with diagnosing and treating endocrine, cardiovascular, respiratory, digestive, hematological, and infectious congenital disease;

        g.  follows the progress of patients and makes changes in examination or treatment;

        h.  applies local anesthetic, examines and cleans wounds, incises, and drains abscesses, and sutures;

        i.  makes rounds in an infirmary or medical-surgical ward alone or with a physician;

        j.  conducts individual and group psychotherapy, psychodrama, and therapeutic listening sessions, counsels with patients and relatives on various physical and mental problems;

        k.  confers with physicians, psychologists, and other professional staff about patients' mental and physical conditions;

        L.  may supervise professional and non-professional personnel; and

        m.  performs related duties as delegated and required by the supervisory physician and the practice setting ; and

    (3)  has successfully completed 3 academic years of preprofessional study in an accredited college or university (or has had 2000 hours of patient care experience in a military or civilian occupation such as laboratory technology, nursing, psychology, biology, or related

activity) plus not less than one year of professional course work in a medical school or hospital; **and**

(4)  is compensated for his or her services on a salary basis of not less than $250 a week, exclusive of board, lodging, or other facilities.

**22d24  Dental hygienists.**

(a)  Dental hygienists do not ordinarily qualify under Reg 541.3 since the job does not generally meet the tests in 541.3(a)(1), 541.3(b), and 541.3(c). In the usual circumstances a dental hygienist is a highly technical specialist.

(b)  A dental hygienist who has completed four academic years of preprofessional and professional study in an accredited university or college recognized by the Commission on Accreditation of Dental and Dental Auxiliary Educational Programs of the American Dental Association will be considered as meeting Reg 541.3(a)(1). In such case, the determination of exempt status will be made on an individual basis, and depends upon whether the hygienist meets all of the other tests in Reg 541.3.

**22d25  Systems Analysts/Computer Programmers.**

(a)  Systems analysts, computer analysts, and others, who design a system of programs, develop methods and systems for resolving computer problems or determine how a problem can be processed so that a solution can be worked out on a computer, exercise the necessary discretion and independent judgment for the administrative exemption.

(b)  Individuals who are involved in program implementation, debugging, coding, updating, or who otherwise work on programs previously designed by others, are applying acquired skills rather than exercising discretion and independent judgment. These employees are sometimes called "computer programmers". This is clearly mechanical work and nondiscretionary in nature, and nonexempt.

(c)  However, the performance of the activities described in (b) above during the initial development stage of the program by the individuals who designed the system or program will be considered work "directly and closely related" to their administrative work, and thus exempt.

**22d26  Application of Reg 541.3 to certain workers employed in computer-related occupations.**

(a)  Public Law 101-583 required the issuance of regulations creating an exemption for certain computer systems analysts, computer programmers, software engineers, and other similarly skilled employees in the computer field, enabling them to qualify for exemption under FLSA Sec 13(a)(1). An interim final rule, published in the Federal Register on 2/27/91, with an effective date of 3/29/91, added Reg 541.5c which exempted workers in the affected computer-related occupations who met the new specified duties tests and whose regular rate of pay, regardless of whether paid on a salary basis or on an hourly basis, was in excess of 6½ times the MW. Workers in the computer field paid on a salary basis at an amount equal to or less than 6½ times the MW could not qualify under the new exemption but continued to be eligible for exemption if they met the existing duties and responsibilities tests prescribed for the executive or administrative exemption. Workers paid on an hourly basis at rates equal to or less than 6½ times the MW continued to be ineligible for exemption under either the interim final rule or the previously existing rules.

(b) The final rule for computer-related occupations was published in the Federal Register on 10/9/92 and became effective on 11/9/92. The new rule deleted Reg 541.5c and adopted new exemption criteria in Reg 541.3 to permit the specified computer-related occupations to qualify for exemption as professional employees. The final rule provides that the statutory exemption is not limited to employees whose pay exceeds 6½ times the MW. This significant revision is the result of public comments in the rulemaking record and a reexamination of the statute and its legislative history, including additional information from the Congressional sponsors of the measure. (See also FOH 52L06.)

(c) The exemption in Reg 541.3 is defined more fully in Subpart B - Interpretations, under a new Reg 541.303, and, among other changes, Reg 541.312 is revised to permit an exception from the "paid on a salary basis" requirements of Reg 541.118 for those computer professional employees who are paid on an hourly basis at a rate in excess of 6½ times the MW.

(d) Under the final rule, a worker paid a "salary" of $170 per week or more, but less than $250, and who meets the following duties tests may qualify for exemption as a professional employee:

    (1) a primary duty involving work that requires theoretical and practical application of highly-specialized knowledge in computer systems analysis, programming, and software engineering, and who is employed and engaged in these activities as a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker in the computer field;

    (2) work that requires the consistent exercise of discretion and judgment in its performance;

    (3) work that is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; and

    (4) not more than 20 percent of hours worked in the workweek are devoted to activities which are not an essential part of and necessarily incident to the work described in paragraphs (1) through (3) above.

(e) An employee paid $250 or more per week on a salary basis may qualify for exemption under a "short" test of duties: (1) primary duty consisting of work identified in item (d)(1) above, and (2) work requiring the exercise of discretion and independent judgment.

(f) Hourly paid workers whose regular rate of pay is greater than 6½ times the MW may also qualify under the new professional exemption if they meet the "short" test of duties described in item (e) above.

(g) The new rule defines primary duty as one or more of the following:

    (1) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;

    (2) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications; or

    (3) the design, documentation, testing, creation or modification of computer programs related to machine operating systems; or

(4)   a combination of the aforementioned duties, the performance of which requires the same level of skills.

(h)   Unlike the exemption for the learned professions, no particular academic degree is required for this exemption, nor are there any requirements for licensure or certification.

(i)   The exemption does not include employees who operate computers, employees in the manufacture, repair, or maintenance of computer hardware, or employees whose work may be highly dependent upon the use of computers, e.g., engineers, drafters, designers, etc.

(j)   Employees in computer-related occupations who qualify under the new exemption may also qualify for exemption under Regs 541.1 or 541.2 provided they meet the existing duties and responsibilities tests. (See also FOH 22d25.)

(k)   Employees in the computer field who are paid on an hourly basis and whose rate of pay is equal to or less than 6½ times the MW continue to be ineligible for exemption. (However, see FOH 52L00.)

22227 – SEE INSERT #1834

FOH Insert #1834
Page 22d26 -3

FIELD OPERATIONS HANDBOOK - 5/22/95

ADD the following new Sec to text and Table of Contents:

22d27 **Paralegals.**

(a)  Paralegals generally perform a variety of tasks, including legal research, interviewing clients and potential witnesses and drafting legal documents. Although, absent the availability of a paralegal, these tasks would be performed by an attorney, the performance of such duties by a paralegal does not make them "professional" employees within the meaning of Reg 541. These tasks require the use of skills and the following of specific procedures rather than the exercise of discretion and independent judgement as contemplated by the requirements in Reg 541 for exempt "administrative" or "professional" employees and can be performed by employees with education and training below the college level. Furthermore, these skills are performed under the direction of an attorney who has the sole legal and professional responsibility to practice law and represent the client.

(b)  To be exempt under Reg 541.3(a)(1) professionals must perform work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study. Generally, this has been defined to mean at least a baccalaureate degree or its equivalent. Educational programs leading to paralegal certificates or degrees are generally of short duration, 2 years or less, which does not qualify as a prolonged course of study as contemplated under the professional exemption.

22e     OUTSIDE SALESMEN -- 541.5

22e00  Nonexempt work test.  The rule that nonexempt work may not exceed
20% of the hours worked in the workweek by nonexempt employees of the
employer applies only to full-time employees.  The maximum amount of
nonexempt work permitted for part-time employees is 20% of their own hours
worked in the workweek.  (See Reg. 541.507.)

22e01  Outside sales from hand trucks, push carts or other vehicles.
Employees who are engaged away from their employer's establishment, such
as on the streets or in factories or office buildings, to make sales of
food products or other items from hand trucks, push carts or other vehicles
are making "outside sales" for purposes of Reg. 541.5.  On the other hand,
an employee is not engaged in making "outside sales" if his duty is simply
to drive a mobile unit to supply other employees of his employer with the
merchandise to be sold by them.

22e02  Finance company employees obtaining or soliciting mortgages.  Employees
of a finance company which is engaged primarily in servicing mortgages and
takes mortgages in its own name may be exempt as outside salesmen, if they
are customarily and regularly engaged away from their employer's place of
business in obtaining mortgages from brokers and individuals.  Such soliciting
is exempt work under Reg. 541.5(a)(2).  Work incidental to the employee's
obtaining the mortgage, such as obtaining credit information from the
mortgagor, before and after the sale would qualify as exempt work if done
with respect to his own sales.  Telephone solicitation, obtaining credit
and other information with respect to sales made by others, and other work
not incidental to his own outside sales would not be exempt work.

22e03  Copywriting, layout, and display work by newspaper advertising
salesmen.  Layout and display work or copywriting prior to, or during the
making of a sale by an outside newspaper advertising salesman or space
salesman, when such work is performed as a part of his sales effort, is
work which is incidental to, and in conjunction with the making of the sale
and so is exempt under Reg. 541.5(2)(b).

22e04  Soliciting business through a dealer.  An employee whose duty is to
convince a dealer of the value of his employer's service to the dealer's
customers and who does not in fact obtain firm orders or contracts
from either the dealer or his customers is not making sales within the
meaning of FLSA Sec. 3(k).  An example is merchant's contact men employed

(WH66-89)

by finance companies who call at the place of business of retail merchants dealing in furniture or appliances and bring to the merchant's attention the finance service that the finance company is prepared to offer to any of the merchant's customers who are in need of money for purchases, and who lay the groundwork for a continuing relationship between the finance company and the merchant. The finance man deals with the merchant and the merchant with his customers. The finance man is not exempt under Reg. 541.5, since he does not obtain orders or contracts from either the customers or the merchant.

22e05  Industrial insurance agents.  Industrial insurance agents, sometimes called "debit men", call on persons to solicit insurance contracts and, once the contracts have been secured, they call on the insured to collect the premium and thus obtain a renewal of the policy. This renewal work is done on policies originally sold by the agents as well as on policies sold by other agents. Industrial insurance agents engaged in this activity are considered to meet all of the requirements of the outside salesman definition contained in Reg. 541.5, and thus qualify for the exemption.

22e06  Real estate salesmen.  (a)  The definition of an exempt "outside salesman" in Reg. 541.5 requires that such an employee be employed for the purpose of, and be customarily and regularly engaged in making "sales" within the meaning of Sec. 3(k) of the Act or in obtaining certain orders or contracts for the use of facilities. Real estate salesmen will generally meet this test, since "sales" under Sec. 3(k) of the Act include contracts to sell.

(b)  An "outside salesman" must be customarily and regularly engaged "away from his employer's place or places of business" in making such sales. Real estate salesmen typically are required, as a customary and regular part of their employment, to spend whatever time is necessary at the site of property to be sold and in visiting prospects at the latter's homes and offices as a part of their sales effort. Most of them must leave whatever place of business of the employer they use as headquarters in order to perform these tasks.

(c)  Real estate salesmen stationed in a model home on a tract from which parcels of real property are being sold with or without improvements, leaving the model home for such purposes, customarily and regularly, would meet the requirement of the definition, so far as making sales "away from" the employer's place of business is concerned. This is true even though all of the property shown to prospects by the salesman is within the tract on which the model home is located. Further, not every home called a "model home" would be a place of business of the employer. One which is in the nature of an "open house" to which a salesman is assigned to meet prospects who may buy that house or another similar one on the tract may more properly be viewed as. analogous to the hotel sample room of a traveling salesman referred to in Reg. 541.502(b) than to an actual place of business of the employer.

Transitory assignments of salesmen permanently headquartered at an office of the employer who are sent to a "model home" or other location at a tract where it will be their duty to engage in sales efforts with respect to real estate on the tract would not defeat an otherwise applicable exemption. The salesman would ordinarily be considered to be engaged in such work "away from" the employer's place of business. On the other hand, when for purposes of convenience a "model home" on a real estate development is maintained on a relatively permanent basis as an office of the employer, staffed with necessary personnel for making sales, salesmen who do not customarily and regularly leave this headquarters as a part of their sales efforts would be "inside" rather than "outside" salesmen just as they would be if confined to such inside work in any other office maintained by the employer. For example, certain land or "homesites" are sold in this manner. Prospects are contacted by someone other than the land sales office salesmen and brought to the site where they usually are given a tour of the premises, meal, film or some other type of presentation showing reasons why they should purchase land at the site. The land office salesmen will attempt to "close" the agreement to purchase with the prospects. The salesmen do not customarily and regularly leave the site. In the case of real estate salesmen, however, this would appear to be the unusual, rather than the usual, case. So long as a salesman customarily and regularly goes to the site of the property or to prospects as a part of making his sales, this requirement for "outside" sales work would be met. Moreover, time spent on return to the model home or other headquarters to conclude a sales transaction or to continue sales effort with the prospect would be deemed part of the salesman's outside sales activity.

(d)  See FOH 59c01 for the WH position concerning the applicability of Sec 13(a)(1) for outside salespersons to employees who sell lots at campgrounds.

(e)  Certain activities performed by real estate salesmen in the employer's place of business may be exempt work if the activities performed are in conjunction with and in furtherance of their outside sales work. In this connection, the following activities may be exempt:

   (1)  Bringing a multiple listing book up to date.

   (2)  Calling prospects with whom the salesman has been dealing during his outside sales activity.

   (3)  Dictating or writing letters to such prospects.

   (4)  Talking to such prospects in the office about their particular transactions.

   (5)  Calling a list of prospective buyers or sellers of homes with whom the salesman has had no prior contact.

Case: 1:02-cv-07884 Document #: 268 Filed: 01/10/05 Page 91 of 91 PageID #:1990

(6) Preparing a contract and other forms required for a sale
negotiated during the salesman's outside sales activity.

(7) Talking to a "walk-in" prospect with whom he has had no prior
contact and showing him photographs and discussing terms on
specific houses, if such activity results in subsequent outside
sales activity with the prospect.

22e07  Timeshare salespersons at condominium resorts or campgrounds

See 59c01 for the WH position concerning the applicability of Sec
13(a)(1) for outside salespersons to employees who sell timeshares
(i.e., intervals or memberships) at condominium resorts or campgrounds.